UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA　　　　　:

　- v.-　　　　　　　　　　　　　　:　　　　　S1 15 Cr. 287 (LTS)

SEAN STEWART,　　　　　　　　　　:

　　　　　　　Defendant.　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND, IN THE
ALTERNATIVE, FOR A BILL OF PARTICULARS**


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
　　of America.


Sarah Eddy McCallum
Brooke E. Cucinella
Assistant United States Attorneys


　-Of Counsel-

**TABLE OF CONTENTS**

TABLE OF CASES ....................................................................................................... ii

I.  BACKGROUND ............................................................................................... 2

    A.  The Complaint ........................................................................................ 2

        i.  Insider Trading in Kendle ............................................................ 3

        ii.  Insider Trading in KCI ............................................................... 4

        iii.  Conclusion of the FINRA Inquiry into Kendle ......................... 5

        iv.  Insider Trading in Gen-Probe ..................................................... 6

        v.  Insider Trading in Lincare .......................................................... 7

        vi.  Insider Trading in CareFusion .................................................... 7

        vii.  The Recordings of Meetings and a Call Between Robert and Cunniffe .... 8

    B.  The Indictment ....................................................................................... 9

    C.  Discovery .............................................................................................. 10

II.  STEWART'S MOTION TO DISMISS .......................................................... 10

III.  ARGUMENT .................................................................................................. 11

    A.  Stewart's As-Applied Vagueness Challenge to the Securities Laws Is Frivolous .............................................................................................. 12

        i.  Applicable Law .......................................................................... 12

        ii.  Discussion .................................................................................. 15

    B.  Stewart's Motion to Dismiss the Indictment For Lack of Detail Fails ........... 18

        i.  Applicable Law .......................................................................... 18

        ii.  Discussion .................................................................................. 19

    C.  The Court Should Deny Stewart's Demand For a Bill of Particulars ............ 23

        i.  Applicable Law .......................................................................... 23

        ii.  Discussion .................................................................................. 25

CONCLUSION ........................................................................................................... 29

**TABLE OF CASES**

*Chiarella* v. *United States*, 445 U.S. 222 (1980) ................................................................ 18

*Dirks* v. *SEC*, 463 U.S. 646 (1983) ............................................................................. 14, 15

*Hamling* v. *United States*, 418 U.S. 87 (1974) ................................................................ 21

*Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ..................... 14, 19

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................13, 14, 19

*Hooper* v. *Mountain States Sec. Corp.*, 282 F.2d 195 (5th Cir. 1960) .................................. 16

*Johnson* v. *United States*, 576 U.S. __, 135 S. Ct. 2551 (2015) ........................................... 13

*Russell* v. *United States*, 369 U.S. 749 (1962) ................................................................... 20

*SEC* v. *Warde*, 151 F.3d 42 (2d Cir. 1998) ....................................................................... 15

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998) ....................................................... 25

*United States* v. *Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ........................................ 27

*United States* v. *Bonventre*, No. 10 Cr. 228 (LTS),
   2013 WL 2303726 (S.D.N.Y. May 28, 2013) ................................................................. 30

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ............................................ 28, 29

*United States* v. *Carpenter*, 791 F.2d 1024 (2d Cir. 1986) .................................................. 18

*United States* v. *Chestman*, 947 F.2d 551 (2d Cir. 1991) .................................................... 12

*United States* v. *Corbin*, 729 F. Supp. 2d 603 (S.D.N.Y. 2010) ...............................23, 31, 32

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) .................................. 27, 28

*United States* v. *Earls*, No. 03 Cr. 0366 (NRB),
   2004 WL 350725 (S.D.N.Y. Feb. 25, 2004) ................................................................... 28

*United States* v. *Falkowitz*, 214 F. Supp. 2d 365 (S.D.N.Y. 2002) ...................................... 29

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) .......................................... 27

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985) .................................................... 25

*United States* v. *Guttenberg*, No. 07 Cr. 141 (DAB),
   2007 WL 4115810 (S.D.N.Y. Nov. 14, 2007) .........................................................22, 24, 30

*United States* v. *Hatfield*, 724 F.Supp.2d 321 (S.D.N.Y. 2010) .......................................... 24

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ......................................... 27, 28

*United States* v. *Jiau*, 734 F.3d 147 (2d Cir. 2013) ............................................................ 15

*United States* v. *Kazarian*, No. 10 Cr. 895 (PGG),
   2012 WL 1810214 (S.D.N.Y. May 18, 2012) .................................................................. 29

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ......................................... 29

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ............................................. 26

*United States* v. *Monserrate*, No. 10 Cr. 965 (CM),
   2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) ................................................................... 28

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ........................................ 29

*United States* v. *Newman*, 664 F.2d 12 (2d Cir. 1981) ......................................................... 18

*United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014) ............................................... passim

*United States* v. *O'Hagan*, 521 U.S. 642 (1997) ............................................................ 14, 23

*United States* v. *Persky*, 520 F.2d 283 (2d Cir. 1975) ......................................................... 16

*United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000) .............................................................. 21

*United States* v. *Riley*, 90 F. Supp. 3d 176 (S.D.N.Y. 2015) .......................................... 23, 24

*United States* v. *Samsonov*, No. 07 Cr. 1198 (CM),
   2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ................................................................ 27, 28

*United States* v. *Skilling*, 561 U.S. 358 (2010) .................................................................... 17

*United States* v. *Slawson*, No. 14 Cr. 186 (RWS),
   2014 WL 5804191 (N.D. Ga. Nov. 7, 2014) ................................................................... 11

*United States* v. *Stringer*, 730 F.3d 120 (2d Cir. 2013) .............................................20, 21, 25

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) .......................................................... 26

*United States* v. *Vaughan*, No. 10 Cr. 233 (CM),
   2010 WL 3025648 (S.D.N.Y. Jul. 27, 2010) ................................................................... 29

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013) .............................................................. 20

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ............................................................ 26

*United States* v. *Willis*, 737 F. Supp. 269 (S.D.N.Y. 1990) .................................................. 18

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008) .................................................. 20, 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

  - v.-                                                      :                    S1 15 Cr. 287 (LTS)

SEAN STEWART,                                         :

              Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

The Government respectfully submits this memorandum of law in opposition to defendant Sean Stewart's motions (1) to dismiss Superseding Indictment S1 15 Cr. 287 (LTS) (the "Indictment") and, in the alternative, (2) for a bill of particulars.  These motions should be denied.

Stewart's conduct, as described in the Indictment and in the criminal complaint that preceded it (the "Complaint"), falls so squarely within the heartland of the prohibition against insider trading that his constitutional vagueness challenge to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder ("Rule 10b-5"), must be rejected as frivolous.  That frivolity is only compounded by Stewart's efforts to capitalize on *United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014)—a decision that issued *after* Stewart's conduct (but before he was charged), and that in any event *narrowed* rather than expanded the scope of criminal liability in this area.  Stewart's conduct, as alleged, was plainly criminal when it occurred, and remains so now.   He should not be heard to complain of lack of notice.

