UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

              -v-                              No. 15CR287-LTS

SEAN STEWART (2),

                       Defendant.

------------------------------------------------------------x

OPINION AND ORDER

APPEARANCES:

| | |
|---|---|
| PREET BHARARA<br>United States Attorney for the Southern<br>District of New York<br>By: Brooke E. Cucinella<br>     Sarah E. McCallum<br>     Assistant United States Attorneys<br>     One St. Andrew's Plaza<br>     New York, NY 10007 | PARK JENSEN BENNETT LLP<br>By:  Tai H. Park, Esq.<br>      Kathleen E. Gardner, Esq.<br>      Tami Stark, Esq.<br>40 Wall Street<br>New York, NY 10005 |
| *Attorney for United States of America* | *Attorneys for Defendant Sean Stewart* |

LAURA TAYLOR SWAIN, United States District Judge

On May 13, 2015, a criminal complaint (the "Complaint" or "Compl.," Docket Entry No. 1) was filed in this district against Defendant Sean Stewart ("Defendant" or "Stewart") and his father Robert Stewart ("Robert"), charging them with nine counts stemming from alleged insider trading in the securities of five different publicly traded health care companies: Kendle International, Inc. ("Kendle"), Kinetic Concepts, Inc. ("Kinetic"), Gen-Probe, Inc. ("Gen-Probe"), Lincare Holdings, Inc. ("Lincare"), and CareFusion Corp. ("CareFusion").  (See Docket Entry No. 1.)  Stewart was arrested the following day.  On July 15, 2015, a superseding indictment was filed in this case, charging both Stewart and Robert with the same nine crimes outlined in the Complaint: one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371; one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; six counts of securities fraud in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5); and one count of tender offer fraud in violation of 15 U.S.C. §§ 78n(e) and 78ff, and Title 17 C.F.R. §§ 240.14e-3 and 240.14e-3(d). (See Docket Entry No. 25, the "Indictment.")

Defendant now moves, Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, to dismiss the Indictment, arguing that the law of insider trading, as applied to his case, is so vague that it violates the due process clause of the Fifth Amendment of the United States Constitution, and that the Government has failed to adequately allege each element of the crime of insider trading in the Indictment.  (See generally Docket Entry No. 43, Defendant Sean Stewart's Memorandum of Law in Support of Motion to Dismiss or For Bill of Particulars ("Def. Memo").)  In the alternative Stewart seeks, pursuant to Federal Rule of Criminal Procedure 7(f), an order requiring the Government to provide a bill of particulars supplying greater detail with respect to the charges against him.

The Court has considered the parties' submissions carefully.  For the reasons stated below, Stewart's motion is denied in its entirety.

BACKGROUND[1]

The Complaint alleges that, during the relevant period of time, Stewart worked as an investment banker in the healthcare field at two different banks.  (See Compl. ¶¶ 12-13.) Both of these banks maintained policies against divulging material non-public information about the banks' clients including, among other things, information related to mergers and acquisitions. (Id. ¶ 22.)  The Complaint alleges that Stewart violated these policies by leaking information about pending mergers and acquisitions to his father, who traded on the leaked information and also caused a co-conspirator, Richard Cunniffe ("Cunniffe," referred to as CW-1 in the Complaint), to make trades on his behalf.  (See id. ¶¶ 17-20.)

The Complaint alleges that, in early February 2011, approximately two weeks after Stewart wrote in an email to a bank colleague that their investment bank had just been "officially mandated to sell Kendle," Robert Stewart began to purchase Kendle stock for the first time.  (Id. ¶ 23.)  The Complaint further alleges that telephone records confirm that Stewart had communicated with Robert just a few days before these purchases were made.  (Id.)  In early March 2011, Robert purchased more Kendle stock, at or around the time he had met with Stewart at a hotel.  (Id.)  The Complaint alleges that, when the acquisition deal was announced in May 2011, Robert sold all of his Kendle stock for a profit of approximately $7,900.  (Id.)  The Complaint also alleges that the proceeds from this sale were used to help fund Stewart's wedding

---

[1]     The facts recited herein are alleged in the Complaint and/or the Indictment.

a month later.  (Compl. ¶¶ 24-25.)  The Kendle transactions are the subject of the allegations in Paragraph 10 of the Indictment.  (See Indictment ¶ 10.)

