**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 15-cr-287 (LTS) |
| ROBERT STEWART, | |
| *Defendant*. | |

## <u>DEFENDANT ROBERT STEWART'S SENTENCING MEMORANDUM</u>

LEVINE LEE LLP

Seth L. Levine
Jillian B. Berman
Christos G. Papapetrou
666 Fifth Avenue
New York, NY 10103
(212) 223-4400

*Attorneys for Robert Stewart*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

MR. STEWART'S BACKGROUND...................................................................... 2

    A.    Mr. Stewart's Personal History, Education and Career ......................... 2

    B.    Mr. Stewart's Devotion to Family and His Critical Role as Caregiver ................. 5

    C.    Mr. Stewart's Health Issues ................................................................. 14

    D.    Mr. Stewart's Life Has Been Characterized by Altruism and Commitment to Friends and Family .......................................................... 15

    E.    Mr. Stewart's Life Since His Arrest ..................................................... 18

RELEVANT SENTENCING CONSIDERATIONS.............................................. 19

I.     THE PLEA AGREEMENT AND OFFENSE CONDUCT.............................. 19

II.    THE SENTENCING GUIDELINES PLACE A DISPROPORTIONATE EMPHASIS ON GAIN, PARTICULARLY AS APPLIED TO MR. STEWART.......... 21

    A.    Courts and Other Authorities Have Recognized the Unfair Reliance on Gain in the Sentencing Guidelines......................................................... 22

    B.    In this Case, Almost All of the Trading Profits Went to Mr. Stewart's Co-Conspirator.......................................................................... 26

III.   A NON-CUSTODIAL SENTENCE IS WARRANTED PURSUANT TO 18 U.S.C. § 3553 ..................................................................................... 27

    A.    The Nature and Circumstances of the Offense Weigh in Favor of A Non-Custodial Sentence......................................................................... 29

    B.    Mr. Stewart's Personal History and Characteristics Support Leniency............... 30

          1.    A Custodial Sentence Would Have Severe Consequences on Mrs. Stewart............................................................................. 30

          2.    Mr. Stewart's Family Role as Caregiver Warrants Leniency.................. 35

    C.    The Need to Promote the Purposes of Sentencing Weighs In Favor of a Non-Custodial Sentence......................................................................... 36

          1.    Deterrence Is Achieved By a Non-Custodial Sentence ........................... 36

          2.    Society Will Derive No Benefit From Incarcerating Mr. Stewart........... 38

IV.   IMPOSITION OF A FINE IS NOT WARRANTED IN THIS CASE............................. 40

CONCLUSION..................................................................................................... 42

i

# TABLE OF AUTHORITIES

**CASES**

*Rita v. United States*,
   551 U.S. 338 (2007)..................................................................................................28

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ....................................................................................28

*United States v. Contorinis*,
   09 Cr. 1083 (RJS) (S.D.N.Y. 2010)...............................................................22, 41

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ....................................................................................22

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ..................................................................22

*United States v. Faibish*,
   No. 12 Cr. 265 (ENV) (E.D.N.Y. 2016)..........................................................25-26

*United States v. Fleishman*,
   11 Cr. 32 (JSR) (S.D.N.Y. 2011)....................................................................22, 41

*United States v. Goffer*,
   10 Cr. 56 (RJS) (S.D.N.Y. 2011)...........................................................................41

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)............................................................22, 26

*United States v. Gupta*,
   No. 11 Cr. 907 (JSR) (S.D.N.Y. 2012)...........................................................22, 38

*United States v. Huerta*,
   371 F.3d 88 (2004)...................................................................................................33

*United States v. Jiau*,
   11 Cr. 161 (JSR) (S.D.N.Y. 2011)..........................................................................41

*United States v. Johnson*,
   964 F.2d 124 (2d Cir. 1992) ...................................................................................30

*United States v. Kimelman*,
   10 Cr. 56 (RJS) (S.D.N.Y. 2011)...........................................................................41

*United States v. Kon*,
   No. 04 CR, 271-03(RWS), 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006).........34, 35

*United States v. Leitch*,
   No. 11 Cr. 00039 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ...................24-25, 28-29

*United States v. Roberts*,
    No. 01 CR 410(RWS), 2005 WL 1153757 (S.D.N.Y. 2005) ............................................ 34, 35

*United States v. Rosen*,
    No. 11 Cr. 300 (JSR) (S.D.N.Y. 2012) .................................................................................. 22

*United States v. Whitman,*
    12 Cr. 125 (JSR) (S.D.N.Y. 2013) .................................................................................. 22, 26

## STATUTES

18 U.S.C. § 3572(a) ............................................................................................................ 40-41

18 U.S.C. § 371 ...................................................................................................................... 1, 20

18 U.S.C. §3553(a) ............................................................................................................ passim

28 U.S.C.A. § 994(j) ................................................................................................................ 24

## OTHER AUTHORITIES

A Report on Behalf of the American Bar Association Criminal Justice Section Task Force
    on the Reform of Federal Sentencing for Economic Crimes (Nov. 10, 2014) .................. 24, 25

The Department of Justice's Office of Inspector General, "The Impact of an Aging Inmate
    Population on the Federal Bureau of Prisons" (May 2015, revised Feb. 2016) ................ 39, 40

United States Sentencing Guidelines § 2B1.1 ...................................................................... 21, 22

United States Sentencing Guidelines § 2B1.4 ...................................................................... 21, 22

Defendant Robert Stewart, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits to assist the Court in sentencing him.

## PRELIMINARY STATEMENT

Mr. Stewart, 61 years old, stands before the Court, ashamed and deeply remorseful for his conduct.  He has admitted that he engaged in insider trading.  He makes no excuses for his unlawful conduct, and due to a sincere desire to accept responsibility for his actions and attempt to minimize the harm he has caused, he quickly accepted responsibility and pled guilty to one count of conspiracy to commit securities fraud and fraud in connection with a tender offer, in violation of 18 U.S.C. § 371.

Pursuant to his plea agreement with the Government, Mr. Stewart's agreed upon Guidelines range is 30 to 37 months' imprisonment—which is driven primarily from the total offense gain of approximately $1.16 million.  However, Mr. Stewart respectfully requests that the Court impose a non-Guidelines, non-custodial sentence of probation with community service. As explained more fully below, and consistent with criticism that has been lodged by practicing attorneys, scholars, professional organizations and judges, we submit that the Guidelines place undue emphasis on "gain," and are not a fair measure of Mr. Stewart's culpability.  This is particularly true where, as here, Mr. Stewart actually received less than a fifth of the overall gain from the offense—as reflected by his agreement with the Government to forfeit $150,000—and was unaware of more than half of the total gain.  Indeed, were the Guidelines to consider personal gain rather than total offense gain, the starting point for the analysis of Mr. Stewart's sentence would be 12 to 18 months' imprisonment.  Mr. Stewart asks that the Court take this into account when considering his request for a non-Guidelines sentence of probation.

Also, the factors set out in 18 U.S.C. §3553(a) favor a sentence of probation.  Most significantly, a sentence of incarceration will have a devastating impact on Mr. Stewart's family,

particularly his wife of almost 40 years.  Claudia Stewart suffers from serious medical conditions and relies exclusively (aside from professional medical caregivers) on Mr. Stewart for medical care and physical, emotional and economic support.  Without Mr. Stewart, Mrs. Stewart will be at grave risk.  In addition, Mr. Stewart plays a vital role in the upbringing of his grandchildren, and is a valuable member of his community.

The conduct that brings Mr. Stewart before this Court is a complete departure from the way Mr. Stewart has otherwise lived his life.  As demonstrated by this submission, including the attached letters submitted by family, friends and colleagues, Mr. Stewart has worked hard his entire life to support and help his family and friends, and to be a valuable and contributing member of his community.[1]  Moreover, he has already been punished by his actions, and incarceration is not necessary to provide additional deterrence or protect the public.  Accordingly, we respectfully request a non-custodial sentence of probation with a condition of community service, which is sufficient, but not greater than necessary, to satisfy the purposes of sentencing set forth in Section 3553(a).

## MR. STEWART'S BACKGROUND

### A.    Mr. Stewart's Personal History, Education and Career

Edward William and Elizabeth Stewart raised Mr. Stewart and his three siblings in a Christian home in Bethlehem, Pennsylvania.  Mr. Stewart's upbringing was not perfect—both of his parents suffered from alcoholic tendencies—but it was a cohesive family structure. At an early age Mr. Stewart embraced such important values as strong work ethic, commitment to family and the need to respect and help others.  (PSR ¶¶ 171-72.)   Mr. Stewart began working a newspaper route when he was approximately 11 years old, and also mowed lawns and shoveled

---

[1]    Letters submitted on Mr. Stewart's behalf from family, friends, and colleagues are attached to this submission at Exhibits A–N.

snow for neighbors.  (*Id.* ¶ 172.)  He excelled as a student at Liberty High School in Bethlehem, and became an Eagle Scout during high school.  As a committed Scout, Mr. Stewart served the community in many ways, including developing an accounting system for his church's collections, conducting book drives, and doing outdoor maintenance of public parks and properties.