1

Stewart's contention that the Indictment should be dismissed for dearth of detail concerning the crimes charged likewise fails. Nothing in *Newman* or any other case requires the Government to—as Stewart puts it—"step up to the plate and provide factual particulars" in its charging instrument. (Def. Sean Stewart's Mem. of Law in Support of Mot. to Dismiss or for Bill of Particulars, filed Sept. 18, 2015 (hereinafter "Stewart Mem."), at 3). The law is, in fact, to the contrary; an indictment need do little more than track the language of the governing statute. The Indictment here does what is required.

Indeed, it does much more; it provides pages of detail concerning the crimes alleged, and identifies with particularity the trades alleged to have been conducted based on Stewart's illegal tips. Substantial additional detail, moreover, is furnished in the 31-page, single-spaced Complaint and in the discovery productions the Government has made, which are accompanied by itemized indices. In light of the ample factual particulars already supplied, no bill of particulars is warranted or should be ordered in this case.

I.      **BACKGROUND**

A.      **The Complaint**

On May 13, 2015, United States Magistrate Judge Andrew J. Peck authorized the Complaint against Stewart and his father, Robert Stewart, a/k/a "Bob" (hereinafter "Robert"), charging them with nine counts related to insider trading in the securities of five different publicly-traded health care companies: Kendle International Inc. ("Kendle"), Kinetic Concepts, Inc. ("KCI"), Gen-Probe Inc. ("Gen-Probe"), Lincare Holdings, Inc. ("Lincare"), and CareFusion Corp. ("CareFusion"). (*See* Exhibit A hereto). The Complaint alleged, in sum, the following:

Throughout the relevant period, Stewart worked as an investment banker in the health care field—first at the investment banking advisory arm of a global bank headquartered in Manhattan ("Investment Bank A"), and then at an independent investment banking advisory

2

firm with its principal place of business in Manhattan ("Investment Bank B").  (Complaint ¶¶ 12-13).  Both banks had explicit policies against divulging material non-public information about the banks' clients—including, among other things, information related to mergers and acquisitions.  (*Id.* ¶ 22).  Stewart repeatedly and blatantly violated those policies by leaking information about upcoming mergers and acquisitions to his father, Robert, who then traded on the information supplied and caused a co-conspirator, Richard Cunniffe, to conduct trades on his behalf.  (*Id.* ¶¶ 17-20).[1]

i.    *Insider Trading in Kendle*

The first such tip occurred in 2011.  While a Vice President in Investment Bank A's Healthcare Investment Banking Group, Stewart worked on a transaction that would culminate in Kendle's acquisition by INC Research, LLC ("INC").  He represented Kendle.  (*Id.* ¶ 23(a)).  The deal was not announced publicly until May 4, 2011.  (*Id.* ¶ 23(*l*)).  Meanwhile, in early February 2011, approximately two weeks after Stewart remarked in an internal email to a colleague that Investment Bank A was "just officially mandated to sell Kendle," Stewart's father Robert began purchasing Kendle stock for the very first time.  (*Id.* ¶ 23(b), (d)).  Telephone records confirm that Stewart and Robert communicated a few days before these purchases.  (*Id.* ¶ 23(c)).  In early March 2011, Robert bought more Kendle stock, this time while he and Stewart were staying together at a hotel, and shortly after Stewart had inquired by email to a colleague about Kendle's stock price.  (*Id.* ¶ 23(f)-(i)).  Robert's instruction to his broker this time was to sell his entire position in another stock and "reinvest all proceeds into KNDL."  (*Id.* ¶ 23(h)).

When the INC/Kendle deal was announced two months later, Kendle's share price rose—as the stock of a company to be acquired typically does—and Robert sold all his

---

[1] Cunniffe is referred to as "CW-1" in the Complaint.  His identity was made public through documents filed and proceedings that occurred after the Complaint's filing.

Kendle stock for a profit of approximately $7,900.  (*Id.* ¶ 23(*l*)-(m)).  He used the proceeds to help fund Stewart's wedding a month later.  (*Id.* ¶¶ 24-25).

Also after the INC/Kendle deal was announced, Robert learned that his friend and colleague Richard Cunniffe had made money by investing in Kendle stock options, based on a tip that "news" had been expected about Kendle, relayed from someone who knew Robert. (*Id.* ¶ 30(a)-(b)).  Upon hearing this, Robert claimed credit for the tip, telling Cunniffe he had been behind it.  (*Id.*).

ii.     *Insider Trading in KCI*

A few weeks after his March 2011 hotel stay with Robert, Stewart learned of another health care company merger deal that Investment Bank A was working on: the proposed acquisition of KCI by private equity group Apax Partners ("Apax").  (*Id.* ¶ 26(b)).  Although not assigned to the deal, Stewart was kept apprised of its progress from April 2011 through July 13, 2011, when the acquisition was announced publicly.  (*Id.*).

Meanwhile, during this period, Stewart's father, Robert, approached Cunniffe to tell him that "news" was expected about KCI and to ask Cunniffe to purchase KCI call options "in the 60s" (meaning in the $60 strike price range) with May expiration dates on Robert's behalf.  (*Id.* ¶ 30(c)).  Because KCI stock was trading at $55.58 per share at this time (*see id.* ¶26(c)), Robert's proposed option order reflected confidence that KCI's stock price would soon rise.  To explain why he could not purchase these call options in his own brokerage account, Robert told Cunniffe that he was "too close to the source."  (*Id.* ¶ 30(c)).  Beginning in April 2011, Cunniffe followed Robert's instructions, and also mirrored Robert's trades in Cunniffe's own account.  (*Id.*¶ 26(c), (j); ¶ 28(a), (d); ¶ 30(d)).  Cunniffe had never purchased KCI stock or options before.  (*Id.* ¶ 26(c)).

At the same time, in early May 2011, Robert was purchasing a modest amount of KCI stock—stock he had never owned before—in his own account.  (*Id.* ¶ 26(e)).  That halted

abruptly, however, when the Financial Industry Regulatory Authority ("FINRA") announced to Investment Bank A that they were reviewing trading in advance of the INC/Kendle deal's public announcement and listed Stewart's name as among those who had been privy to inside information in advance of the announcement. (*Id.* ¶ 27). On June 1, 2011, after Stewart became aware of FINRA's inquiry, and the same day that Stewart and Robert had a flurry of phone calls with one another, Robert sold all his KCI stock at a slight loss. (*Id.* ¶ 27(d)). His brokerage records reflect no trading in any individual company stocks from that date forward, all the way to February 2015, the date of the last of the records the Federal Bureau of Investigation ("FBI") reviewed for Robert's account. (*Id.* ¶ 26(e)).