The Complaint next alleges that Stewart learned of the proposed acquisition of KCI by private equity group Apax Partners.  (Compl. ¶ 26.)  Thereafter, Robert approached Cunniffe and asked him to purchase KCI call options on his behalf.  (Id. ¶ 30.)  Beginning in April 2011, Cunniffe followed Robert's instructions, and mirrored the trades in his own account. (Id. ¶¶ 26, 28, 30.)  However, following an announcement by the Financial Industry Regulatory Authority ("FINRA") that it would review trading in advance of the Kendle deal, Robert sold all of his KCI stock, following a series of phone calls with Stewart.  (Id. ¶ 27.)  Cunniffe, however, purchased KCI call options and, when it was announced on July 13, 2011, that KCI was being bought out, the stock price jumped and Cunniffe cashed out his and Robert's options for a combined profit of approximately $107,790.  (Compl. ¶ 28.)  These transactions are the subject of Paragraph 11 of the Indictment.  (See Indictment ¶ 11.)

The Complaint next alleges that, in March 2012, the investment bank where Stewart was working was selected to serve as an advisor to Hologic, Inc., in connection with its contemplated acquisition by Gen-Probe.  (Compl. ¶ 32.)  Stewart was assigned to work on the deal.  (Id.)  After a month of frequent communication between Stewart and Robert, as well as a call between Robert and Cunniffe on April 18, 2012, Cunniffe began buying Gen-Probe call options.  (Id.)  Gen-Probe's stock price rose immediately after the deal with Hologic was announced on April 30, 2012.  (Id.)  In early May, Cunniffe sold the Gen-Probe call options that he had accumulated for Robert and himself for a profit of approximately $180,590.  (Id.)  These transactions are the focus of Paragraph 12 of the Indictment.  (See Indictment ¶ 12.)

The Complaint further alleges that, in May 2012, a German health care company

called Linde AG hired the bank where Stewart was working as an advisor in connection with its proposed tender offer acquisition of the U.S. company Lincare.  (Compl. ¶ 33.)  At the end of that month, after telephone communications between Stewart and Robert and between Robert and Cunniffe, Cunniffe began to accumulate Lincare call options.  (Id.)  These purchases continued through June 2012.  (Id.)  The Linde/Lincare deal was announced publicly on July 1, 2012, and Cunniffe thereafter cashed out his and Robert's Lincare options for a profit of approximately $407,573.  (Id.)  These transactions are addressed in Paragraph 13 of the Indictment.  (See Indictment ¶ 13.)

Finally, the Complaint alleges that, on or about March 7, 2014, the investment bank at which Stewart worked was retained to advise health care company CareFusion in connection with a potential acquisition by Becton, Dickinson & Co.  (Compl. ¶ 36.)  Stewart allegedly became aware of Becton's interest on that same day, and had telephone conversations with Robert shortly after Becton made its preliminary bid in early August 2014.  (Id.)  On or about August 18, 2014, after CareFusion had indicated that the bid was insufficient and a due diligence process had begun, Robert communicated with Cunniffe by email regarding meeting.  The two were in the same area of Manhattan on the next day and, that same day, Cunniffe began to buy CareFusion call options for the benefit of himself and Robert.  Cunniffe continued to make such purchases through October 2014, when the acquisition deal was publicly announced.  (Id.)  Cunniffe thereafter cashed out the call options for a combined profit of approximately $446,448.  (Id.)  These transactions are summarized in Paragraph 14 of the Indictment.  (See Indictment ¶ 14.)

The Indictment, though less detailed than the Complaint, contains a recitation of the statutory language pertinent to the charged crimes as well as a factual overview of the case.

(See generally Indictment.)  The Indictment alleges that Stewart divulged material non-public information to Robert about the health care company acquisitions described in the Complaint, that he did so "in breach of fiduciary duties and other duties of trust and confidence," and that he received "pecuniary benefits . . . as part of the insider trading scheme," detailing specifically the benefit of a payment to cover certain of Stewart's wedding expenses.  (See id. ¶¶ 7-9.)  The Indictment also specifies the trades – including dates and stock/option quantities – that are alleged to have been made based on inside information that Stewart provided to Robert.  (See id. ¶¶ 23, 25, 27.)

In its brief in opposition to Defendant's motion, the Government represents that it has produced voluminous discovery to Stewart, including approximately 600,000 pages of documents, along with video and audio files.  (See Government's Memorandum of Law in Opposition to Defendant's Motions to Dismiss and, in the Alternative, for a Bill of Particulars ("Gov. Memo"), Docket Entry No. 46 at p. 10.)  The discovery includes trading records, telephone records, bank records and email correspondence produced by the investment banks at which Stewart worked, as well as correspondence seized pursuant to search warrants executed on the personal email accounts of Robert and Cunniffe, recordings of meetings and calls between Robert and Cunniffe and relevant public filings and press releases.  (Gov. Memo at p. 10.)  The Government represents that it has provided a "clear roadmap" along with these productions to assist Stewart in navigating through the most important materials.  (Id.)