Mr. Stewart graduated from college and earned his master's degree in business in 1980, and thereafter, attained his C.P.A. license.  (PSR ¶¶ 188, 191.)  He then began his accounting career at ███████████████.  (*Id.* ¶ 202.)  After approximately four years there, he and another individual started a small accounting firm, ███████████.  (*Id.* ¶¶ 201-02.)  In approximately 1991, Mr. Stewart was hired to serve as CFO at ████████████████ ██████████████████ where Mr. Stewart remained until 1998 when the company disbanded.  (*Id.* ¶ 200.)  Mr. Stewart made a strong, lasting and favorable impression on his colleagues at ████.  Jon Tracosas, who served as General Manager, recalls Mr. Stewart as "a man who could be relied upon; a man who was always willing to help co-workers, often volunteering his time and services" (Letter from J. Tracosas, Ex. M.)  Ralph Tuzzo, another ████ colleague, echoes this sentiment:

> There was no one who worked harder and was more dedicated to his job than Robert. The integrity he displayed goes beyond the norm. I was fortunate to have him as my accountant and amazed that I was never charged for doing my taxes, all these years.
>
> I remember when a fellow worker from the mailroom at the agency asked for his help in a dispute with his landlord, Robert took it upon himself to advise the fellow then met with the landlord to solve the problem. In addition to that good deed, he also demonstrated his outstanding character by also filing the taxes for that individual, without pay.

(Letter from R. Tuzzo, Ex. N.)

George Lois summarized Mr. Stewart's selfless nature and upstanding character:

> Writing a letter concerning a man's character, for Bob Stewart, immediately brings up memories of his almost unbelievable, innate kindness to dozens of his fellow workers . . . . he volunteered working late in his office and at home on the tax returns of a dozen or so upper management executives of the agency – but Bob made it clear that his door was open each and every year to rank and file workers – a dozen secretaries, many assistants, and mailroom personnel, all in desperate need of talented, and honest, financial help. And Bob Stewart never, ever, accepted a penny in return!
>
> I asked him one once why he was always so magnanimous, and he merely answered, "Some people really need help."

(Letter from G. Lois, Ex. J.)

Mr. Stewart's charity towards others—his helping hand—is something he does, time and time again, without thinking, and without expecting anything in return.

Since ███ dissolved in 1998, Mr. Stewart has held a number of jobs, many of them at early stage technology companies.  The most recent was with ███.  (PSR ¶¶ 194-99.) Mark Meyers, its founder and CEO, speaks to the critical support that Mr. Stewart provided to him during a difficult period in his life:

> In 2012, I met a company in New York that was willing to partner and fund ███ ███.  As we were going through the process of due diligence I met Mr. Stewart (Bob).   Bob was instantly a believer in the company and tried hard to make the investment happen.  After a year of diligence the other company decided to not fund ███.  Bob continued to be a friend and was helping me through a very tough time.
>
> In 2013 I was running out of options.  I left ███ in 2011 and invested every dollar I had into the company.  I was late on paying my mortgage and was getting to a point where I could not support my family.  After losing my entire life savings I was not only desperate for help with the business but was desperate for a friend to help me through a tough time.  My wife at the time wanted a divorce and I needed someone to help me keep this business moving.  Bob was the person who helped me and never asked for a dime.
>
> We were able to keep the business moving and in 2014 we actually were able to bring in funding and start building a real business, for which Bob then served as a CFO, from approximately July 2014 until approximately May 2015.  Bob was the rock that kept me going and was my friend who helped me keep things together.

(Letter from M. Meyers, Ex. K.)

4

In approximately 2008, Mr. Stewart formed ███████, through which he has provided business and accounting services to organizations.  He also operates a partnership, ████████ ████, which provides tax services to clients, mostly individuals.  (PSR ¶¶ 192-93, 206.)  Mr. Stewart has worked at, or invested in, numerous other companies over his career, and through his hard work, Mr. Stewart has managed to live a good life and to provide for his family.  However, Mr. Stewart has also made a series of poor investments and financial decisions, including investments in various Cinnabon food franchises that have not performed well.  (*Id.* ¶¶ 206, 208.)  Accordingly, Mr. Stewart has business loans and other debt that have caused him financial hardship.  (*Id.* ¶¶ 205, 209.)

## B.    Mr. Stewart's Devotion to Family and His Critical Role as Caregiver

Three generations of Mr. Stewart's family rely on him to fill the critical role of caregiver, and Mr. Stewart's devotion is unwavering.  As witnessed by Philip Brugge, a lifelong friend of 35 years:

> Bob exemplifies the true meaning of a devoted husband and father. He has gone to incredible lengths to educate his sons, provide for his wife, see to the long term care needs of his ailing mother-in law (recently deceased) and the on-going duties of a loving grandfather. He just seems to do it all without expecting any recognition or medal for his selfless acts of kindness and compassion.

(Letter from P. Brugge, Ex. F.)

Mr. Stewart met his wife in 1973, and they were married in 1977.  (PSR ¶ 174.)  They have been together 43 years.  Their commitment to one another has been steadfast and unwavering throughout the decades.  The couple raised two children, Sean and Ryan, sacrificing much and always putting the boys first.  Despite a busy work schedule, Mr. Stewart was actively involved with his children's schooling and activities, serving as a Boy Scout leader, baseball coach and soccer coach.  Ryan Stewart conveys the unconditional love and support Mr. Stewart demonstrated for his children:

My father sacrificed his life to ensure my brother and I had an incredible life.  My father made sure that we went to the best high school and college and was supportive in furthering our education, including staying up late to help us study or work on school projects. I can vividly remember how he would come home, attend our sporting events, we would eat dinner as a family, he would help us with homework, we would go to bed, and then my father's night was just beginning as he would work from home, working extra hard to make sure that he could support our family's needs, while making sure that he was present in our lives.  His presence continued all throughout my college days, as he and my mother would drive and / or fly hundreds of miles just to watch my college golf tournaments or be in attendance at college events.  My father has an unconditional love for his family which is deeper than any love that I have seen from any other father.

(Letter of R. Stewart, Ex. B.)

Apart from raising his children, Mr. Stewart's devotion to his family is best exemplified in the care he has provided to his wife over the course of several prolonged medical conditions; in the comfort and support he provided to his recently deceased mother-in-law during her battle with Alzheimer's disease; and in his commitment to caring for, and playing a significant role in the upbringing of, his grandchildren.  (PSR ¶¶ 175-77; Letter of R. Stewart, Ex. B; Letter of M. Stewart, Ex. C; Letter of C. Stewart, Ex. A.)

Claudia Stewart has been suffering over the past 14 years from numerous serious medical issues, ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████     ███████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

       ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

       As described more fully below, Mr. Stewart has been at Mrs. Stewart's side throughout

these medical problems: █████████████████████████████████████████████████████

████████████████████████████       He is a constant source of support and caregiving.  In sickness

and health, Mr. and Mrs. Stewart have stood as one, as partners.  In fact, sometimes they even

share the same thoughts: this past Halloween, as on a number of other occasions, Mr. and Mrs.

Stewart unknowingly purchased for one another the exact same holiday card.  In Mr. Stewart's

card to Mrs. Stewart, he wrote her a poem that expressed his commitment and love:

> It's a scary time, this Halloween night
> When ghosts and goblins give you a fright.
> But holding each other will get us through.
> Two bodies as one, me and you.
> For any time I am down or blue.
> The thought of your smile, your touch makes all smooth.
> So I exclaim again! You are the love of my life!!
> My lover, my partner, companion, so lucky you are my wife!!
> All my love, Bob."

(Ex. O.)  This poem—one of many Mr. Stewart has written for his wife—provides the Court

with a glimpse of the bond between Mr. and Mrs. Stewart, and the source of strength that Mr.

Stewart has been, and continues to be, for his wife.