Cunniffe's KCI trading on his own and Robert's behalf, by contrast, proceeded apace, with heavy purchases of KCI call options reflecting a confidence that KCI's stock price would soon rise. (*Id.* ¶ 28(a), (d)). When KCI announced on July 13, 2011 that it was being bought out by Apax, its stock price jumped, and Cunniffe cashed out his and Robert's call options for a combined profit of approximately $107,790. (*Id.* ¶ 28(e)-(f)).

After the Apax/KCI deal was announced, Cunniffe remarked to Robert how impressive it was that he had had two acquisition tips in a row—first Kendle and then KCI. (*Id.* ¶ 30(e)). When Robert responded that the tips were from his son, Cunniffe asked to be kept in the dark about the particulars of the source, explaining that he wanted to have plausible deniability in the event of a law enforcement inquiry. (*Id.*). Robert obliged. (*Id.*). Moreover, citing concerns that his telephone was being tapped, Robert suggested to Cunniffe that the two avoid discussing their trading over the phone or email. (*Id.* ¶ 30(g)). For those times when phone or email could not be avoided, the two adopted a "golf"-related code to discuss their trades. (*Id.*; *see also id.* ¶¶ 33-34).

### iii.   Conclusion of the FINRA Inquiry into Kendle

On July 19, 2011, shortly after the Apax/KCI deal was announced, after Robert and

Cunniffe had cashed out on their Kendle and KCI investments, and after the proceeds of the Kendle trading had been used to help fund Stewart's wedding, FINRA supplied Investment Bank A with a list of names of people who had engaged in potentially suspicious trading in advance of the INC/Kendle deal's announcement, and asked that it be circulated to Investment Bank A personnel to see whether they had connections to the listed people.  (*Id.* ¶ 29(a)).  Robert's name was on the list.  (*Id.*).  Yet Stewart failed to identify it for his employer or for FINRA.  (*Id.* ¶ 29(b)).  Only after FINRA pressed Investment Bank A to inquire once more of Stewart whether he knew his own father's name did Stewart confess that he did, and claim that he had simply overlooked it earlier.  (*Id.* ¶ 29(c), (e)).

Years later, during a 2015 meeting that was being surreptitiously recorded by Cunniffe at the direction of the FBI, Robert would describe this FINRA inquiry to Cunniffe, saying that Stewart "got nailed by FINRA – they questioned him," but "nothing happened." (*Id.* ¶ 37(b)).  Robert would further report to Cunniffe at this meeting that Stewart admonished him once for failing to take advantage of a particular tip he had given Robert. Specifically, as Robert reported to Cunniffe, Stewart chastised Robert by saying, "I can't believe I handed you this on a silver platter and you didn't invest in it."  (*Id.*).

### iv.    Insider Trading in Gen-Probe

In October 2011, several months after the Apax/KCI deal was announced, Stewart left Investment Bank A.  (*Id.* ¶ 29(f)).  Soon thereafter, he joined Investment Bank B as a Managing Director.  (*Id.* ¶ 13).  In the spring of 2012, Robert finally introduced Stewart to Cunniffe, and explained to Cunniffe that Stewart had been the source of the tips on which they had been trading.  (*Id.* ¶ 30(f)).  (Before this, Cunniffe had been under the mistaken impression that Robert's other son, who also worked in the financial industry, was the source. (*Id.* ¶ 30(e)).)  Cunniffe reiterated that he did not want details about the source of the tips.  (*Id.* ¶ 30(f)).

6

Stewart's next tip came right around the time of this meeting.  In March 2012, Investment Bank B was selected to serve as advisor to Hologic, Inc. ("Hologic") in connection with its contemplated acquisition by another health care company, Gen-Probe. (*Id.* ¶ 32(a)).  Stewart was assigned to work on the deal.  (*Id.* ¶ 32(i)).  After a month of frequent communication between Stewart and Robert, and in the immediate wake of a call between Robert and Cunniffe on April 18, 2012, Cunniffe began buying Gen-Probe call options, reflecting an expectation that Gen-Probe's stock price would soon rise.  (*Id.* ¶ 32(b)-(h)).  It did so—immediately after Gen-Probe and Hologic announced their agreement publicly on April 30, 2012.  (*Id.* ¶ 32(i)-(j)).  When, in early May, Cunniffe sold all of the Gen-Probe call options he had accumulated for Robert and himself, the two reaped profits of approximately $180,590.  (*Id.* ¶ 32(k)).

> v.  *Insider Trading in Lincare*

In May 2012, a German health care company called Linde AG ("Linde") hired Investment Bank B to serve as an advisor in connection with its proposed tender offer acquisition of a U.S. company, Lincare.  (*Id.* ¶ 33(a)).  At the end of that month, following telephone communications between Stewart and Robert and then between Robert and Cunniffe, Cunniffe began accumulating Lincare call options reflecting an expectation that Lincare's share price would soon rise.  (*Id.* ¶ 33(c)).  These purchases continued through June 2012.  (*Id.* ¶ 33(d), (f), (h)).  After the Linde/Lincare deal was announced publicly on July 1, 2012, Cunniffe cashed out his and Robert's Lincare options for a whopping profit of approximately $407,573.  (*Id.* ¶ 33(i)-(j)).

In December of the same year, Robert made payments to Stewart totaling at least $15,000.  (*Id.* ¶ 35).

> vi.  *Insider Trading in CareFusion*

In March 2014, Investment Bank B was retained to advise health care company

7

CareFusion in connection with its potential acquisition by Becton, Dickinson & Co. ("Becton"), another health care company.  (*Id.* ¶ 36(a)-(b)).  Stewart became aware of the proposed acquisition on March 7, and, as reflected in email correspondence between himself and Robert, worked on the deal.  (*Id.*).

On August 19, 2014, following telephone communications between Stewart and Robert earlier in the month, Robert met with Cunniffe at a restaurant in Manhattan to inform him of the proposed acquisition of CareFusion. (*Id.* ¶ 36(d), (g)-(h)).  The same day, Cunniffe began buying CareFusion call options, reflecting an expectation that CareFusion's stock price would soon rise.  (*Id.* ¶ 36(i)).  These purchases continued through early October 2014, when the Becton/CareFusion deal was finally announced publicly.  (*Id.* ¶ 36(j), (m), (o)).  Cunniffe cashed out his and Robert's call options for a combined profit of approximately $446,448. (*Id.* ¶ 36(t)).

> ### vii.    *The Recordings of Meetings and a Call Between Robert and Cunniffe*

In early 2015, Cunniffe began to cooperate with the FBI's investigation in this case. As part of that cooperation, he recorded two meetings and a phone call he had with Robert. (*Id.* ¶ 37).  As noted, at one of the meetings, Robert recalled Stewart's having been "nailed by FINRA" in relation to the Kendle trading, and also reported Stewart's chastisement of Robert for failing to capitalize on a tip Stewart had handed Robert "on a silver platter."  (*Id.* ¶ 37(b)).