<u>D</u>ISCUSSION

<u>Stewart's Motion to Dismiss the Indictment – Due Process Argument</u>

Stewart argues that the insider trading charges against him should be dismissed because the federal criminal law of insider trading, as applied in this case, is violative of the due process clause of the Fifth Amendment to the Constitution of the United States.[2]  Stewart asserts principally that the concepts of "fiduciary duty" and "materiality," as incorporated in the statutes, regulations and case precedents criminalizing insider trading, are impermissibly vague in light of the current state of insider trading law.  (<u>See</u> Defendant Sean Stewart's Memorandum of Law in Support of Motion to Dismiss or For Bill of Particulars ("Def. Memo"), Docket Entry No. 43 at pp. 6-13.)

To comport with the constitutional requirement of due process, a criminal law must provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972).  "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law.'" <u>Johnson v. United States</u>, 135 S. Ct. 2551, 2556-57 (2015) (quoting <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391 (1926)).  Thus, "[t]o satisfy due process, 'a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

[2]  While Stewart characterizes his constitutional challenge as one to the statute "as applied" to the insider trading charges against him, his arguments focus more broadly on his perception of the state of insider trading law, and of the relevant definition of materiality, than on the circumstances underlying the specific charges against him.  As explained below, his general arguments are inconsistent with binding Supreme Court and Second Circuit precedent, and his contention that the law is too vague to support the particular charges against him is also unavailing.

<u>Skilling v. United States</u>, 561 U.S. 358, 402-03 (2010) (quoting <u>Kolender v. Lawson</u>, 461 U.S.

352, 357 (1983)).  "When the challenge is vagueness 'as-applied,' there is a two-part test: a court

must first determine whether the statute give[s] the person of ordinary intelligence a reasonable

opportunity to know what is prohibited' and then consider whether the law provide[s] explicit

standards for those who apply [it]."  <u>See</u> <u>United States v. Nadi</u>, 996 F.2d 548, 550 (2d Cir. 1993)

(internal quotation marks and citations omitted).

   Stewart is charged under Section 10(b) of the Securities Act of 1934 ("Section

10(b)"), which bans the use, "in connection with the purchase or sale of any security," of "any

manipulative or deceptive device or contrivance" prohibited by SEC rules and regulations.  15

U.S.C.S. § 78j(b) (LexisNexis 2012).  The pertinent SEC rule, Rule 10b-5, also broadly yet

plainly bans the use, "in connection with the purchase or sale of any security," of any "device,

scheme or artifice to defraud" and "any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  As the statute and

regulation do not specifically prohibit insider trading, the Supreme Court and the lower federal

courts have, over decades, fleshed out the circumstances under which securities trading based on

non-public information, or tipping non-public information to others who then use it to trade,

constitutes fraud or deceit violative of the statute and regulation.  Stewart, consequently, argues

that the law of insider trading is "not [a] creature of legislation but is, instead, an evolving theory

of criminal liability . . . that the courts have struggled to contain since at least 1980," which has

essentially led to the creation of an impermissible body of federal criminal common law.  (Def.

Memo at p. 8.)

   The Second Circuit has soundly rejected the notion that Section 10(b) and Rule

10b-5 have been construed so expansively as to fail to give fair warning of what conduct is

prohibited.  Nor is the need for judicial interpretation of common terms used in the statute and

rule a fatal flaw:

> While it is true that the language of (the section) uses general
> terms, its provisions, while perhaps falling short of the standards of
> immutability followed by the laws of the Medes and the Persians,
> are definite enough according to the canons of Anglo-American
> law.
>
> Subjecting the words . . . to critical scrutiny, we find no fatal
> ambiguity or indefiniteness, such as might prove a pitfall to any
> person . . . attempting to obey the law.  No honest and reasonable
> citizen could have difficulty in understanding the meaning of
> 'untrue,' 'material fact,' 'any omission to state a material fact,' 'in
> light of the circumstances under which they were made,' or
> 'misleading.'  All these terms, it is true, call for interpretation in
> accordance to the facts of a particular case.  So do[es] the term . . .
> 'fraud,' . . . and thousands of other expressions well established in
> the law.

United States v. Persky, 520 F.2d 283, 287 (2d Cir. 1975) (internal citation and punctuation

omitted).