As a result of her serious recurring health issues, when Mrs. Stewart's mother developed

Alzheimer's disease and needed assistance, Mrs. Stewart was unable to provide the level of care

her mother required.   Thankfully, Mr. Stewart was ready and willing to assume the role of

caregiver for Mrs. Stewart's mother as well.  According to Mrs. Stewart:

> During the last 4 years Bob was instrumental in providing care to my mother.
> Due to my medical issues, I could not do much for my mother physically.  Bob
> stepped up and handled many of the everyday tasks and chores associated with
> her well-being.  He was always at the ready to help or step in, whether it be
> picking my mother off the floor when an aide dropped her, ensuring that she was
> properly fed, making repairs in her apartment, and most importantly, just visiting
> her every day and spending time with her.  Unfortunately, my mother recently
> succumbed to the ravages of Alzheimer's Disease.

(Letter of C. Stewart, Ex. A; PSR ¶ 176.)

Many of the people close to Mr. Stewart remark about the incredible role he has filled in

caring for both Mrs. Stewart and her mother.  Lou Groia, a longtime friend, says:

> As I think about specific examples of who Bob Stewart is more and more come to
> mind. One example is how devoted he was to his mother in law, Mary Jane
> O'Connor. She has recently passed away but as far back as I can remember Bob
> has always been there helping her with everything from shopping to fixing things
> to planting with her, to caring for her medical needs. Bob and Claudia were
> always taking her to Church, dinner and including Mrs. O'Connor in everything

that they were doing at the time. Mrs. O'Connor has 2 sons and a daughter and the night that she passed away it was Bob who she wanted to see.

(Letter of L. Groia, Ex. H.)

Mr. Stewart's daughter-in-law, Marissa Stewart, has recognized the critical role Mr. Stewart has fulfilled as caregiver to his wife and mother-in-law, as well as to her own family:

> In addition to helping my immediate family, for many years, Bob was the caretaker for his ailing mother-in-law, before she recently passed away. Bob would begin and end each day visiting his mother-in-law's house and helping the health aides with the feeding and care of his mother-in-law. █████████████████████

(Letter of M. Stewart, Ex. C.)

As close family members and friends have observed, Mrs. Stewart's medical problems discussed above, ███████████████████████████████ inhibit her daily living and mobility.  Mrs. Stewart relies on Mr. Stewart for needed support, both to assist her and to run their household.   Ryan Stewart discusses how critical Mr. Stewart's presence is to the wellbeing of his mother:



(Letter of R. Stewart, Ex. B.)

As a result of her medical issues, Mrs. Stewart is limited in her vocation and earning ability.  Mr. Stewart is and has been the primary financial provider for his family.  However, after her sons left home for college, Mrs. Stewart has held a number of jobs, including, for the past decade, a position as a teacher's aide at a middle school. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████, and obtaining additional employment is not a viable option.

Throughout the course of Mrs. Stewart's medical issues and her mother's illness and death, Mr. Stewart has been a constant source of strength, support, comfort and encouragement to his wife and family.  Mr. Stewart's sisters, Barbara Stewart and Diane Flack, emphasize the vital role Mr. Stewart fulfills in his marriage; they also highlight the devastating effect incarceration would have on Mrs. Stewart:

> Bob continues to provide the emotional strength and stability in his marriage. He also has responsibility for all important decisions and activities and major responsibility for most day to day decisions and activities, due to Claudia's various health issues. Her current physical health issues will likely require Bob to provide significant caregiving from time to time as he has in the past. In light of Claudia's considerable dependence on Bob, we believe it would be extremely difficult for her to carry on without him in the home.

(Letter of B. Stewart and D. Flack, Ex. D.)

Mr. Stewart's commitment to his family also shows in the love and care he provides to his grandchildren.  Mr. Stewart's younger son Ryan has two children under the age of two, and his wife Marissa is expecting a third child in October 2016.  Ryan and Marissa depend on Mr. Stewart to help with regular childcare needs, and Mr. Stewart plays an important role in the lives of his grandchildren. According to Ryan:

My father is a crucial influence on the lives of my children. Unfortunately, given my work schedule, and difficulties of having two children under the age of two at home, along with my wife being pregnant with a third child, we rely on the help of my father to act as a key caretaker of our children. My father always makes it a priority to come over in the afternoons and assist my wife with the children. He is willing to drop everything that he has going on to help us.

██████████████████████████████████████████████████ Additionally, my ten month old daughter has her own needs and is obviously unable to care for herself; as such, my father plays a crucial role in the day-to-day duties of caring for our children. Not only is he around to assist with the children, but he has formed an incredible bond with ██████, and is truly a positive influence in teaching him how to speak, read, and develop key motor skills. My father has shown my children the same unconditional love that he has shown to our family, which has resulted in a crucial, necessary, irreplaceable positive influence. My dad is the backbone and glue that keeps my family together and we rely on him for so much when it comes to the wellbeing of my children.

(Letter of R. Stewart, Ex. B.)  Marissa Stewart reiterates that Ryan's work schedule keeps him away from home much of the time, such that her family relies heavily on Mr. Stewart for childcare:

My husband, Ryan, works 40 minutes away from our house, in New York City. As a mother with two children under two, it is not an understatement to say that we could not survive without Bob's assistance. Oftentimes, Ryan works late or travels out-of-state. In those instances, if I need help feeding or putting our children to bed, I know I can call Bob and he will come to our house on a moment's notice. Similarly, while managing the logistics of raising two young children, I can always count on Bob to stay with one child while I attend doctor's or other necessary appointments with our other child. The relationship he has developed with both ████████████████████ is beautiful. While he is far-removed from diapers, formula and feedings himself, Bob never struggled to readjust to these duties as the grandfather to our children. Our children look forward to the time they spend with Bob (or Gramps, as they refer to him.) I expect that I will rely on Bob even more after my third child is born.

(Letter of M. Stewart, Ex. C.)

Depriving Mr. Stewart's grandchildren of his presence would put severe strain on the family.  According to Mr. Stewart's sisters:

We have carefully considered the likely impact Bob's incarceration would have on his family. Bob has been and continues to be an active caregiver for his grandchildren. We believe separation would be difficult for the grandchildren who are emotionally attached to Bob and for their parents who depend upon Bob to assist them with caregiving.

(Letter of B. Stewart and D. Flack, Ex. D; *see also* Letter of C. Stewart, Ex. A, at 1 (explaining the vital role that Mr. Stewart provides in caring for, and in assisting in the upbringing of, his grandchildren).)

### C.    Mr. Stewart's Health Issues

Mr. Stewart, at 61 years old, suffers from his own medical problems. ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

Finally, while Mr. Stewart recognizes that he brought this upon himself by engaging in illegal conduct, ever since his arrest he has been under serious emotional strain—largely because

of his fear about what will happen to his wife if he goes to prison.  (*See infra* at Section III.B.1.)

### D.      Mr. Stewart's Life Has Been Characterized by Altruism and Commitment to Friends and Family

Throughout his life Mr. Stewart has always made the effort to help family, friends, colleagues, and members of his community.  Because of this, he is described as: "a family man and upright member of our community" "a man who was understated and humble; a man who values loyalty and friendship" and "a man of truly great character." (Letters of Rev. T. Gallagher (Ex. G), J. Tracosas (Ex. M), and G. Lois (Ex. J).)  Mr. Stewart often offers support and shows his friendship through small acts of kindness that leave strong impressions because of their thoughtfulness, as his friend John Healy remembers:

> As our friendship developed over the years I noticed that Bob and his wife Claudia together, went out of their way to do little kindnesses that are so often absent in todays world. Cards with good wishes would arrive for almost any occasion, just their way of letting you know YOU are important to us. On my birthday, a phone call, not just a text or Facebook post. Any time there was an illness or death in our family Bob and Claudia would call and offer kind words of support.                                                   Shortly afterward, a package arrived at my home. Inside was a beautiful leather bound book. Inside the pages were blank. Apparently, I mentioned to Bob that I might take a stab at creative writing since I would no longer be at the office all day. Buying that book told me they supported my desire to write and hoped that I would stay healthy enough to do so. I was really touched by their thoughtfulness and I told them so in writing and in person.

(Letter of J. Healy, Ex. I.)

Mr. Stewart's commitment to supporting others is not limited to small gestures and gifts. He has consistently made himself available to friends facing hardship.  Irene Pellicane, Mr.

Stewart's neighbor for nearly thirty years, speaks to the support Mr. Stewart provided her family

██████████████████████████ :

> My husband and I became friends with the Stewart's when our children were in
> elementary school. Over the years, Bob has become a steady source of comfort
> and support to my family. ██████████████████████████████ and
> Bob was always been a vigilant friend and neighbor. Whether offering to drive us
> to the hospital or coming over to make us laugh, he was a steadfast presence
> during a difficult time. What I did not know at the time was how much his support
> and love would grow after my husband passed in 2013. He and his wife Claudia
> became woven into our family during our darkest days. There was always a phone
> call or a visit to ask how he could be of assistance and for that, I will be eternally
> grateful. However, none of this came as a surprise, as Bob has never wavered in
> his care for my family.