At the second meeting, Cunniffe asked Robert why Stewart had been tipping them, and Robert responded that he believed Stewart "gets angry at times"—"[a]ngry at the industry."  (*Id.* ¶ 37(d)).  Pressed further by Cunniffe for details about why Stewart had supplied the inside information, Robert retreated, claiming—contrary to his earlier "silver platter" report—that he never told Stewart he had "done anything" with the tips.  (*Id.*

¶ 37(e)).[2]  As he would acknowledge in a phone call with Cunniffe a few days later, Robert became suspicious during this second meeting—correctly worrying that authorities were setting Cunniffe up to question him.  (*Id.* ¶ 37(f)).

### B.    The Indictment

On the basis of the May 13, 2015 Complaint, Robert was arrested the next day at his Long Island home, and Stewart surrendered to authorities in Michigan, where he was traveling.  In July 2015, approximately two months later, a grand jury sitting in this District returned the Indictment, which charges Stewart and Robert with the same nine counts as are contained in the Complaint: one count of conspiracy to commit securities fraud and tender offer fraud, in violation of Title 18, United States Code, Section 371 (Count One); one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Two); six counts of securities fraud, in violation of Section 10(b) and Rule 10b-5 (Counts Three through Eight); and one count of tender offer fraud, in violation of Title 15, United States Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d) (Count Nine).  (*See* Exhibit B hereto).

Although the Indictment contains less detail than the 31-page, single-spaced Complaint that preceded it, it includes not just a recitation of the statutory language of the crimes charged but also a factual overview of the case.  In this overview, the Indictment specifically alleges that Stewart divulged material non-public information to Robert about the five health care company acquisitions described above (INC/Kendle, Apax/KCI,

---

[2] Stewart, citing his counsel's declaration, asserts that "[i]t is undisputed that prior to his arrest, Robert Stewart told Cunniffe . . . that Sean Stewart had no knowledge of Robert's trading activities."  (Stewart Mem. at 5-6).  That is misleading.  Robert did deny in the *second* recorded meeting with Cunniffe that Stewart knew Robert had "done anything" with the tips, but that was (a) after Robert's suspicions had been raised about Cunniffe's motivations in questioning him on the topic and (b) contrary to what Robert had told Cunniffe in the first meeting—*viz.*, that Stewart chastised Robert for not trading on a particular tip he had supplied.

Hologic/Gen-Probe, Linde/Lincare, and Becton/CareFusion), "in breach of fiduciary duties and other duties of trust and confidence owed to the sources of the information," and that Stewart received "pecuniary benefits . . . as part of the insider trading scheme." (Indictment ¶¶ 8-9). The Indictment details with particularity the precise trades—with dates and stock or options quantities—that are alleged to have been made based on the inside information that Stewart provided Robert. (*See id. ¶¶* 23, 25, 26).

### C. Discovery

The Government has produced voluminous discovery—approximately 600,000 pages of documents, as well as video and audio files—to the defense in this matter. Included in the production are trading records, telephone records, bank records, email correspondence and other documents produced by Investment Bank A and Investment Bank B, email correspondence seized pursuant to search warrants executed on the personal email accounts of Robert and Cunniffe, recordings of meetings and calls between Robert and Cunniffe, relevant public filings and press releases, and share price histories, all clearly designated as such and identified by Bates range. These productions have been accompanied by detailed indices that provide a clear roadmap of the documentary and recorded evidence in the case and the sources thereof.

## II. STEWART'S MOTION TO DISMISS

Stewart purportedly moves to dismiss Counts One through Eight based on a constitutional void-for-vagueness challenge to the statutes charged, and Counts One through Nine for failure to satisfy the pleading requirements of Federal Rule of Criminal Procedure 7(c) ("Rule 7(c)"). The arguments supporting these motions are more limited, however, and the motions themselves should therefore be treated as less sweeping than they purport to be.

First, Stewart's constitutional vagueness challenge is framed as an attack on the insider trading law developed under Section 10(b) and Rule 10b-5. Stewart does not identify

any alleged vagueness in the wire fraud conspiracy statute charged in Count Two, *see, e.g.*, *United States* v. *Slawson*, No. 14 Cr. 186 (RWS), 2014 WL 5804191, at *6 (N.D. Ga. Nov. 7, 2014) (noting that elements of Section 10(b) and Rule 10b-5 are not co-extensive with elements of wire fraud conspiracy in an insider trading case), and expressly concedes that there is no vagueness in the tender offer statute the violation of which is alleged as the second object of the conspiracy charged in Count One.  (*See* Stewart Mem. 8 n.4).  Accordingly, Stewart's vagueness challenge should be construed as confined to an attack on Counts Three through Eight and a partial attack on Count One, and is construed as such below.

Second, to the extent that Stewart's Rule 7(c) challenge rests on a purported failure to allege action for personal benefit, that challenge does not apply to Counts Nine (tender offer fraud), Count One to the extent it alleges tender offer fraud as an object, or Count Two (wire fraud conspiracy).  Neither the tender offer fraud laws, 15 U.S.C. §§ 78n(e) and 78ff; 17 C.F.R. §§ 240.14e-3(a) and 240.14e-3(d), nor the wire fraud conspiracy statute require proof of action for personal benefit.  *See, e.g.*, *United States* v. *Chestman*, 947 F.2d 551, 557 (2d Cir. 1991) (*en banc*) (noting that SEC tender offer rule requires no proof of breach of a fiduciary duty, and affirming tender offer fraud conviction in face of challenge to the rule); *United States* v. *Slawson*, 2014 WL 5804191, at *6-7.  Accordingly, to the extent Stewart's motions turn on alleged deficiencies in pleading related to personal benefit, they should be construed—and are construed below—as seeking dismissal of Counts Three through Eight only.

## III.   ARGUMENT

An investment banker who, for his own benefit rather than that of his clients, tips outsiders about still-secret merger and acquisition deals he and his colleagues are working on, knowing that the outsiders he is tipping will likely trade on that information, violates Section

10(b) and Rule 10b-5.  This is classic insider trading, the prohibition against which has been plain for decades.

Yet Stewart claims that he had insufficient notice of the prohibition; that the laws prohibiting securities fraud through insider trading, as applied to him, were so lacking in clarity, and alleged with so little particularity in the Indictment, that his due process rights have been violated, necessitating dismissal of the subject charges.  Stewart grounds his constitutional void-for-vagueness challenge in the Second Circuit's recent decision in *United States* v. *Newman*, 773 F.3d 438, which, by constricting the definition of what qualifies as a personal benefit for which an insider-tipper breached his fiduciary duty by disclosing inside information, makes it more difficult in some cases for the Government to sustain a Section 10(b)/Rule 10b-5 charge in this context.