      The application of the prohibitions of Section 10(b) and Rule 10b-5 to insider

trading has been developed through judicial interpretation of the statute and rule, and focuses not

merely on the misuse of non-public information but on the breach of duties of confidentiality

with respect to such information for personal, rather than institutional, benefit.  The Supreme

Court has held that Section 10(b)'s proscription against use of "deceptive devices" is violated

when an insider breaches his fiduciary duty to a company and its shareholders by trading on

information for the insider's personal benefit.  See United States v. O'Hagan, 521 U.S. 642, 652

(1997).  This "classical theory applies not only to officers, directors and other permanent insiders

of a corporation, but also to attorneys, accountants, consultants and others who temporarily

become fiduciaries of a corporation."  O'Hagan, 521 U.S. at 652.  Persons who are not corporate

insiders, but who use, for personal benefit, material non-public information that they have

received in confidence, are liable for insider trading under a "misappropriation theory."  This

theory "holds that a person commits fraud 'in connection with' a securities transaction, and

thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for

securities trading purposes, in breach of a duty owed to the source of the information . . . Under

this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or

sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the

exclusive use of that information . . . [T]he misappropriation theory premises liability on a

fiduciary-turned-trader's deception of those who entrusted him with access to confidential

information." Id.

        Under either theory, the breach of duty occurs only if the purpose of the

disclosure is to benefit the disclosing fiduciary personally.  "Absent some personal gain, there

has been no breach of duty . . ." Dirks v. Securities and Exchange Commission., 463 U.S. 646,

662 (1983).  In Dirks, the Supreme Court recognized that such purpose of personal benefit could

be inferred from "objective criteria, i.e., whether the insider receives a direct or indirect personal

benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate

into future earnings." Id. at 663.  Dirks' formulation of the personal benefit element of breach of

fiduciary duty suggested that the inference could be justified even in the absence of a quid pro

quo exchange:

> There are objective facts and circumstances that often justify such
> an inference.  For example, there may be a relationship between
> the insider and the recipient that suggests a quid pro quo from the
> latter, or an intention to benefit the particular recipient.  The
> elements of fiduciary duty and exploitation of nonpublic
> information also exist when an insider makes a gift of confidential
> information to a trading relative or friend.  The tip and trade

> resemble trading by the insider himself followed by a gift of the
> profits to the recipient.

<u>Dirks</u>, 463 U.S. at 664.  <u>See also</u> <u>United States v. Jiau</u>, 734 F.3d 147, 153 (2d Cir. 2013)

("Personal benefit is broadly defined . . . [to] include[ ] not only 'pecuniary gain,' but also, <u>inter</u>

<u>alia</u>, any reputational benefit that will translate into future earnings, and the benefit one would

obtain from simply mak[ing] a gift of confidential information to a trading relative or friend.")

(internal quotation marks and citations omitted); <u>Securities Exchange Commission v. Warde</u>,

151 F.3d 42, 48 (2d Cir. 1998) (holding that the Government "need not show that the tipper

expected or received a specific or tangible benefit in exchange for the tip.").

> In its recent decision in <u>United States v. Newman</u>, however, the Second Circuit

limited the concept of personal benefit, holding, in a case involving the distribution of

information to and among casual friends that, to demonstrate a breach of fiduciary duty, the

Government could not rely on "the mere fact of a friendship, particularly of a casual or social

nature."  773 F.3d 438, 452 (2d Cir. 2014).  The <u>Newman</u> Court held the <u>Dirks</u> inference of

personal benefit from a gift "impermissible in the absence of proof of a meaningfully close

personal relationship that generates an exchange that is objective, consequential and represents at

least a potential gain of pecuniary or similarly valuable nature."  <u>Id.</u>  As Stewart notes, the

Government took strong issue with the <u>Newman</u> Court's apparent narrowing of the definition of

"personal benefit," seeking a rehearing of the case <u>en</u> <u>banc</u> and then filing a petition for a writ of

<u>certiorari</u>.  The Government argued, <u>inter</u> <u>alia</u>, that <u>Newman</u> erroneously departed from the <u>Dirks</u>

standard with regard to gifts and that <u>Newman</u>'s standard would be impossible to apply and

would harm markets by blurring the line between permissible and impermissible activity.  (<u>See</u>

<u>generally</u> Declaration of Tai H. Park, Docket Entry No. 42, Ex. B, Cert. Petition.)