(Letter of I. Pellicane, Ex. L.)

Such selfless friendship has earned Mr. Stewart the complete trust of those in his

community.   Phil Brugge trusts Mr. Stewart so deeply that he has made Mr. Stewart guardian for

his children:

> I have always had a complete trust in Bob to do the right thing regardless of the
> circumstances. My wife and I some years back named Bob second trustee and
> guardian for our (3) minor children. Truthfully there can be no greater trust and
> faith in a man than placing your children in his care and guardianship. I did that
> then and I would do that now, regardless of the allegations [sic] against Bob. I
> feel that strongly about his integrity and professionalism. It matters least to me
> what people or newspapers report regarding this case, deep down I know the man.

(Letter of P. Brugge, Ex. F.)

As a man of faith, Mr. Stewart is active in his church community at Sacred Heart Roman

Catholic Church in Merrick.   He attends church regularly and has volunteered time serving the

parish.   Lou Groia acknowledges Mr. Stewart's role in helping fundraise to build a new church

building:

> Bob is a well respected and involved member of our parish, Sacred Heart RC
> Church in Merrick, who has always given his time to help those in need. Bob was
> part of the New Church Committee and instrumental in helping to raise the funds
> to build our new church by giving his time to make calls to other parishioners
> asking for donations. Bob was also very involved in our parish working with the

> Boy Scouts, and serving as a leader and role model to the boys who have participated.  He also possesses a great deal of integrity, constantly strives to make sure that he is always doing the right thing. Bob is that friend that you look to and say "I would like to be more like Bob".

(Letter of L. Groia, Ex. H.)

Mr. Stewart volunteered as a Boy Scout leader and handled the group's financial matters when his sons were involved in the organization.  Father Thomas Gallagher, who was Mr. Stewart's pastor for nearly forty five years, recalls working with him on the Boy Scouts program at the church:

> Over those years, I did note and admire the close family life that Claudia and Bob had created with and for their sons. For years Bob was involved in the Boy Scout program we had at Sacred Heart and served that program in varied ways. I do recall handling some financial matters with him in his role with the BSA. It was our custom to tithe to several parish related organizations, the BSA being one of them. It struck me that his colleagues in the parish BSA program knew and respected him enough to trust him with this responsibility. (It was also an indication that as a convert he had embraced his place in our parish to the degree that gained him this respect and trust.)

(Letter of Rev. T. Gallagher, Ex. G.)  Additionally, Father Gallagher speaks to Mr. Stewart's character and role in the church community:

> Bob is a very mild mannered person. I never found him to be anything but respectful, obliging and exceptionally forthright when it came to dealing with me as his pastor. In fact, I found him to be a true and genuine spirit within the community of the parish and a man who cultivated a strong dedication to his family and friends.

(*Id*.)  Wherever he encounters people in need, Mr. Stewart is affected by their situation and offers to lend a helping hand.  Mrs. Stewart offers an anecdote in her letter of a recent case in which Mr. Stewart literally did lend a hand:

> Recently, during the big snowstorm in January of this year, Bob dropped me off at an appointment and waited in the car for me nearby.  I looked out the window from my appointment and observed him carrying groceries through the snow for various people.  When I finished my appointment and asked what he did while I was inside, he only told me he did some reading—and he did not mention the random acts of kindness I observed.

17

(Letter of C. Stewart, Ex. A.)

In short, Mr. Stewart is a person who is beloved by those in his community because of how considerate and respectful he is towards others. People know who he is and enjoy seeing him around town:

> One of my favorite anecdotes about Bob is that no matter where you go with him in our town, everyone knows and asks for him. From the local pizzeria to the post office to the dry cleaner and the ice cream parlor, his presence is felt in the community. He has always been active in his son's schools and their church congregation. This is a rare quality in this day and age and speaks to Bob's genuine, thoughtful character.

(Letter of I. Pellicane, Ex. L.)

Since the passing of his mother-in-law this past November 2015, Mr. Stewart has committed to doing volunteer work for the elderly; to that end, he has offered his services to the Long Island Family & Elder Care Trading Post (the "Trading Post"), a non-profit organization in Bellmore, New York, that "helps elderly, disabled and handicapped people who are unable to care for themselves remain in their homes with their families and loved ones or find a new place to call home, by assisting them in identifying and applying for resources that can help them." *See* https://lifec.org/our-mission.  Mr. and Mrs. Stewart first learned of the Trading Post when volunteers there assisted the Stewarts with several issues surrounding care for Mrs. Stewart's mother.  Characteristic of Mr. Stewart, he is now looking to give back.

### E.    Mr. Stewart's Life Since His Arrest

Mr. Stewart barely sleeps since his arrest.  He is haunted by his actions.  He recognizes, very sincerely, that his conduct was wrong.  As far as punishment, a custodial sentence is not warranted here to reprimand Mr. Stewart.  That punishment has already come.  Mr. Stewart has irreparably harmed his family.  His son Sean is facing criminal charges; Mr. Stewart's ability to support his family financially has decreased dramatically, through his diminished employment

prospects and substantial financial levies he faces as a result of this case and the parallel Securities and Exchange Commission ("SEC") action; and most significantly, he has placed himself in a position where he may be unable to provide physical, emotional or financial support to his wife and to be present for his grandchildren during formative years of their lives. The prospect of not being there to support his family—and frankly, the concern that his wife will not survive in his absence—has agonized Mr. Stewart since his arrest, and is the reason he seeks leniency from the Court.

## RELEVANT SENTENCING CONSIDERATIONS

Mr. Stewart has accepted responsibility for his actions and pleaded guilty to conduct that carries an applicable Guidelines range of 30 to 37 months' imprisonment. However, this Guidelines range does not account for all relevant sentencing considerations, including: (1) the fact that Mr. Stewart received just a small portion of the overall trading profits from the offense; and (2) the 3553(a) factors, which this Court must evaluate in fashioning an appropriate sentence. As set forth below, we respectfully submit that upon consideration of these factors, a non-custodial sentence of probation with a condition of community service (and, should the Court deem it necessary, a term of home confinement), is an appropriate sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. 18 U.S.C. § 3553(a).

## I.    THE PLEA AGREEMENT AND OFFENSE CONDUCT

Mr. Stewart was arrested on May 14, 2015, pursuant to a Complaint, for insider trading. Immediately upon his arrest he agreed to speak to FBI agents and he admitted that he engaged in wrongful conduct. On August 12, 2015, shortly after an indictment was returned, Mr. Stewart pleaded guilty before Magistrate Judge Francis, pursuant to a plea agreement ("Plea

Agreement"), to conspiring to commit securities fraud and fraud in connection with a tender offer, in violation of 18 U.S.C. § 371, as charged in Count One of the Indictment.[2]

Under the terms of the Plea Agreement and as calculated in the PSR, Mr. Stewart's total offense level is 19 (a base offense level of 8, plus 14 levels because the gain from the offense was between $550,000 and $1,500,000, minus 3 levels for acceptance of responsibility) and his Criminal History Category is I, resulting in a Stipulated Guidelines Range of 30 to 37 months' imprisonment ("Stipulated Guidelines Range").  (PSR ¶¶ 7, 212-13.)  However, either party may seek a sentence outside the Stipulated Guidelines Range based upon the factors set forth in 18 U.S.C. § 3553(a).  (Id. ¶ 225.)

As reflected in his allocution to the Court, Mr. Stewart acknowledged that he used material non-public information about a number of companies for personal benefit, by trading on his own or, in most instances by sharing the information with Mr. Cunniffe.  (Id. ¶ 153.)  Mr. Cunniffe then placed trades and shared some of the trading profits with Mr. Stewart, primarily through small, cash payments to Mr. Stewart.  (Id. ¶ 97.)  The total offense gain is approximately $1.16 million.  (Id. ¶ 30.)  Of this amount, it is unknown precisely how much Mr. Stewart received, but it is undisputed that most of the profits went to the Government's cooperator, Mr. Cunniffe.   The Government believes that Mr. Stewart personally profited approximately $150,000, and while Mr. Stewart believes he received less, because he desired to resolve this case promptly, he agreed to forfeit $150,000.  (See Stewart Preliminary Order of Forfeiture, ECF No. 36.)  Mr. Cunniffe, who received most of the trading profits, is required to forfeit $900,000 per his agreement with the Government.   As explained below (see infra at Part II.B), if the Guidelines were to be calculated based on the gain a defendant personally received—which

---

[2]      This Court accepted Mr. Stewart's guilty plea by order dated September 3, 2015. Sentencing is scheduled for May 4, 2016.

admittedly is not what is called for under the current Sentencing Guidelines framework—then the starting point for the Court's analysis would be a Guidelines range of 12 to 18 months.