The Court should reject Stewart's bid for dismissal, and should likewise reject his unpersuasive claim that where, as here, the Government has already supplied a detailed blow-by-blow narrative of the defendant's and his co-conspirators' illegal conduct, accompanied by a roadmap to the evidence, a bill of particulars is somehow warranted.

### A.     Stewart's As-Applied Vagueness Challenge to the Securities Laws Is Frivolous

To begin, Stewart's constitutional vagueness challenge should be rejected as frivolous.  However confusing the Second Circuit's newly-restricted test for what qualifies as a personal benefit under Section 10(b) and Rule 10b-5 may be, that test (1) was not even in place at the time Stewart engaged in the conduct at issue; (2) narrows rather than expands criminal liability under the relevant rules; and (3) is, even under the most restrictive reading, plainly satisfied by the facts of this case.

#### i.     Applicable Law

The Government violates due process when it takes "away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the

conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson* v. *United States*, 576 U.S. __, 135 S. Ct. 2551, 2556 (2015). But a court must "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 23 (2010) (quoting *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).[3]

The law at issue here is Section 10(b), along with Rule 10b-5 promulgated thereunder. Section 10(b) broadly yet clearly bans the use, "in connection with the purchase or sale of any security," of "any manipulative or deceptive device or contrivance" prohibited by SEC regulation. 15 U.S.C. § 78j(b). The pertinent regulation, Rule 10b-5, likewise broadly yet clearly bans the employment, "in connection with the purchase or sale of any security," of "any device, scheme, or artifice to defraud," the making of "any untrue statement of a material fact" or misleading omission of any such fact, and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Insider trading is one of the "deceptive devices" prohibited by Section 10(b) and Rule 10b-5. *United States* v. *O'Hagan*, 521 U.S. 642, 652 (1997).

Case law applying Section 10(b) and Rule 10b-5 to insider trading has adopted certain principles designed not to resolve ambiguity in the statutory or regulatory language, but to limit the provisions' potential encroachment upon the work of financial analysts and other professionals in the financial industry. Most notably, in *Dirks* v. *SEC*, 463 U.S. 646 (1983),

---

[3] To the extent he is attacking Section 10(b) and Rule 10b-5 "as applied *to the doctrine of insider trading*" (Stewart Mem. at 3 (emphasis added)), Stewart misapprehends the bounds of an as-applied challenge—the only type of challenge cognizable in this context, and one that, as noted, requires the Court to consider the law "as applied *to the particular facts at issue*." *Holder* v. *Humanitarian Law Project*, 561 U.S. at 23 (emphasis added). That is, even if the law might be considered vague as applied to other insider trading cases, it is valid if not vague as applied to Stewart's conduct.

the Supreme Court, adopted a rule that a person who discloses material non-public

information to others whom he knows will use that information to trade in securities, to the

disadvantage of market participants lacking access to that same information, does not violate

Section 10(b) or Rule 10b-5 unless his disclosure amounts to a breach of fiduciary duty owed

to the source of the information.  For these purposes, the Court explained, a breach of the

duty of confidentiality would not suffice; the tipper had to be shown to have acted for

personal benefit of some kind—broadly defined.  *Id.* at 663-64 (offering as examples of

requisite personal benefit "a pecuniary gain or a reputational benefit that will translate into

future earnings," and "simply making a gift of confidential information to a trading relative

or friend"); *see also, e.g.*, *United States* v. *Jiau*, 734 F.3d 147, 153 (2d Cir. 2013) (same);

*SEC* v. *Warde*, 151 F.3d 42, 48-49 (2d Cir. 1998) (finding personal benefit requirement

satisfied because insider tipped a "close friend"; explaining that Government "need not show

that the tipper expected or received a specific or tangible benefit in exchange for the tip").[4]

In *Newman*, the Second Circuit further limited the application of Section 10(b) and

Rule 10b-5 in the insider trading context, holding, among other things, that the personal

benefit element from *Dirks* cannot be satisfied merely by showing—as *Dirks* itself had

suggested—that the tipper gifted corporate information to a trading friend or relative.  *See*

773 F.3d at 452.  Instead, the Government must show either an expectation of pecuniary gain

by the tipper or that the disclosure of information was made in the context of "a meaningfully

close personal relationship that generates an exchange that is objective, consequential, and

represents at least a potential gain of a pecuniary or similarly valuable nature."  *Id.*  As the

---

[4] The elements of an insider trading charge under Section 10(b) and Rule 10b-5 are thus that "(1) the insider-tippe[r was] entrusted the duty to protect confidential information, which (2) [he] breached by disclosing to [his] tippee . . . , who (3) knew of [the insider's] duty and (4) still used the information to trade a security or further tip the information for [his] benefit, and finally (5) the insider-tippe[r] benefited in some way from [his] disclosure."  *United States* v. *Jiau*, 734 F.3d at 153.

14

Government argued recently in (unsuccessfully) seeking Second Circuit and Supreme Court review of this holding, the *Newman* test adopts a more restrictive benefit definition than is contemplated by *Dirks*, and thus would appear to render lawful conduct that previously had been considered, under *Dirks*, to be unlawful.

> ii.    Discussion

As the Second Circuit held more than forty years ago, neither Section 10(b) itself nor Rule 10b-5 promulgated thereunder is unconstitutionally vague. *United States* v. *Persky*, 520 F.2d 283, 286-88 (2d Cir. 1975). Although the statute and rule "us[e] general terms, [their] provisions, while perhaps falling short of the standards of immutability followed by the laws of Medes and the Persians, are definite enough according to the canons of Anglo-American law.'" *Id.* at 287 (quoting *Hooper* v. *Mountain States Sec. Corp.*, 282 F.2d 195, 201 n.4 (5th Cir. 1960)).

Faced with this long-standing precedent (which Stewart nowhere acknowledges in his brief supporting his motions), Stewart is compelled to argue that there is something about the case law applying Section 10(b)'s and Rule 10b-5's broad prohibition to the particular context of insider trading that renders the rules themselves unconstitutionally vague. This is an untenable argument, for several reasons.

First, it turns the constitutional vagueness analysis on its head. A court considering an otherwise vague statute might well seek to save the law from a due process challenge by identifying cases that apply it to particular factual contexts and drawing from those applications a limiting construction that passes constitutional muster. *See, e.g.*, *United States* v. *Skilling*, 561 U.S. 358, 405-07 (2010) (saving 18 U.S.C. § 1346, the honest services statute, from a constitutional vagueness challenge by adopting a limiting construction—"a salvageable honest-services core"—supported by case law applications). But the analysis does not work in reverse; an otherwise clear (though broad) statutory prohibition does not

15

become unconstitutionally "vague" simply because *limiting* principles that courts have engrafted onto it are purportedly complicated, confusing, or "labyrinthine." (*Cf.* Stewart Mem. 8-9 (complaining of "labyrinthine organization of cases" applying Section 10(b) and Rule 10b-5 in insider trading context)).