Stewart's "as applied" challenge to his Indictment seizes upon the Government's efforts to overturn Newman, arguing that the decision has made the law of insider trading so uncertain as to be unconstitutionally vague, and asserting that the Government's position on Newman is an "acknowledgment that there exists no 'clear guidance' or 'practical application' of the law, only . . . fatal ambiguity."  (Def. Memo at p. 10.)  Stewart further asserts that both the Section 10(b) and the tender offer-related fraud charges against him are unconstitutionally vague because the concept of "materiality" in the context of insider trading law is impermissibly vague, contending that, because the SEC has refused to define this term, the courts have been forced to do so, which has "spawned legions of cases and criticism throughout the country for decades." (Def. Memo at p. 13.)   Indeed, Stewart argues that the SEC has purposefully left the definition of  materiality vague in order to give the Government broad discretion as to whom it chooses to prosecute, which in turn encourages arbitrary and discriminatory enforcement that is violative of the Constitution.  (See id. at pp. 13-14.)

Stewart's arguments are overblown, unfounded and unavailing.  As an initial matter, courts within this Circuit have consistently upheld insider trading prosecutions in the face of vagueness challenges.  See, e.g., United States v. Willis, 737 F. Supp. 269, 277 (S.D.N.Y. 1990) ("The Second Circuit has repeatedly rebuffed attempts to invalidate criminal prosecutions brought under Section 10(b) and Rule 10b-5 on the ground that those anti-fraud provisions give inadequate notice of the conduct that they proscribe"); see also Securities and Exchange Commission v. Payton, 97 F. Supp. 3d 558 (S.D.N.Y. 2015) (refusing to dismiss complaint in civil proceeding brought by the SEC due to allegedly insufficient notice of insider trading law.). As explained above, Section 10(b) has been held sufficiently plain to withstand a constitutional challenge to its breadth and its use of general terms.  In developing and interpreting insider

trading law over the years, the courts have only narrowed the concept of fraud as applied in that context.  An otherwise clear statutory prohibition does not become unconstitutionally "vague" as a result of complicated limiting principles that the courts may have engrafted onto it.  (See Gov. Memo at pp. 15-16.)

    Even if, however, some hypothetical vagueness may exist with respect to some applications of insider trading law, there is nothing vague about the law as it applies to Stewart's alleged conduct here.  "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) (footnote omitted). Here, both the Complaint and the Indictment clearly allege that Stewart, prior to the Newman decision and under circumstances that were well within the personal benefit standard as articulated in Dirks, breached his fiduciary and contractual duties of confidentiality to his employer and clients, disclosed material non-public information to his father, who traded on it directly and indirectly, and received personal benefits in the form of a wedding expense payment and cash.  Under Dirks, the allegation that Stewart breached his fiduciary duty necessarily subsumes the allegation that he disclosed the non-public information for his own personal benefit.  Morever, even under the Newman formulation of the personal benefit requirement, Stewart's familial relationship with his father and the alleged receipt of pecuniary benefits can support inferences of exchange for personal benefit and "at least a potential gain of a pecuniary or similarly valuable nature."[3]  See Newman, 773 F.3d at 452.  The conduct alleged by the

---

[3]  Stewart's arguments that the payment of wedding expenses is not properly indicative of a quid pro quo and that the later payment represented the partial return of funds lent to Robert raise issues of fact for the jury, rather than questions of law properly considered by the Court on a motion to dismiss an indictment. See United States v. Alfonso, 143 F.3d 772, 773 (2d Cir. 1998) ("a challenge to

Government, if proven, falls squarely within well-established insider trading prohibitions.  Thus, on the facts alleged by the Government, it ought have been clear to Stewart that his tipping constituted a crime under well established, controlling case law.  Under these circumstances, Stewart has failed to demonstrate that the law of insider trading, as applied to his alleged conduct, is impermissibly vague.

   Stewart's argument that the concept of "materiality," as used in insider trading law, is impermissibly vague is likewise unavailing.  The Supreme Court has articulated a definition of materiality that is widely relied upon by lower courts.  See e.g., TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix of information made available."); see also Securities and Exchange Commission v. Wyly, 950 F. Supp. 2d 547, 559 (S.D.N.Y. 2013) ("Information is material if there is a substantial likelihood that a reasonable shareholder would consider it important or, in other words, there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available." (internal quotation marks and citation omitted)); United States v. Rajaratnam, 802 F. Supp. 2d 491, 498 (S.D.N.Y. 2011) ("Information is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to invest." (internal quotation marks and citation omitted)).

---

the sufficiency of the evidence is not appropriately decided on a pretrial motion to dismiss.").