In addition, Mr. Stewart was unaware of the scope and magnitude of Mr. Cunniffe's trading until after Mr. Stewart was arrested.  Upon reading the allegations, Mr. Stewart learned that Mr. Cunniffe was not only trading in his brokerage account (the "Brokerage Account"), but was also placing trades in his personal IRA Account (the "IRA Account").[3]  Based on the Government's allegations and the virtually identical ones contained in the SEC's parallel civil complaint against Mr. Stewart (*see SEC v. Sean Stewart & Robert Stewart*, 15 Civ. 3719, filed May 14, 2015 (the "SEC Complaint")), Mr. Stewart learned not only that Mr. Cunniffe had realized trading profits of approximately $1.16 million, but that more than half of this amount— approximately $566,000—was from trades in Mr. Cunniffe's IRA Account.  (SEC Compl. at ¶¶ 52-53, 73-74, 82-83, 98-99.)  Mr. Stewart did not receive any of the trading profits from the IRA Account—nor could he—and was unaware of this trading activity.

## II.    THE SENTENCING GUIDELINES PLACE A DISPROPORTIONATE EMPHASIS ON GAIN, PARTICULARLY AS APPLIED TO MR. STEWART

Mr. Stewart's advisory Guidelines range is driven almost entirely by the total gain from the instant offense of approximately $1.16 million dollars.  *See* U.S.S.G. §§ 2B1.4, 2B1.1. However, gain is not necessarily a fair measure of culpability.  In many cases, the correlation between total gain and culpability is attenuated at best, and leads to unfair and irrational sentences.  This is even more a concern when, as here, the total gain exceeds that which a

---

[3]    The Government has suggested that the cooperating witness, Mr. Cunniffe, reportedly told Mr. Stewart about the trades Mr. Cunniffe was placing in his IRA Account.  To the contrary, Mr. Stewart did not know about such trading activity, and believes Mr. Cunniffe advised the Government that he was not certain whether he told Mr. Stewart about his IRA trading activity.

particular defendant received or even knew about. Accordingly, Mr. Stewart respectfully requests that the Court decline to rely on a guidelines calculation that is anchored on gain.

### A. Courts and Other Authorities Have Recognized the Unfair Reliance on Gain in the Sentencing Guidelines

In recent years, courts have recognized that the Sentencing Guidelines place an untoward emphasis on "gain resulting from the offense." U.S.S.G. §§2B1.4, 2B1.1; *see, e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.").[4]

Because of the arbitrary anchoring of Guidelines ranges on gain, courts in this district have suggested time and again in insider trading cases that the Guidelines can lead to unfair and even absurd sentencing ranges. *See* Sentencing Tr. at 7:13-22, *United States v. Whitman,* 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24, 2013) ("*Whitman* Sentencing Tr.") (Ex. P); Sentencing Tr. at 3:22-4:16*, United States v. Rosen*, No. 11 Cr. 300 (JSR) (S.D.N.Y. May 7, 2012) ("*Rosen* Sentencing Tr.") (Ex. Q); Sentencing Tr. 3:22-4:16, *United States v. Gupta*, No. 11 Cr. 907 (JSR) (S.D.N.Y. Oct. 24, 2012) ("*Gupta* Sentencing Tr.") (Ex. R); Sentencing Tr. at 4:17-22, *United States v. Fleishman*, No. 11 Cr. 32 (JSR) (S.D.N.Y. Dec. 21, 2011) ("*Fleishman* Sentencing Tr.") (Ex. S); Sentencing Tr. at 58:1–11, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 17, 2010) ("*Contorinis* Sentencing Tr.") (Ex. T). As a result, there is a gaining groundswell of

---

[4]     *See United States v. Corsey*, 723 F.3d 366, 378-79 (2d Cir. 2013) (Underhill, J., concurring) (recognizing a "widespread perception that the loss guideline is broken, [leaving] district judges without meaningful guidance in high-loss [fraud] cases"); *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (GEL) (condemning the "excessive weight on [the fraud loss] factor" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

support for a different sentencing regime that does not place such a disproportionate emphasis on gain or loss in fraud cases.

Even the U.S. Sentencing Commission has recognized that the Guidelines are not aligned with a defendant's culpability in economic crimes.  In 2014, the U.S. Sentencing Commission announced that one of its policy priorities for the 2014–2015 Amendment Cycle was "to consider potential changes to the guidelines resulting from its multi-year review of federal sentences for economic crimes."  *See* U.S. Sentencing Commission Press Release (August 14, 2014), available at http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories /press-releases/20140814_Press_Release_Revised.pdf.  The Commission specifically identified "loss amounts" as an area of the Guidelines it would consider during this review.  (*Id.*)  In November 2015, the Commission amended the Guidelines modestly by increasing the amount of gain or loss associated with certain offense levels.  But it did not change the almost absolute reliance that the Guidelines calculation places on the loss tables.  The Commission's effort to address the irrational results from the loss calculations was simply not enough to address the problem.

Jurists, practitioners and scholars have criticized the economic crimes Guidelines for the irrational approach to loss and gain.  To that end, the American Bar Association commissioned a task force ("ABA Task Force") to propose amendments to the economic crimes Guidelines.[5] The ABA Task Force Report, which was published in November 2014, offered an alternative

---

[5]     Members of the ABA Task Force included practicing attorneys, academics, and jurists, including the Honorable Gerard Lynch (U.S. Court of Appeals for the Second Circuit), the Honorable John Gleeson (formerly of the U.S. District Court for the Eastern District of New York), the Honorable Nancy Gertner (Professor at Harvard Law School, and formerly of the U.S. District Court for the District of Massachusetts), and the Honorable Jed Rakoff (U.S. District Court for the Southern District of New York).  A full list of its members can be found at http://www.americanbar.org/groups/criminal_justice/economic_crimes_taskforce.html.

approach to sentencing financial crimes defendants, shifting the focus from "loss" to "culpability." *See* A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes (Nov. 10, 2014) ("ABA Task Force Report"), *available at* http://www.americanbar.org/content/dam/aba/uncatego rized/criminal_justice/economic_crimes.authcheckdam.pdf.   The ABA Task Force Report proposed a comprehensive overhaul of the Guidelines for economic crimes.   In addition to moving the Guidelines away from an emphasis on loss, the Task Force was concerned with sentences for first time non-violent offenders who commit non-serious offenses.  The ABA Task Force recommended that "[i]f the defendant has zero criminal history points under Chapter 4 and the offense was not 'otherwise serious' within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and ***a sentence other than imprisonment is generally appropriate***." *See id.* at 2 (emphasis added).   The ABA Task Force did not introduce this guideline for economic crimes as its own creation:  it was taken directly from the Sentencing Reform Act, which originally authorized the Sentencing Commission to promulgate guidelines to the courts of the United States.  In describing the duties of the Sentencing Commission, Congress directed:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C.A. § 994(j) (West).  As Judge Gleeson has recognized, this Congressional mandate to the Sentencing Commission,

> was supposed to ensure 'the general appropriateness' of probationary sentences for first-time offenders unless they commit 'crime[s] of violence or ... otherwise serious offense[s].'  Instead, [the Sentencing Commission] unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider trading, fraud, and

> embezzlement case is 'otherwise serious,' and thus no more eligible for a
> sentence of probation, even when committed by a firsttime offender, than would a
> crime of violence.  As Professor Kate Stith and Judge José A. Cabranes observed
> fifteen years ago, 'While before the Guidelines nearly 50 percent of federal
> defendants were sentenced to probation alone, that figure is now less than 15
> percent.'  Last week the Commission reported that that figure is now less than six
> percent.

*United States v. Leitch*, No. 11 Cr. 00039 (JG), 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28,

2013) (internal citations omitted, alterations in original).

The ABA Task Force recommended that the factors to be considered by courts

determining whether the offense is one for which a sentence of probation is appropriate should

include the following:

> the amount of the loss; whether loss was intended at the outset of the offense
> conduct; whether the defendant's gain from the offense is less than the loss;
> whether the defendant's offense conduct lacked sophistication (including whether
> it was committed in a routine manner or without the involvement of a large
> number of participants); whether the defendant acted under duress or coercion;
> the duration of the offense conduct and the defendant's participation in it; whether
> the defendant voluntarily ceased the offense conduct before it was detected; and
> the nature of the victim impact caused by the offense.