Second, even if an otherwise non-vague law could be rendered unconstitutionally vague through the engrafting of confusing limiting principles, the confusion Stewart identifies—that resulting from the *Newman* decision—was generated after Stewart engaged in the conduct at issue, not before. At the time he committed the insider trading alleged, *Newman* had yet to be decided, and *Dirks* had been well-settled law for nearly three decades. Tellingly, although he cites liberally to law review articles (*see* Stewart Mem. 11-14), Stewart cites no case from this 30-year period, or any other, standing for the proposition that the federal prohibition against insider trading is unconstitutionally vague. To the contrary, as one court noted in an insider trading case decided in 1990, the Second Circuit had by then already "rebuffed repeated attempts to invalidate criminal prosecutions brought under Section 10(b) and Rule 10b-5 on the ground that those anti-fraud provisions give inadequate notice of the conduct that they proscribe." *United States* v. *Willis*, 737 F. Supp. 269, 277 (S.D.N.Y. 1990); *see United States* v. *Carpenter*, 791 F.2d 1024, 1034 (2d Cir. 1986) (holding in misappropriation insider trading case that "[t]he district court properly found that defendants had adequate notice of the illegality of their scheme"); *United States* v. *Newman*, 664 F.2d 12, 19 (2d Cir. 1981) (holding in misappropriation insider trading case that "Rule 10b-5's proscription of fraudulent and deceptive practices upon any person in connection with the purchase or sale of a security provided clear notice to appellee that his fraudulent conduct was unlawful"); *see also Chiarella* v. *United States*, 445 U.S. 222, 227 (1980) (in confirming that insider trading was punishable under Section 10(b), observing that duty to disclose in which insider trading liability is grounded was "not a novel twist of the law" and was instead

16

imbedded in common-law concept of fraud captured by language of the statute).  Because he engaged in the subject conduct while the law was in this well-settled state, Stewart cannot have suffered any due process violation.[5]

Finally, even if there were some hypothetical vagueness in the law at the time Stewart engaged in the conduct at issue, there neither was nor is anything vague about the law as it applied to him—which is all that matters.  *See Holder* v. *Humanitarian Law Project*, 561 U.S. at 20 ("'A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" (quoting *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. at 495)).  As alleged in the Indictment and the Complaint, and as the Government expects to prove at trial, Stewart plainly acted for personal benefit rather than for a corporate purpose.  He passed material non-public information to his father, knowing that his father would trade on it for pecuniary gain, and expecting—as in fact happened—that Stewart himself would benefit in some pecuniary fashion from that trading.  After all, Stewart had wedding expenses paid out of the proceeds of the Kendle trading, and got other payments from his father, amounting to at least $15,000, during the course of the conspiracy.  This meets the benefit test not just under *Dirks*, but also under *Newman*, which was decided months before the charges against Stewart were brought in this case.  Even reading the *Newman* test in the most restrictive light, Stewart at a

_____

[5] A change in the law that narrows criminal liability under a given statute after the conduct has occurred might in the appropriate case give rise to an argument that the subject conduct is no longer *criminal*.  But it cannot support a claim—prerequisite to sustaining a vagueness challenge—that the defendant lacked *notice* that the Government would deem his conduct criminal at the time he undertook it.  Relatedly, although the Government has leveled criticism at the *Newman* decision for its adoption of an unduly restrictive and confusing benefit definition (*see* Stewart Mem. 1, 6-7, 12), it is disingenuous—bizarre, even—to declare that the Government has thereby "conceded that the law in the Second Circuit, as it currently stands, is unconstitutionally vague."  (Stewart Mem. 1; *see also id.* at 12).  Far from suggesting that the clear but broad prohibition contained in Section 10(b) and Rule 10b-5 is vague, the Government has maintained that the Second Circuit in *Newman* placed an unwarranted and confusing *limit* on the scope of that prohibition.

minimum had a "meaningfully close personal relationship" with his father that "generate[d] an exchange that [wa]s objective, consequential, and represent[ed] at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452. Thus, however purportedly vague or ambiguous the governing law might be as applied to conduct at the margins, Stewart's alleged conduct falls so squarely within the heartland of the prohibition against insider trading that his vagueness challenge must be rejected.

### B.   Stewart's Motion to Dismiss the Indictment For Lack of Detail Fails

Stewart's motion to dismiss the Indictment for failure to comply with Rule 7(c) likewise fails. The Indictment here amply alleges all that must be alleged to satisfy the rule and the underlying constitutional principles it was designed to protect.

#### i.   Applicable Law

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States* v. *Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Rule 7(c) (alterations omitted)). To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted). Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, that heightened standard is limited to "very rare cases," such as those involving refusal to answer questions before Congress, in which "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States* v. *Stringer*, 730 F.3d 120, 125-26 (2d Cir.

2013) (discussing the special case of *Russell* v. *United States*, 369 U.S. 749 (1962)).[6]

Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense

charged and fairly informs a defendant of the charge against which he must defend, and,

second, enables him to plead an acquittal or conviction in bar of future prosecutions for the

same offense.'"  *United States* v. *Stringer*, 730 F.3d at 124 (quoting *Hamling* v. *United

States*, 418 U.S. 87, 117 (1974)); *United States* v. *Yannotti*, 541 F.3d at 127.

 Moreover, even in cases involving very bare-bones charges, courts will not dismiss

the indictment absent a showing of prejudice.  *Stringer*, 730 F.3d at 124.  Where a defendant

has been given sufficient notice of the charges against him by means of, for example, a

criminal complaint or discovery, prejudice will not have been shown, and the indictment

should stand.  *See, e.g.*, *id.* at 124-25; *Yannotti*, 541 F.3d at 127.

  ii. *Discussion*

 Stewart falls very far short of establishing any pleading deficiency here.  The

Indictment not only tracks the language of the applicable statutes and rules, but also

specifically alleges that Stewart disclosed material non-public information about five separate

merger and acquisition deals (with all of the companies identified by name), "in breach of

fiduciary duties and other duties of trust and confidence owed to the sources of the

information," which information was used by others to place trades as detailed in Counts

Three through Nine.  The Indictment further specifies that Stewart's father, Robert, used the

proceeds of the insider trading "to confer a pecuniary advantage upon [Stewart]," and that

"[a]mong the pecuniary benefits that [Stewart] received as part of the insider trading scheme

was payment by [Robert], from the proceeds of the scheme, of expenses related to [Stewart's]

---

[6] Stewart's near-exclusive reliance on *Russell* and a similarly unique case, *United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000), for the legal standards he contends should govern his motion (*see* Stewart Mem. at 15-16, 24) sets him on the wrong course.  Those cases are limited to their special facts, and the heightened pleading standard they employ has no place in evaluating the sufficiency of securities fraud charges.

wedding in or about June 2011."  (Indictment ¶ 9).