Nor is it fatal to the instant charges that, under some circumstances, information tangentially related to acquisitions can be immaterial.  (See Def. Memo at pp. 13-14 and cases cited therein.)  Here, the Government alleges that: Stewart, an employee of an investment bank retained to assist with actual transactions, acquired specific non-public information about the transactions by means of his employment; that Stewart communicated with his father on numerous occasions while in possession of the non-public information; and that his father traded in stocks of the subject companies and call options thereon, directly and indirectly, often in close proximity to his communications with Stewart.  These circumstances could properly support inferences that the information communicated was material to the decisions to engage in the charged transactions.  See e.g., Securities and Exchange Commission v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) ("because a merger is one of the most important events that can occur for a small company, information regarding a merger can become material at an earlier stage than would be the case as regards lesser transactions) (quoting Securities and Exchange Commission v. Geon Industries, 531 F.2d 39, 48 (2d Cir. 1976)); accord Rajaratnam, 802 F. Supp. 2d at 516.

Accordingly, Stewart's motion is denied to the extent it seeks dismissal of the Indictment as unconstitutionally vague.

Stewart's Motion to Dismiss the Indictment – Insufficiency Argument

Stewart next argues that the Indictment should be dismissed for failure to adequately allege each element of insider trading.  (See Def. Memo at pp. 14-24.)  Stewart asserts that the Indictment's charge of breach of fiduciary duty is insufficient, arguing that: it lacks an allegation of an expectation of personal benefit; that the allegations with respect to the wedding gift from his father Robert do not meet this requirement; and that there is no allegation

of any personal benefit received after June 2011, the time at which the wedding gift was made.

Stewart further argues that the Indictment does not sufficiently allege the materiality of the

information he is accused of disclosing, as it does not explicitly set forth what he is alleged to

have told his father and when, and thus he cannot meaningfully defend himself on the element of

materiality.  Both of these arguments must fail.

    The Constitution requires that a defendant be provided with notice of the

accusations that he is expected to answer.  See U.S. CONST. AMEND. VI  ("In all criminal

prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the

accusation.").  This requirement is codified in Rule 7 of the Federal Rules of Criminal

Procedure, which provides that "the indictment or information must be a plain, concise and

definite written statement of the essential facts constituting the offense charged."  See Fed. R.

Crim. P. 7(c); see also United States v. Vilar, 729 F.3d 62, 80 (2d Cir. 2013).  The Second

Circuit has held that, to satisfy this rule, "'an indictment need do little more than to track the

language of the statute charged and state the time and place (in approximate terms) of the alleged

crime.'"  United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) (quoting Alfonso, 143 F.3d

at 776).  Indeed, "[a]n indictment is sufficient when it charges a crime with sufficient precision

to inform the defendant of the charges he must meet and with enough detail that he may plead

double jeopardy in a future prosecution based on the same set of events."  United States v.

Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992).  It is only in "very rare cases" that "specification

of how a particular element of a criminal charge will be met (as opposed to categorical recitation

of the element) is of such importance to the fairness of the proceeding that it must be spelled out

in the indictment."  United States v. Stringer, 730 F.3d 120, 126-28 (2d Cir. 2013).

"Accordingly, an indictment that alleges the essential elements of the crime and states specific

facts indicating at least the time and the place of the alleged offense is generally sufficient." United States v. Heicklen, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012) (citing United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002)).

In light of this well-established standard, the allegations contained within the Indictment are plainly sufficient.  As an initial matter, the Indictment clearly tracks the language of the applicable statutes and rules.  (See e.g., Indictment ¶¶ 15-17.)  In a Section 10(b) and Rule 10b-5 insider trading misappropriation case such as this, the requisite "deceptive device or contrivance" must be proven by establishing that the misappropriator had and breached, by using material non-public information obtained in confidence for his personal benefit, a fiduciary duty, and used the information, without disclosure to his principal, in the purchase or sale of securities. See O'Hagan, 521 U.S. 642 at 654-656.  The tender offer fraud proscriptions of 15 U.S.C. §§ 78n(e) and 78ff and 17 C.F.R. § 240.14e-3 require a showing that, after any person has taken a substantial step to commence, or has commenced, a tender offer, a person who is in possession of material non-public information relating to the tender offer acquired directly or indirectly from the offeror or issuer engages in a transaction in the securities without disclosure or communicates such information to any other person under circumstances in which it is reasonably foreseeable that communication is likely to result in violation of the prohibition.  See e.g., United States v. Chestman, 947 F.2d 551, 557 (2d Cir. 1991).