ABA Task Force Report at 6-7.  The ABA Task Force's recommendation has not been adopted

by the Sentencing Commission, but reflects the support of respected judges, scholars and

practitioners who are intimate with the federal sentencing system, that a sentencing court's

attention should not revolve around gain, but should take a broader view of the offense by

looking at a number of other factors.  This is wholly consistent with Congress's directive that

courts, in fashioning a sentence that is fair and appropriate, must consider a wide variety of

factors, including a defendant's history and characteristics and the nature of the offense.  More

significantly, courts have started to rely on the ABA Task Force's analysis in fashioning

sentences that place less reliance on loss or gain.  *See, e.g.,* Sentencing Tr. at 23:13-24:1, *United*

*States v. Faibish*, No. 12 Cr. 265 (ENV) (E.D.N.Y. Mar. 10, 2016) ("*Faibish* Sentencing Tr.")

(Ex. U) (imposing a 63-month sentence when the Guidelines recommended an 80-year term of imprisonment).

Here, for the reasons discussed below, the advisory Guidelines range of 30 to 37 months is not an appropriate indicator of the sentence Mr. Stewart should receive. *See Whitman* Sentencing Tr. at 7:19-20; 9:17-18 (Ex. P) (Judge Rakoff noted "that the guidelines place far too much emphasis on the alleged monetary gain" and "are skewed irrationally in this respect.").

**B.     In this Case, Almost All of the Trading Profits Went to Mr. Stewart's Co-Conspirator**

As stated above (*see supra* Part I), Mr. Stewart received less than twenty percent of the total offense gain.  The Government's forfeiture agreements with Mr.Cunniffe ($900,000) and Mr. Stewart ($150,000) confirm this.  In addition, more than half of the total trading profits were earned by Mr. Cunniffe in his personal IRA Account, from which Mr. Stewart did not benefit. These facts are relevant to this Court's determination of an appropriate sentence.

In fashioning an appropriate sentence in an insider trading case, Judge Rakoff explained the "irrationality" of including the profits of a defendant's accomplices:

> [T]here is no better illustration of the irrationality of this approach than the instant case: for of the total of 30 Guidelines points calculated by the Probation Department and endorsed by the Government as reflecting the proper measure of Mr. Gupta's crime and punishment, no fewer than 20—or two-thirds of the total—are exclusively the product of Mr. Rajaratnam's and his companies' monetary gain, in which Mr. Gupta did not share in any direct sense. . . .  [I]f the sentences so calculated are the product of placing an overwhelming emphasis on a factor that may be central to some frauds but largely incidental to others, the effect is to create, in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind.

*Gupta*, 904 F. Supp. 2d at 351.  The same logic applies in the Court's consideration of Mr. Stewart.  Of the 14-level increase in Mr. Stewart's Guidelines calculation that is ascribed to gain,

at least 6 levels are the "exclusive product" of gain that Mr. Stewart did not receive (and much of it, he did not know about).[6]

Accordingly, in evaluating his request for a sentence of probation, Mr. Stewart respectfully asks that the Court consider that the advisory Guidelines range of 30 to 37 months is driven by an amount of money that Mr. Stewart did not receive, and thus, should not be the starting point for the Court's evaluation. Rather, to the extent any Guidelines calculation tethered to gain would provide an appropriate starting point for the Court's analysis, it would be a calculation based on a personal gain of up to $150,000, which yields a Guidelines range of 12 to 18 months.

## III.   A NON-CUSTODIAL SENTENCE IS WARRANTED PURSUANT TO 18 U.S.C. § 3553

In any event, the Guidelines range is advisory and is only one of a number of relevant considerations. As this Court knows, it must consider the sentencing factors set forth in 18 U.S.C. § 3553(a) in order to determine a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a). Thus, the Court, in fashioning an appropriate sentence, shall consider:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

    (2) the need for the sentence imposed—

        (A) to reflect the seriousness of offense, to promote respect for the law, and to provide just punishment for the offense;

---

[6]     Moreover, of the $150,000 that Mr. Stewart agreed to forfeit, there is no dispute that Mr. Stewart did not receive this entire amount. Instead, with Mr. Stewart's agreement, Mr. Cunniffe invested approximately $50,000 on Mr. Stewart's behalf, and Mr. Stewart had received only a few thousand dollars back as a return on this investment at the time of his arrest. Mr. Stewart has no expectation that he will ever receive any additional return on this investment, but nonetheless Mr. Stewart has agreed to forfeit this amount to the Government in the interest of resolving the charges against him and taking responsibility.

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

U.S.C. § 3553(a)(1) & (2).  *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (directing district courts not to "presume that a Guidelines sentence is reasonable" and requiring courts to perform an "independent review of the sentencing factors" in each case); *Rita v. United States*, 551 U.S. 338, 367 (2007) (the Guidelines are "truly advisory").

Section 3553(a) also requires the Court to consider the "kinds of sentences available." 18 U.S.C. § 3553(a)(3).  Here, a probationary sentence with a condition of community service is a sufficient punishment, and satisfies the goals of deterrence as well.  As Judge Gleeson has articulated:

> [I]t bears emphasis that when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment. And as the Supreme Court has recognized, probation is *significant* punishment:
>
> "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court."
>
> In addition to standard and special conditions, there is an array of alternative sanctions—home confinement, community service, and fines, for example—that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison.

*Leitch,* 2013 WL 753445, at *12 (internal quotations and citations omitted).  For the reasons articulated below, we respectfully request that the Court sentence Mr. Stewart to a sentence of probation.

> ### A.     The Nature and Circumstances of the Offense Weigh in Favor of A Non-Custodial Sentence

Mr. Stewart promptly accepted responsibility for his actions, and he acknowledges that what he did was unlawful.  There is no allegation that he obstructed law enforcement to conceal his actions—he did not.  In fact, on the day he was arrested, Mr. Stewart spoke to FBI Agents and conceded that he knew what he did was wrong.  In evaluating an appropriate sentence under Section 3553(a), there are several facts concerning the nature and circumstances of Mr. Stewart's particular offense that support leniency and a non-custodial sentence.

First, the offense was limited in its participants and was far from sophisticated.  Mr. Stewart, who is not a professional trader, shared material, non-public information with Mr. Cunniffe, so that Mr. Cunniffe could trade based on this information.  Aside from the very few trades Mr. Stewart placed early on during the course of this illegal scheme, Mr. Cunniffe made virtually all of the trading decisions, including the timing of trades, the types of options to purchase, and the volume of securities to purchase.  As discussed above (*see supra* at Part I), Mr. Stewart was unaware of the scope of Mr. Cunniffe's trading.

Second, Mr. Stewart never intended for any victim to sustain loss in connection with his conduct.  And—while there is no question that individuals have suffered as a result of Mr. Stewart's conduct—Mr. Stewart did not steal money from anyone and there are no identifiable victims of Mr. Stewart's offense to support a severe sentence.  Indeed, Mr. Stewart is tortured every moment with the knowledge that his actions have irreparably harmed his own family.

29

**B.      Mr. Stewart's Personal History and Characteristics Support Leniency**

Mr. Stewart acknowledges that he has made grave errors.  But, as reflected in the many letters submitted on his behalf (*see* Exs. A–N), Mr. Stewart, while not perfect, has worked hard to be a good husband, father, grandfather, sibling, and colleague.  He is not an individual who poses a risk of recidivism, and the conduct that brings him before the Court—for which he is deeply remorseful—is an aberration from his otherwise upstanding life.  Mr. Stewart is strongly committed to his family and community, and his unique family circumstances call for a lenient, non-custodial sentence.

1.      A Custodial Sentence Would Have Severe Consequences on Mrs. Stewart

Most significantly, Mr. Stewart has been caring for, and is needed to care for, his wife, ████████████████████████████████████████████████████████████.  No other family member is available to fill Mr. Stewart's role if he is incarcerated, and his absence will "wreak extraordinary destruction" on Mrs. Stewart.  *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992).  Moreover, as is demonstrated by his past actions, Mr. Stewart's commitment to Mrs. Stewart is unwavering.

Mr. and Mrs. Stewart are life partners.  They have been together for 43 years, have raised children together, have experienced gloriously happy moments together, and have weathered many storms standing side by side.  Through these decades, they have naturally developed a reliance on one another.  But theirs is not the typical situation that presents itself when a spouse faces imprisonment, leaving behind family dependents to carry on in the defendant's absence.  We recognize that in virtually all such situations, a defendant's family members face a hardship during the defendant's term of imprisonment.  But this situation is not like most; it is an extreme situation, ████████████████████████████████████████████████████████████

████████ (*See supra* at 6–13.)