Even assuming *arguendo* that the Government was required to do more than track the statutory language, and to instead explicitly recite the elements of the crime as they appear in the case law, *but see, e.g.*, *United States* v. *Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810, at *3 (S.D.N.Y. Nov. 14, 2007) (holding that indictment tracking language of Section 10(b) and Rule 10b-5 in insider trading case sufficed), Stewart's accusation that it failed to do so here is sophistic.

First, regarding the personal benefit requirement, a tipper in an insider trading case does not breach a fiduciary duty unless his disclosure of material non-public information was for personal benefit.  *See Newman*, 773 F.3d at 447-48 ("*Dirks* counsels us that the exchange of confidential information for personal benefit is not separate from an insider's fiduciary breach; it *is* the fiduciary breach that triggers liability for securities fraud under Rule 10b–5. For purposes of insider trading liability, the insider's disclosure of confidential information, standing alone, is not a breach.").  Accordingly, the Indictment's allegation that Stewart disclosed to Robert material non-public information "in breach of fiduciary duties and other duties of trust and confidence owed to the sources of the information" necessarily entails an allegation that Stewart acted for personal benefit—a fact the Government of course plans to prove at trial.[7]  That allegation is then fleshed out by the Indictment's particulars referencing

---

[7] At one point in his brief supporting his motions, Stewart demands to know what fiduciary duty he is alleged to have breached by tipping his father about secret merger and acquisition transactions he learned about as part of his employment as an investment banker.  (*See* Stewart Mem. at 14 ("In what way is Mr. Stewart deemed to have breached a fiduciary duty? What was the duty?")).  The answer should be obvious:  As spelled out in his employers' insider trading policies, Stewart, as an investment banker, owed fiduciary duties to his clients not to leak the confidential information with which they had entrusted him.  *See, e.g.*, *United States* v. *O'Hagan*, 521 U.S.at 652 (noting that duty to disclose or abstain from trading extends under classical insider trading theory "not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation.").  He owed duties to the

the "pecuniary benefits" and "pecuniary advantage" Robert conferred upon Stewart "as part of the insider trading scheme" alleged.  This plainly suffices.

Second, on the materiality element, Stewart's argument that more "factual particularity" is required to explain why information about a prospective acquisition of one company by another might be viewed as important to a reasonable investor (*see* Stewart Mem. at 21-22) is baseless.  There is no requirement that the Government prove precisely what Stewart told his father about the impending—and manifestly secret—transactions at issue, much less a requirement that the Government *allege* what was said with particularity in the Indictment.  *Cf. United States* v. *Riley*, 90 F. Supp. 3d 176, 196-97 (S.D.N.Y. 2015) (upholding insider trading conviction base on circumstantial evidence establishing that news of acquisition was passed to tippee); *United States* v. *Corbin*, 729 F. Supp. 2d 603, 606 (S.D.N.Y. 2010) (rejecting demand for bill of particulars specifying precise timing and content of tips regarding acquisition); *see, e.g.*, *United States* v. *Guttenberg*, 2007 WL 4115810, at *3 (rejecting argument, in insider trading case, that Government need do more than allege that information was material).[8]  Materiality is of course a question of fact for the jury, *see, e.g.*, *United States* v. *Hatfield*, 724 F. Supp. 2d 321, 324 (S.D.N.Y. 2010) (noting as much in an insider trading case), and the Government expects to argue to the jury, among other things, that the fact that an investment bank has been retained to work on a potential acquisition—the bare minimum of information that, as the Indictment makes clear, Stewart must have conveyed to his father—is itself material non-public information that cannot and

---

counter-parties to his clients' transactions as well, the breach of which rendered him guilty of insider trading under the so-called "misappropriation" theory.  *Id.* at 653 & n.5.

[8] Notably, every single case Stewart cites for the proposition that more detailed allegations are required is a *civil* case, in which different pleading standards apply.  (*See* Stewart Mem. at 22-23).

should not have been disclosed.[9]  *See United States* v. *Riley*, 90 F. Supp. 3d at 197 ("The fact that there is no direct evidence that Riley knew all of the finer points of the deal does not render unreasonable the only logical inference—that Riley knew enough about the deal to provide MNPI regarding it to Teeple.").

Even if the Court were to adopt Stewart's position that the indictment in an insider trading case must contain incantations along the lines he suggests (*e.g.*, "Mr. Stewart provided the information to his father *so that he could receive* the pecuniary benefit alleged," Stewart Mem. at 18 (emphasis added)), dismissal is patently inappropriate here.  That is because Stewart cannot show any prejudice.  He knows full well that the Government's theory, as fleshed out in the Indictment, the Complaint, and the discovery, is that he disclosed material inside information to his father for personal benefit—including the personal pecuniary gains he in fact received during the course of the conspiracy (*e.g.*, payment by Robert of wedding expenses and of cash transfers totaling at least $15,000).  "Taking these disclosures into account, it is beyond question that [Stewart has been] sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy."  *Stringer*, 730 F.3d at 124.

Finally, to the extent that Stewart's attack on the sufficiency of the Indictment's allegations is really an attack on the sufficiency of the evidence related to personal benefit and/or materiality (*see* Stewart Mem. at 18-19, 22-23), it has no place in these motions.  Sufficiency of the evidence is a matter for trial, not for pretrial litigation.  *See, e.g.*, *United*

---

[9] On this point, Stewart's citations to cases discussing, for example, "'[t]he mere fact that a company has received an acquisition overture'" or the "desire and agreement of chairman and vice chairman to sell [a] company" (Stewart Mem. at 22-23) are unavailing.  Here, Robert knew at a minimum that the discussions were serious enough to get an investment bank retained, and the information Stewart supplied was particular enough to give Robert and Cunniffe the level of confidence they needed about the prospects of an actual deal to place the aggressive options bets that they did.

*States* v. *Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

    **C.**    **The Court Should Deny Stewart's Demand For a Bill of Particulars**

As an alternative to dismissal, Stewart seeks a bill of particulars.  The unusually detailed factual narrative that has already been supplied in the Complaint, along with the voluminous, indexed discovery the Government has furnished, make this a particularly poor case in which to advance such a demand.  It should be denied.

    *i.*    *Applicable Law*

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial."  *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added); *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) ("The ultimate test must be whether the information sought is necessary, not whether it is helpful.").  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted).