The Indictment alleges these elements of the criminal objects of the conspiracy and the substantive crimes charged.  It alleges that Stewart acquired material non-public information pertaining to the relevant mergers and acquisitions through his employment with investment banks and divulged that information to his father, in breach of fiduciary duties and other duties of trust and confidence owed to his sources.  By alleging the breach of fiduciary

duty, the Government necessarily also alleges that Stewart engaged in the activity for his own

personal benefit.  See Dirks 463 U.S. at 662.[4]  It alleges that Stewart disclosed such material

non-public information to his father about five specifically-identified merger deals, and that the

communications and securities trading activity regarding one of the subject companies, Lincare,

took place, without public disclosure, after an offering person had taken substantial steps to

commence a tender offer.  (See Indictment ¶¶ 7-14, 22-27.)  The Indictment further alleges that

Stewart's father and their co-conspirator acted upon the material non-public information by

engaging in the securities trades that are detailed in Counts Three through Nine (see id. ¶¶ 22-

27), and that Stewart himself received a pecuniary benefit, to wit, "payment by Robert Stewart,

from the proceeds of the scheme, of expenses related to Sean Stewart's wedding in or about June

2011." (Id. ¶ 9.)  The Indictment sets forth the timing of the business transactions in connection

with which Stewart's co-conspirators traded, and thus clearly puts Stewart on notice of the

charges that he will be required to meet at trial.  Its specificity as to the activity underlying the

charges is also clearly sufficient to enable Stewart to plead double jeopardy in a future

prosecution based on the same set of events.  Thus, the Indictment has sufficiently alleged the

---

[4]     To the extent that Stewart may argue that more explicit language is required to
frame his expectation of benefit (i.e., that Stewart provided material, non-public
information to his father so that he could receive a pecuniary benefit), such an
argument must fail because Stewart cannot demonstrate that he has suffered any
prejudice, which is a requirement here.  See, e.g., Stringer, 730 F.3d at 124-25.
The Government's theory is well developed in the Indictment, the Complaint, the
Government papers in opposition to this motion practice and the discovery that
has been provided to Stewart: the Government contends that Stewart disclosed
material inside information to his father for personal benefit, in the form of the
payment of wedding expenses and an additional payment, demonstrating the
existence of gain, or at least potential gain, of a pecuniary or similarly valuable
nature.  See Newman, 773 F.3d at 452.  This clear documentation of the theory of
the Government's case forecloses Stewart from arguing that he has suffered any
prejudice.  See Stringer, 730 F.3d at 124-25.

breach of fiduciary duty element of the insider trading offense.

Stewart also claims that the Indictment's failure to provide "factual particularity as to materiality" is a fatal flaw.  (See Def. Memo at pp. 21.)  This position has no basis in case law.  The Government has alleged that the information supplied by Stewart was material and has bolstered that general assertion with allegations that Robert traded in Kendle securities based on the information (Indictment ¶ 10), that Robert passed Stewart's tips regarding the KCI, Gen-Probe, Lincare and CareFusion acquisitions on to Cunniffe, asking Cunniffe to trade in call option contracts for those companies' stock (id. ¶ 11-14), and that certain transactions took place contemporaneously with communications between Stewart and Robert.  (Id. ¶ 18.)  The alleged connections between the tips and the trading activities imply the materiality of the information conveyed.  "On a pre-trial motion to dismiss an Indictment pursuant to Fed. R. Crim. P. 12(b), a court must accept all factual allegations in the Indictment as true."  United States v. Guttenberg, No. 07CR141-DAB, 2007 WL 4115810, at *3 (S.D.N.Y. Nov. 14, 2007) (quoting Alfonso, 143 F.3d at 777).  Indeed, materiality is a question of fact for the jury.  See, e.g., United States v. Hatfield, 724 F. Supp. 2d 321, 325 (E.D.N.Y. 2010) ("materiality is generally a jury question.").  The Government therefore need not allege the precise details of the information Stewart shared with his father with respect to the impending transactions.  See, e.g., United States v. Corbin, 729 F. Supp. 2d 603, 606 (S.D.N.Y. 2010) (denying request for bill of particulars based on lack of detail regarding information provided by tipper to tippee).[5]  Forcing the Government to do so at this point would prematurely require the Government to disclose the particulars of its trial

---

[5]     Stewart's reliance in this connection on S. E. C. v. Mayhew is unavailing. Mayhew did not address the requisite content of an indictment.  Mayhew dealt with the review of a district court's post-trial determinations in a civil forfeiture proceeding and thus has no bearing on the sufficiency of the allegations made by the Government in the Indictment.  See generally 121 F.3d 44.

proof.  Here, the Indictment plainly alleges the nature of the information supplied by Stewart – specifically, information pertaining to merger and acquisition deals.  (See Indictment ¶¶ 10-14.)

The Indictment clearly meets the requirements of Rule 7(c), and Stewart's motion to dismiss the Indictment as insufficient is denied.