Aside from medical professionals, ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████        In addition, Mr. Stewart is responsible for, and carries out, necessary household responsibilities beyond simply caring for Mrs. Stewart physically.  These responsibilities include, but are not limited to, paying bills and monitoring their finances; maintaining the house, including making necessary repairs (or coordinating with a repair person); car maintenance and repairs; and shopping.

As Mr. Stewart's son Ryan noted:

[Mr. Stewart] is the only caretaker for my mother including taking her to doctors, administering medicine, assisting her with physical therapy and being her key emotional support which has been crucial to my mother given the emotional impact that all of her medical issues has on her.  My mom would have extreme difficulty in surviving on a daily basis without the help of my father.

(Letter of R. Stewart, Ex B.)

31

This message has been reiterated by others, including Mrs. Stewart herself who, after describing some of her medical problems, states:



(Letter of C. Stewart, Ex. A.)  Indeed, Mrs. Stewart simply does not have the capacity to carry on independently without Mr. Stewart.  ████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████  and she certainly cannot maintain a household.  And, if Mr. Stewart is incarcerated, there is no one who can assume his role.  Mr. and Mrs. Stewarts' son Sean is charged in the instant case, faces trial before this Court in July 2016, will be consumed with preparing for trial, faces an uncertain future, and at present, is not at liberty to leave his home as he pleases.  The Stewarts' other son, Ryan, and Ryan's wife Marissa, simply do not have the capacity to care for Mrs. Stewart's medical needs, or to assist with her household responsibilities, given their family situation.  Ryan works fifteen hour days, and he and Marissa, currently parents to two children ages two and under, are expecting their third child in October 2016.  (*See* Letter of R. Stewart ("Given that I work over 80 hours each week and I travel out of the state, and my wife has to take care of currently two children (and soon to be three children), we are not in a position to assist my mother on a daily basis.  Therefore, my father is the only person who can take care of my mother and give her the assistance that she requires to survive and hopefully improve her health."); Letter of M. Stewart ("As much as I wish to help [Claudia],

I will be too busy caring for my 3 young children and not in a position to help.").)  With their demanding family situations, it is not realistic or possible for Ryan or Marissa to assume Mr. Stewart's responsibilities if he is incarcerated.

Moreover, from a financial perspective, while Mr. Stewart's employment opportunities are constrained as a result of the instant offense, he is unquestionably the sole provider for Mrs. Stewart. ███████████████████████████████████████████

███████████████████████████████  Even though this amount does not cover the Stewarts' monthly expenses (*see* PSR ¶ 205 ███████████████████████████████

████████████████), it goes a substantial way toward their expenses.  Mrs. Stewart, however, does not have any significant earning capacity.  Her income as a teacher's aide is extremely modest: ███████████████████████████████████████  (PSR ¶ 205.) ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  (*See id*.)

In exceptional situations such as this, where a defendant has a dependent that relies upon him for support and no other family member can assume the role of providing necessary care and financial support, courts have recognized that a non-Guidelines sentence—including a non-custodial sentence—may be appropriate.  In *United States v. Huerta*, 371 F.3d 88 (2004), the Second Circuit made clear that "the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents [ ] is a central part of the extraordinary family circumstances inquiry."  *Id.* at 95.  Accordingly, in

---

[7]     Mr. Stewart anticipates that virtually all, if not all, of his savings will be used to satisfy the forfeiture order of $150,000, as well as any additional fines levied by the SEC in connection with its case against him (which he anticipates settling).

*United States v. Kon*, No. 04 CR, 271-03(RWS), 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006),

the district court sentenced the defendant, who faced a guidelines range of 30-37 months'

imprisonment for a drug-related conviction, to a non-Guidelines sentence of time served.[8]   The

principal factor that led to the court's imposition of the non-custodial sentence was its

determination that the defendant's family circumstances were extraordinary.  The defendant was

the sole caretaker of her two year old daughter, she had no immediate family in the United States

upon whom she could rely to assist with her daughter, and her estranged husband's family had

demonstrated no willingness to assist.  *Id.* at *4-5.

Similarly, in *United States v. Roberts*, No. 01 CR 410(RWS), 2005 WL 1153757

(S.D.N.Y. May 16, 2005), the district court imposed a sentence of time served (to include ten

months of home confinement) upon a defendant facing a Guidelines range of 10-16 months'

imprisonment.  *Id.* at *4-7.  There, the defendant's extraordinary family circumstances were a

primary factor that led to the court's imposition of a non-incarceratory sentence.  The defendant

was the sole caretaker for his chronically ill and disabled life partner who, among other

challenges, "experience[d] difficulty with everyday living, including keeping track of

medications, cooking and cleaning."  *Id.* at *5.  The defendant acted as his partner's "exclusive

care-taker, assisting her with any and all of her daily activities, administering her medication,

maintaining their residence, and providing her with a regular regiment of physical therapy."  *Id.*

Also, since the defendant's partner was unable to work, only the defendant could "earn a steady

income to support their home and [his partner's] medical needs."  *Id.*

---

[8]     The District Court in *Kon* determined that the extraordinary family circumstances
presented in that case supported either a downward departure or alternatively, a non-Guidelines
sentence in consideration of the factors set out at 18 U.S.C. § 3553(a)(1).  2006 WL 3208555, at
*5.

Similar to the situations presented in *Roberts* and *Kon,* Mr. Stewart's family circumstances present an extraordinary case, as measured by Mrs. Stewart's reliance upon her husband, and the severity of the impact that Mr. Stewart's incarceration would have on her. Without Mr. Stewart, Mrs. Stewart ██████████████████████████████████████ ████████████████████████████████████████ Additionally, if Mr. Stewart is incarcerated, Mrs. Stewart will be unable to pay necessary living expenses, mortgage payments, medical bills and other necessities, and will be unable to maintain her house.

Accordingly, we respectfully request that the Court impose a non-custodial sentence of probation with a condition of community service (or, should the Court deem it warranted, a term of home confinement), so as to enable Mr. Stewart to continue to provide necessary care and financial support for Claudia.

2.   Mr. Stewart's Family Role as Caregiver Warrants Leniency

Mr. Stewart is a loving grandfather who is heavily involved in the day-to-day care for his two young grandchildren, ████████████████. As discussed above (*see supra* at 13–14), Marissa and Ryan Stewart, depend greatly on Mr. Stewart (and Mrs. Stewart, as she is able) to provide child care multiple days a week.  If Mr. Stewart is incarcerated, Ryan and Marissa's childcare situation will be even more challenging, particularly with the arrival of their third child in October.   Mr. Stewart's incarceration would inevitably limit Mrs. Stewart's ability to babysit—to the extent she is even physically able—because of the additional responsibilities she will be forced to try to handle in Mr. Stewart's absence.  In this respect, as in many other respects, Mr. Stewart's history in providing needed support and care to his grandchildren, demonstrate his enduring commitment to family, and Marissa and Ryan Stewart are depending on Mr. Stewart.  (*See* Letter of M. Stewart, Ex. C ("As a mother with two children under two, it is not an understatement to say that we could not survive without Bob's assistance. . . .

35

He is a daily, crucial part of our lives."); Letter of R. Stewart, Ex. B ("My father is a crucial influence on the lives of my children.  Unfortunately, given my work schedule, and difficulties of having two children under the age of two at home, along with my wife being pregnant with a third child, we rely on the help of my father to act as a key caretaker of our children. . . . My dad is the backbone and glue that keeps my family together and we rely on him for some much when it comes to the wellbeing of my children.")

Accordingly, we respectfully submit that Mr. Stewart's history of caregiving and commitment to his family, coupled with their significant dependence upon him, support a lenient sentence.

### C.   The Need to Promote the Purposes of Sentencing Weighs In Favor of a Non-Custodial Sentence

As set forth above, this Court must fashion a sentence that is "sufficient, but not greater than necessary," to further the relevant sentencing purposes, which include "provid[ing] just punishment for the offense," "afford[ing] adequate deterrence to criminal conduct," "protect[ing] the public from further crimes of the defendant," and "provid[ing] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(A)-(D).  We respectfully submit that given the circumstances present here, a non-custodial sentence will appropriately address these purposes, and incarceration is unnecessary.

### 1.   Deterrence Is Achieved By a Non-Custodial Sentence

The Court must fashion a sentence that "afford[s] adequate deterrence to criminal conduct," and "protect[s] the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(B) & (C).  Here, we respectfully submit that a non-custodial sentence is sufficient to accomplish both of these purposes and will provide both specific and general deterrence.