"The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories."  *United States* v. *Mitlof*, 165 F. Supp. 2d at 569.  The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars."  *Id.* (citing *United States* v. *Torres*, 901 F.2d at 233-34); *see also, e.g.*, *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to

23

trial.'") (quoting *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States* v. *Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994).  Moreover, "given that a bill of particulars confines the Government's proof to particulars furnished," a request for a bill of particulars should not be granted "where the consequence would be to restrict unduly the Government's ability to present its case . . . or permit the defendant to tailor [his] testimony to explain away the Government's case."  *Id.* (citation omitted); *see also United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

In applying this guidance, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date.  *See United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States* v. *Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States* v. *Samsonov*, 2009 WL 176721, at *4 (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States* v. *D'Amico*, 734 F. Supp. 2d at 335 (denying bill of particulars request where supplementary facts supplied to defense by way of letter);

24

*United States* v. *Earls*, No. 03 Cr. 0366 (NRB), 2004 WL 350725, at *4-5 (S.D.N.Y. Feb. 25, 2004) (denying motion for bill of particulars in fraud case where, among other things, Government had "furnished the defendant with voluminous discovery"); *Henry*, 861 F. Supp. at 1198 ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself."). Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of particulars where one would otherwise be required, *see United States* v. *Bortnovsky*, 820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars.  *See United States* v. *Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012); *United States* v. *Vaughan*, No. 10 Cr. 233 (CM), 2010 WL 3025648, at *2 (S.D.N.Y. Jul. 27, 2010); *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery); *United States* v. *Falkowitz*, 214 F. Supp. 2d 365, 391 (S.D.N.Y. 2002) (denying in principal part request for bill of particulars in insurance fraud case where the Government had produced over 100,000 documents "in an orderly fashion").

    ii.  *Discussion*

    Applying these principles, Stewart is not entitled to, and should not be granted, a bill of particulars.  The Indictment, standing alone, specifies the trading at issue and makes plain that Stewart is alleged to have passed material non-public information to his father concerning five acquisition transactions, the parties to which, and the dates of the

announcement of which, are identified with particularity.   As discussed above, Stewart's contention that the Government must identify—or even prove at trial—precisely what Stewart said to his father about these deals is baseless.  So is his contention that more specificity is needed to identify the personal benefits Stewart sought and received for tipping his father with inside information.  Both benefit and materiality are alleged with ample particularity already.  Stewart's demands for more are "merely seeking additional evidentiary detail," something to which he is not entitled.  *See Guttenberg*, 2007 WL 4115810, at *5 (denying bill of particulars in insider trading case).

If the Indictment itself were not enough (and, under governing case law, it is), the incredibly detailed 31-page Complaint that was filed in this case, along with the voluminous discovery accompanied by clear indices, furnish a wealth of additional detail more than sufficient to overcome any purported deficiency.  Stewart even has in hand a summary, contained in the Complaint, of what the principal witness against him, Cunniffe, will say at trial.  Under these circumstances, a bill of particulars cannot possibly be considered "necessary" to permit Stewart to defend against the charges.  *United States* v. *Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013) (denying motions for bill of particulars where other materials, including the indictment and the Government's brief in opposition to the motion for a bill of particulars, sufficiently apprised the defendants of the Government's case theory).

On point in this regard is the case of *United States* v. *Corbin*, 729 F. Supp. 2d 603. There, the Government filed a criminal complaint charging the defendant with insider trading crimes related to the passing of merger and acquisition  information, and then had the grand jury return a superseding indictment.  It also provided a "large amount of discovery to [the defendant], including trading records, emails, and bank records." *Id.* at 605.  Faced with the defendant's motion for a bill of particulars detailing the facts about the fiduciary duty alleged

to have been breached, how the defendant and his tipper acquired the information at issue, and the precise nature of the information supplied, the court denied the motion. *Id.* 605-06. In support of its ruling, the court observed, among other things, that the details the defendant was demanding were ones that the Government need neither allege nor even prove at trial:

> If the Government sufficiently proves that [the intermediate tipper] and his wife had an agreement that nonpublic information within her knowledge or possession was not to be shared with others, and that [the intermediate tipper] did improperly disclose such information to [the defendant], [the defendant] would be culpable if he traded on the information whether [the intermediate tipper] was told the information over a romantic dinner or he pilfered it from his wife's briefcase or email account.

*Id.* at 606. The same went for details about the precise information relayed in the tips: the indictment, which "specifie[d] that [the intermediate tipper] passed on information about acquisitions before the public knew of them," and identified the transactions at issue, sufficed. *Id.* That reasoning applies here; the details Stewart demands not only are not required at this pleading stage, but are not required even to prove the charges at trial.

Finally, Stewart's reliance on the *Gupta* case for the proposition that he is entitled to greater detail about the personal benefits for which he acted in this case (*see* Stewart Mem. at 27-29) is misplaced. In *Gupta*, the original indictment's benefit allegation charged as follows: "[The defendant] provided the Inside Information to [his tippee] because of [the defendant's] friendship and business relationships with [the tippee]. [The defendant] benefitted and hoped to benefit from his friendship and business relationships with [the tippee] in various ways, some of which were financial." (*United States* v. *Gupta*, No. 11 Cr. 970 (JSR), Sealed Indictment, Docket Entry No. 1, at ¶ 25). During argument on the defendant's motion for a bill of particulars offering more specificity about the benefit, Judge Rakoff agreed that the Government should amplify either in a superseding indictment it expected to file or in a letter to be filed closer to trial what it meant by the phrase "some of which were financial." (Decl. of Tai H. Park in Support of Mot. to Dismiss or for Bill of

Particulars, filed Sept. 18, 2015, Ex. H at 21).  In its superseding indictment, the Government

used the same benefit allegation as before, but added three examples of the financial

relationships the defendant had with his tippee.  (*United States* v. *Gupta*, No. 11 Cr. 970

(JSR), Superseding Indictment, Docket Entry No. 25, at ¶ 29).  When the defense moved for

further particulars regarding the examples, the court denied the motion, characterizing it as a

request for "highly specific evidentiary detail [in]appropriate for a bill of particulars."  *United

States* v. *Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 1066804, at *3 (S.D.N.Y. Mar. 27, 2012).

      Here, the Government has offered at least as many particulars about the character of

the "pecuniary benefits" Stewart hoped for and received as part of his participation in the

charged scheme, and incidental to his "meaningfully close personal relationship" with his

tippee, *Newman*, 773 F.3d at 438, as were offered in the superseding indictment in *Gupta*.

He has two specific examples—wedding expenses and $15,000—of financial benefits

flowing from his father to himself during the course of the scheme, and an allegation that

Robert *admitted* that the first of these expenses was paid from the proceeds of the Kendle

trading.  No more detail could possibly be required.

## CONCLUSION

The Government respectfully submits that the Court should DENY the defendant's motions to dismiss and for a bill of particulars.

Dated: New York, New York           Respectfully submitted,
       October 16, 2015

                                         PREET BHARARA
                                         United States Attorney

By:              /s/_____
                      Sarah Eddy McCallum
                      Brooke E. Cucinella
                      Assistant United States Attorneys
                      Tel.: (212) 637-1033/2477