Stewart's Alternative Request for a Bill of Particulars

Stewart argues that, if the Court does not dismiss the Indictment, it should, in the alternative, require the Government to provide him with a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).  Rule 7(f) allows a defendant to "seek a bill of particulars to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  "The ultimate test must be whether the information sought is necessary, not whether it is helpful."  United States v. Mitlof, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (emphasis added).  A bill of particulars is necessary only where "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotation marks and citations omitted).  Thus, courts within this district frequently deny requests for bills of particulars seeking information regarding the "wheres, whens, and with whoms" of the crime.  Mitlof, 165 F. Supp. 2d at 569.

Furthermore, the Government "may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or preview the Government's

evidence or legal theories." <u>Mitlof</u>, 165 F. Supp. 2d at 569.  This is because "[a] bill of

particulars is not a general investigative tool, a discovery device, or a means to compel the

government to disclose evidence or witnesses to be offered prior to trial."  <u>United States v.</u>

<u>D'Amico</u>, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (internal quotation marks and citation

omitted).  The decision as to whether to require a bill of particulars rests within the discretion of

the court.  <u>See</u> <u>United State v. Panza</u>, 750 F.2d 1141, 1148 (2d Cir. 1984).

      When determining whether a bill of particulars is warranted, a court should

consider not only the text of the Indictment itself, but also the discovery and other materials

supplied to the defendant to date.  <u>See</u>, <u>e.g.</u>, <u>Bortnovsky</u>, 820 F.2d at 574 ("Generally, if the

information sought by defendant is provided in the indictment or in some acceptable alternative

form, no bill of particulars is required"); <u>see</u> <u>also</u> <u>United States v. Samsonov</u>, No. 07CR1198-

CM, 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying request for bill of particulars

where "discovery letters and materials, and other information about anticipated trial evidence

that has been voluntarily disclosed by the Government provides the defendant with more than

enough information" to prepare for trial and prevent surprise).  In this connection, courts have

held that the provision of voluminous discovery, in combination with some form of guidance

regarding what is most pertinent and important, can obviate the need for a bill of particulars.  <u>See</u>

<u>e.g.</u>, <u>United States v. Vaughn</u>, No. 10CR233-CM, 2010 WL 3025648, at *2 (S.D.N.Y. July 27,

2010) (denying motion for bill of particulars where Government produced voluminous discovery

"in a form that [enabled] the defendant to easily identify the transactions at issue" in the

indictment).

      Stewart nonetheless argues that the Government must identify with particularity

the material, non-public information that he is charged with tipping to his father.  While

specificity as to the substance of tipping communications may sometimes be necessary in complex insider trading cases involving multiple alleged conspirators and communications, large numbers of companies and transactions and extended time periods (cf. United States v. Rajaratnam, No. 09CR1184-RJH, 2010 WL 2788168, at *2-3 (S.D.N.Y. July 13, 2010)), no such challenge of complexity is presented here.  For substantially the reasons detailed above in connection with the other aspects of Stewart's motion practice, the information already proffered by the Government is sufficient to enable Stewart to prepare for trial.  Moreover, the Complaint contains a detailed preview of the testimony of the Government's cooperating witness, Richard Cunniffe.  (See generally Compl.)  In light of this supplemental material, Stewart cannot credibly argue that "the charges of the indictment are so general that they do not advise [him] of the specific acts of which he is accused," Walsh, 194 F.3d at 47, or that, without more, he will be unable to mount a proper defense.[6]   Stewart has more than enough information in hand to enable him to prepare for trial and prevent unfair surprise, which is all that the law requires.  See, e.g., Bortnovsky, 820 F.2d at 574.  Stewart's alternative request for a bill of particulars is therefore denied.

---

[6]     For the reasons discussed above, Stewart's argument that the Government must further specify how he is alleged to have breached his fiduciary duty is likewise unavailing.  (See discussion supra.)  The Indictment and the Complaint contain sufficient detail regarding the nature of Stewart's breach of fiduciary duty, the character of the personal benefit he sought to receive for his participation in the alleged scheme and the "meaningfully close personal relationship" that existed between him and his tippee, his father Robert.  Newman, 773 F.3d at 438.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant Sean Stewart's motion to dismiss the

Indictment or for a bill of particulars is denied in its entirety.

This Opinion and Order resolves Docket Entry Number 41.

The next pretrial conference in this matter is scheduled to be held on **Friday,**

**January 22, 2016, at 10:00 a.m.**

SO ORDERED.

Dated: New York, New York
      January 19, 2016

                                             /s/ Laura Taylor Swain
                                          LAURA TAYLOR SWAIN
                                          United States District Judge