With respect to specific deterrence, Mr. Stewart already faces severe penalties as a result of his misconduct. He has agreed to forfeit $150,000, and he faces considerable penalties in connection with the parallel SEC action. The combination of these financial penalties already threatens to far exceed any ability to pay by Mr. Stewart, and he will likely be contributing to these penalties for the remainder of his life. Further, as a result of his conduct and arrest, Mr. Stewart's employment opportunities are significantly restricted. Given the publicity and the nature of the charges he faced, he resigned from his job ████████ (which was unrelated to his conduct that brought him here), and as a result of his felony conviction, his earning ability is substantially diminished.

In addition to the financial toll his misconduct has had on Mr. Stewart and his family, Mr. Stewart's conduct has had a devastating emotional toll on his wife and children. Mr. Stewart's actions have contributed to charges being brought against his son Sean. The suffering this has brought to his family cannot be overstated. The relationship Mr. Stewart once had with his sons (as a role model, mentor, and friend) is irreparably damaged and is unlikely to ever recover. Mrs. Stewart has suffered additional emotional trauma as a result of constantly reliving the morning of Mr. Stewart's arrest, which haunts both Mrs. and Mr. Stewart. As Mrs. Stewart writes:

> We were awoken by the banging on the door in the early morning, and when we looked out the window we saw the front lawn covered with armed agents. I am haunted by the humiliation of having my husband stripped in front of strangers, the man-handling of myself by agents who kept trying to get me to sit even though I physically was unable, the taunting tone of agents stating that others in our family were going to be arrested. I then had to go downstairs without my glasses, so that I was not only in jeopardy of falling but I was unable to see what was going on. Agents were rooting through our house for "firearms," yet we are so against weapons because Bob's grandfather, an avid hunter, accidentally shot and killed himself, so even the thought of having firearms in our house is so disturbing to us. I relive the trauma of these events every day, and there is not a night that I sleep through and not a morning I do not wake and dread looking out

37

the window.  I know Bob is going through the same trauma.  While not a punishment in the physical manner, it is a mental punishment that will outlast any sentence and will be with us forever.

(Letter of C. Stewart, Ex. A)

As a result of the suffering that has already ensued from his conduct, there is no legitimate risk that Mr. Stewart will engage in criminal conduct in the future, and no additional punishment is necessary to advance that goal.  *See, e.g.*, *Gupta* Sentencing Tr. 54:3-6 ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.").  Mr. Stewart has also been severely punished—and deterred from future wrongdoing—by the public nature of his conduct and conviction.

Moreover, a sentence of incarceration is not necessary to deter criminal conduct generally.  Mr. Stewart does not work at an investment bank, hedge fund, Fortune 500 company, or other financial services company.  He is a partner at a small accounting firm and in the past decade has served in financial or accounting roles at other small start-up companies.  For anyone similarly situated to Mr. Stewart, the purpose of deterrence has been served by everything that Mr. Stewart has already lost:  his reputation in the community, his livelihood, his source of income, most of his assets, a lifetime of financial penalties to pay, and his family relationships.

2. <u>Society Will Derive No Benefit From Incarcerating Mr. Stewart</u>

The purposes of sentencing will not be further promoted by incarcerating Mr. Stewart.  To the contrary, given the higher costs of, and challenges to, incarceration for individuals like Mr. Stewart—individuals who are age 50 and older and who have medical issues—coupled with the virtually non-existent likelihood of recidivism for Mr. Stewart, societal interests would be better served through a non-custodial sentence such as probation that includes, as a condition, community service.  This would enable Mr. Stewart to contribute positively to his community, as

he has done in the past.   In particular, Mr. Stewart hopes to volunteer at the Trading Post. Moreover, were the Court to deem it necessary, it could include a term of home confinement as part of Mr. Stewart's sentence, and avoid the costs of incarceration.

In May 2015, the Department of Justice's Office of Inspector General ("OIG") issued a report titled, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons" (the "OIG Report," *available at* https://oig.justice.gov/reports/2015/e1505.pdf).   The OIG Report is a culmination of OIG's review of the impact that the aging population (defined in the OIG Report as age 50 and older) on the Bureau of Prison's ("BOP") "inmate management, including costs, health services, staffing, housing, and programming."   (OIG Report at i).   The OIG also assessed, and reported on, "the recidivism of inmates who were age 50 and older at the time of their release."   (*Id.*)

The OIG found that the BOP had limitations in its ability to house elderly inmates, and incurred a greater cost in doing so.   The OIG's findings included:

(1) on average, the costs of incarcerating inmates age 50 and higher is 8% higher than younger inmates due to increased medical needs;

(2) the BOP's ability to address the needs of aging inmates—including, for example, trips outside the correctional institution to medical facilities—is limited by its number of staff, including staff with appropriate training;

(3) there is limited availability of appropriate housing for aging inmates, including unavailability of lower bunks (which are often required by elderly inmates) due to overcrowding; and

(4) BOP does not have programming opportunities designed to meet the needs of aging inmates.

(*Id.* at i-iii).

The OIG Report further concludes that aging inmates engage in fewer incidents of misconduct while incarcerated, have a significantly lower recidivism rate than that for all federal inmates, and most of the aging inmates who were arrested following their release already had a history of recidivism.  (*Id.*)

As these findings demonstrate, Mr. Stewart's age and medical problems will render incarceration more costly, and the limited availability of programs designed for aging inmates, if any, suggest that societal interests in providing Mr. Stewart with "needed educational or vocational training" will not be advanced.  18 U.S.C. § 3553(a)(2)(D).  In contrast, if Mr. Stewart receives a non-custodial sentence, among other things, he will be able to contribute to society by working to pay off his penalties, providing community service through volunteer work, and supporting his family.

## IV.    IMPOSITION OF A FINE IS NOT WARRANTED IN THIS CASE

As is clear from the PSR, Mr. and Mrs. Stewart now have extremely limited assets that that will make even daily living difficult. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████, Mr. Stewart intends to use this money to pay his forfeiture obligation and any remaining penalties owed to the SEC, as well as daily living expenses.  This will not go far.  Thus, given his financial situation and the financial penalties Mr. Stewart and his family already face, and that Mr. Stewart has already agreed to forfeit the profits he obtained from this offense, we respectfully request that the Court decline to impose any fine in this case, much less the $25,000 fine that probation recommends. *See, e.g.,* 18 U.S.C. § 3572(a) (requiring courts to consider a variety of factors in determining whether to impose a fine, including, *inter alia*: (i) the need to deprive the defendant of illegally

obtained gains from the offense; (ii) civil obligations arising from the defendant's conduct; (iii) the defendant's ability to pay; and (iv) the burden that a fine would impose on the defendant and his family).  Such a finding is consistent with the approach taken by other courts in this District in insider trading cases.  *See, e.g., United States v. Fleishman*, 11 Cr. 32 (JSR) (S.D.N.Y. Dec. 23, 2011), Docket No. 154 (no fine imposed after jury conviction on counts of conspiracy to commit securities fraud and wire fraud); *United States v. Kimelman,* 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 13, 2011), Docket No. 288 (no fine imposed after jury conviction on conspiracy and two insider trading counts); *United States v. Goffer*, 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011), Docket No. 283 (no fine imposed after jury conviction on conspiracy and two insider trading counts); *United States v. Jiau*, 11 Cr. 161 (JSR) (S.D.N.Y. Oct. 4, 2011), Docket No. 124 (no fine imposed after jury conviction on conspiracy and insider trading); *United States v. Contorinis*, 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 22, 2010), Docket Nos. 94, 95 (no fine imposed after jury conviction on conspiracy and seven insider trading counts); *United States v. Goffer*, 10 Cr. 56 (RJS) (S.D.N.Y. Sept. 22, 2011), Docket No. 271 (no fine imposed after jury conviction on two counts of conspiracy and twelve insider trading counts).

**CONCLUSION**

For the foregoing reasons, Mr. Stewart respectfully requests that this Court impose a non-custodial sentence of probation with a condition of community service.


Dated:   New York, New York                    Respectfully Submitted,
         April 20, 2016


                                                */s/ Seth L. Levine*

                                                Seth L. Levine
                                                Jillian B. Berman
                                                Christos G. Papapetrou
                                                **LEVINE LEE LLP**
                                                666 Fifth Avenue
                                                New York, New York 10103
                                                (212) 223-4400
                                                slevine@levinelee.com
                                                jberman@levinelee.com
                                                cpapapetrou@levinelee.com

                                                *Attorneys for Robert Stewart*