UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

      - v. -                                       :

ROBERT STEWART,                          :

                 Defendant.            :

15 Cr. 287 (LTS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING SUBMISSION


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Sarah Eddy McCallum
Brooke E. Cucinella
Assistant United States Attorneys
  -- Of Counsel --

The Government respectfully submits this memorandum in connection with the sentencing of defendant Robert Stewart ("Stewart"), which is scheduled for May 4, 2016, at 11:00 a.m.  For the reasons that follow, the Government agrees with the Probation Office that a sentence within the range of 30 to 37 months' imprisonment calculated pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") is appropriate.

Stewart participated in an insider trading conspiracy that spanned over four years and generated profits of approximately $1.16 million, with Stewart himself reaping approximately $150,000 of those gains.  Stewart and his co-conspirators went to great lengths to conceal their illegal behavior from the authorities.  Early in the conspiracy, for example, after the Financial Industry Regulatory Authority ("FINRA") directed an inquiry to Stewart's son and co-conspirator, Sean Stewart ("Sean"), about Stewart's suspicious trading, Sean lied about communicating material nonpublic information to Stewart, and Stewart began conducting his illicit trading in the account of his acquaintance, Richard Cunniffe, to escape further regulatory notice.  When the Securities and Exchange Commission ("SEC") later asked Stewart about the suspicious trading that had triggered FINRA's notice, Stewart engaged in further deceit, falsely asserting that he had never spoken to Sean about the company in question.

Stewart's conduct, both the crime and the cover up, was brazen.  It went on for years.  As such, the goals of sentencing—particularly just punishment, promotion of respect for the law, and adequate deterrence—warrant a term of imprisonment within the stipulated Guidelines range.

## THE OFFENSE CONDUCT

On August 12, 2015, Stewart pled guilty to Count One of Superseding Indictment S1 15 Cr. 287 (LTS) (the "Indictment"), charging him with participating in a conspiracy to commit

securities fraud and fraud in connection with a tender offer from February 2011 through April 2015. As detailed in the Indictment, the underlying criminal complaint (a copy of which is attached as Exhibit A hereto), and the final presentence investigation report ("PSR") prepared by the Probation Office, Stewart traded illegally in advance of five separate mergers and acquisitions of healthcare companies—all based on information provided to Stewart by Sean, Stewart's son and co-conspirator. Stewart knew that Sean had learned this material nonpublic information through Sean's role as an investment banker at two different investment banks, and that Sean was passing that information on to Stewart in violation of Sean's fiduciary duties.

**A.     Stewart's Illegal Trading**

The first deal in advance of which Stewart traded illegally was the acquisition of Kendle International Inc. by INC Research, LLC, which was announced publicly on May 4, 2011. Sean's employer at the time ("Investment Bank A") represented Kendle, and Sean was assigned to work on the matter. Sean leaked material nonpublic information to his father about the deal, and Stewart made approximately $7,900 in profits by trading on the information. (*See* PSR ¶¶ 38-51).

The second deal was the acquisition of Kinetic Concepts, Inc. by Apax Partners, announced on July 13, 2011. Investment Bank A represented KCI in connection with the transaction, and Sean was kept apprised of the deal's developments throughout. Sean told his father about the upcoming merger, and Stewart traded on that information. First, he bought KCI shares in his own account. A few weeks later, after Investment Bank A was alerted that FINRA had flagged Stewart's earlier Kendle trading as potentially suspicious (discussed further below), Stewart changed tack and had his colleague, Cunniffe, conduct KCI options trading in Cunniffe's

account, for the benefit of both Stewart and Cunniffe.  These illegal trades generated profits of $107,790 for Cunniffe and Stewart.  (*See* PSR ¶¶ 58-68, 75-81).

By the time of the third merger in advance of which Stewart traded, Sean was working for a different investment bank ("Investment Bank B"), and representing Hologic, Inc. in connection with its proposed acquisition of Gen-Probe Inc.  The deal would be announced on April 30, 2012.  Based on Sean's illegal tips to Stewart in advance of the deal, Stewart had Cunniffe purchase Gen-Probe call options—trades that ultimately, after the deal was announced, yielded profits of $180,590.  (*See* PSR ¶¶ 102-13).

The fourth transaction about which Sean tipped Stewart involved the acquisition by tender offer of Lincare Holdings, Inc. by Linde AG, announced on July 1, 2012.  Investment Bank B represented Linde in connection with the deal.  When Sean tipped Stewart about the upcoming acquisition, Stewart passed that material nonpublic information to Cunniffe, who then purchased Lincare call options for himself and Stewart.  These trades generated combined profits of $407,573.  (¶¶ 114-24).

Finally, Sean tipped Stewart about the planned acquisition of CareFusion Corp. by Becton, Dickinson & Co.—a deal that would be publicly announced on October 5, 2014.  Investment Bank B represented CareFusion, and Sean was involved in the deal.  Stewart again conveyed the material nonpublic information he received from Sean to Cunniffe, who purchased CareFusion options in advance of the announcement.  These trades generated profits of $446,448.  (*See* PSR ¶¶ 126-46).

## B.    Stewart's and his Co-Conspirators' Related Acts of Deception

Stewart broke the law with impunity.  Not only did he repeatedly seek financial advantage for himself and his family by trading on the most sensitive of corporate information,

but he continued this course unabated for *years* after regulatory authorities first caught wind of his activities, by employing means to cover his tracks and avoid detection.

The need to employ increasingly deceptive means first arose from a regulatory inquiry in 2011. In May of that year, after public announcement of the Kendle deal, FINRA directed an inquiry to Investment Bank A. In its letter, FINRA asked whether anyone involved in the Kendle deal at Investment Bank A knew any of a number of people, including Stewart, whose trading FINRA had identified as suspicious. (*See* PSR ¶¶ 70, 83). Sean initially denied knowing anyone on the list—that is, denied knowing his own father. Sean only told the truth about the family connection after FINRA, having connected the dots itself, sent a follow-up inquiry to Investment Bank A. (PSR ¶¶ 84-87). Sean continued to lie about the impetus for his father's trades, however, falsely asserting that he never discussed Kendle with Stewart. (PSR ¶ 87).

Stewart's own response to the FINRA inquiry was not to come clean, and not to stop engaging in insider trading. Instead, Stewart honed his deception. He stopped trading stocks in his own brokerage account (*see* PSR ¶¶ 71-74), under his own name, and instead asked his acquaintance and colleague, Cunniffe, to use Sean's illegal mergers and acquisitions tips to conduct sophisticated options trading on his behalf, kicking back profits to Stewart. (PSR ¶¶ 92-93). As Stewart told Cunniffe, the reason to take these evasive steps was because Stewart was "too close to the source." (PSR ¶ 92). Stewart had Cunniffe pay him his share of the ill-gotten gains in small—generally cash—installments over time, often in a parking lot, so that he could not be investigated through bank record analysis. (PSR ¶ 100). And Stewart had Cunniffe communicate in code about their trading, using "golf" terminology to mask their crimes, in case anyone was listening to their conversations or reviewing their email. (*See* PSR ¶¶ 96, 116).

In April 2015, during a meeting with Cunniffe (who was by then cooperating with the Government and carrying a recording device), Stewart referred back to the 2011 FINRA inquiry, recalling that "Sean got nailed by FINRA – they questioned him."  (Ex. A ¶ 37(b)).  He also talked about when the SEC had questioned Stewart directly about his Kendle trading.  (*See id.*).  That interview occurred in May 2013, nearly two years after the initial FINRA inquiry.  (PSR ¶ 56).  During the interview, Stewart falsely denied having discussed work-related matters with Sean, and fraudulently claimed that he had purchased Kendle stock based on his own research into the company.  (*Id.*).

## APPLICATION OF THE GUIDELINES

The parties and the Probation Office agree that the Guidelines range for imprisonment in this case is between 30 and 37 months, which is tethered to a loss amount of approximately $1.16 million "reasonably foreseeable" to Stewart as part of the conspiracy.  The base offense level for insider trading is eight, and the applicable loss adjustment is 14 levels.  *See* U.S.S.G. §§ 2B1.4(a), 2B1.4(b)(1), & 2B1.1(b)(1)(H).  Applying the three-level deduction for acceptance of responsibility, the total offense level is 19.   *See* U.S.S.G. §§ 3E1.1(a) and (b).  Because Stewart has no criminal history, he falls into Criminal History Category I.  (*See* PSR ¶¶ 154-67).

## DISCUSSION

Applying the factors set forth in Title 18, United States Code, Section 3553(a), a sentence within the applicable Guidelines range of 30 to 37 months' imprisonment is "sufficient, but not greater than necessary" to serve the goals of sentencing.  Of particular relevance to this case are the goals of specific and general deterrence, the need to promote respect for the law, and an interest in assuring that just punishment is rendered.  *See* 18 U.S.C. § 3553(a)(2).

Stewart engaged in a prolonged, calculated insider trading scheme, and went to great lengths to evade authorities and mask his activities.  His calculation continued all the way through until right before his May 2015 arrest, when he was caught on tape telling Cunniffe that he believed he and the other conspirators would not be brought to justice because the "statute of limitations" had "passed" for the Kendle trades—the only ones that, to Stewart's knowledge at the time of the recording, the authorities had identified.  (Ex. A. ¶ 37(c)).[1]  Later during this meeting with Cunniffe, Stewart grew suspicious that Cunniffe might be cooperating with authorities, and clammed up.  When Cunniffe reached out to him a few days later, thus assuaging Stewart's concerns, Stewart admitted why he had acted strangely:  "After we met . . . you'll probably laugh about this, but . . . couple of the questions you asked me, uh, when we were at lunch . . . I tried to give you a call back and I couldn't get you, I'm like, 'oh my god,' I wonder if, uh, there was something going on there, now I can't get [Cunniffe] because they got [Cunniffe] somewhere, where I can't talk to him and . . . for about two weeks, I didn't sleep at night . . . I'm like, 'oh my god,' uh, you know, something's going on, something bad's going on, and all this stuff . . ."  (Ex. A ¶ 37(f)).

On these recordings—indeed, at all stages from 2011 through 2015—Stewart exhibited none of the remorse he now expresses.  The brush with FINRA in 2011 prompted no regret or correction.  Stewart's interview by the SEC in 2013, in which he lied to escape trouble, likewise prompted no such response.  Only after Stewart was arrested by law enforcement and it was clear they understood the scope of his criminality did he begin to express the remorse and shame emphasized in his sentencing submission.  This belated reaction does not weigh against imposition of a Guidelines sentence.

---

[1] Stewart erroneously believed he was in the clear since it had been "four years since the trade."  (Ex. A. ¶ 37(c)).

Nor does the fact that Stewart's imprisonment will impose hardship upon those members of his family—his wife in particular—who share none of the blame for his criminal acts. Stewart chose to initiate and then continue his criminal activity knowing that his wife was ill. He, with his co-conspirators, exposed his wife to any hardship she will suffer from his absence. As the Probation Office correctly notes, this impact on innocent family members is always a harsh consequence of crime. (*See* PSR at 36). And Stewart's family is in at least one respect better positioned than most to withstand his incarceration: Stewart's son Ryan appears to be both emotionally supportive and able to assist financially.

Finally, there is no merit to Stewart's suggestion that the Guidelines range here somehow overstates his culpability because of its link to the illicit proceeds reasonably foreseeable to him but not personally enjoyed by him.[2] The Guidelines properly account for the scope of the scheme in which the defendant chooses to participate, and there is no question here that Stewart reasonably understood that his trading and that of his partner in crime and trading agent, Cunniffe, could generate profits commensurate with the 14-level loss amount adjustment. The fairness of holding a defendant responsible for the reasonably foreseeable gains of his co-conspirators is particularly evident where, as here, the defendant is the one who enlisted the only other co-conspirator whose gains are being counted into the scheme. Moreover, the other aspects of Stewart's criminal conduct, standing alone and without regard to the happenstance of profit generated, independently support a sentence within the stipulated Guidelines range.

At base, the criminal conduct here, buttressed as it was by sustained subterfuge and the flouting and misleading of regulatory authorities, weighs heavily in favor of a substantial term of imprisonment. *See* 18 U.S.C. § 3553(a)(1) (court must weigh "nature and circumstances of the

---

[2] Although Stewart quibbles with his level of knowledge concerning the extent of Cunniffe's trading, the Government does not read his sentencing submission to dispute that, as reflected in is plea agreement, the full $1.16 million in gain was reasonably foreseeable to Stewart.

offense"). So, too, do the "history and characteristics of the defendant," *id.*, insofar as they are reflected in such calculated criminal conduct. Stewart's crimes were not an aberration, but a source of income for him for years. Much is made in Stewart's sentencing submission of his sacrifices for his sons. But the Court must recognize the turn that Stewart and Sean's relationship took. It became focused on profits and evading authorities. Their relationship became that of criminal co-conspirators. As Stewart himself described on tape, Sean essentially egged his father's criminal behavior on—chastising Stewart for failing to make use of a particular tip, saying, "I can't believe I handed you this on a silver platter and you didn't invest in it." (Ex. A. ¶ 37(b)).

## RESTITUTION AND FORFEITURE

There is no restitution here. Stewart has signed a consent order of forfeiture in which he agrees to forfeit $150,000, and which the Government will ask the Court to so-order upon sentencing. The Government respectfully requests that that forfeiture order be incorporated into the judgment as well.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines range of 30 to 37 months' imprisonment is appropriate.

DATED:       April 27, 2016
             New York, New York

                                  Respectfully submitted,

                                  PREET BHARARA
                                  United States Attorney


                          By: ___/s/_____
                                  Sarah Eddy McCallum
                                  Brooke E. Cucinella
                                  Assistant U.S. Attorneys
                                  Southern District of New York
                                  Tel. (212) 637-1033/2477

9

Exhibit A

Approved: _____
         SARAH E. MCCALLUM/BROOKE E. CUCINELLA
         Assistant United States Attorneys

Before:   HONORABLE ANDREW J. PECK
          United States Magistrate Judge
          Southern District of New York

                                        15 MAG      1634

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :      **SEALED COMPLAINT**
                                 :
          - v. -                 :      Violations of
                                 :      15 U.S.C. §§ 78j(b),
                                 :      78n(e) & 78ff; 17 C.F.R.
SEAN STEWART and                 :      §§ 240.10b-5, 240.10b5-2,
ROBERT STEWART, a/k/a "Bob,"     :      240.14e-3(a) &
                                 :      240.14e-3(d); and 18
          Defendants.            :      U.S.C. §§ 371, 1349 & 2
                                 :
- - - - - - - - - - - - - - - - x

                                        COUNTY OF OFFENSES:
                                        New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

     ERIC BURNS, being duly sworn, deposes and says that he is a
Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

                          COUNT ONE
            (Conspiracy to Commit Securities Fraud and
             Fraud in Connection with a Tender Offer)

     1.   From in or about February 2011 through in or about
April 2015, in the Southern District of New York and elsewhere,
SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants,
and others known and unknown, willfully and knowingly did
combine, conspire, confederate, and agree together and with each
other to commit offenses against the United States, to wit, (a)
securities fraud, in violation of Title 15, United States Code,
Sections 78j(b) and 78ff, and Title 17, Code of Federal
Regulations, Sections 240.10b-5 and 240.10b5-2; and (b) fraud in
connection with a tender offer, in violation of Title 15, United
States Code, Sections 78n(e) and 78ff, and Title 17, Code of
Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d).

## Objects of the Conspiracy

2.    It was a part and object of the conspiracy that SEAN
STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and
others known and unknown, willfully and knowingly, directly and
indirectly, by the use of means and instrumentalities of
interstate commerce, and of the mails, and of facilities of
national securities exchanges, would and did use and employ, in
connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances in violation
of Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2 by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material fact and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,
practices, and courses of business which operated and would
operate as a fraud and deceit upon persons, to wit, the
defendants and others known and unknown conspired to commit
insider trading in connection with the securities of Kendle
International Inc. ("Kendle"), Kinetic Concepts, Inc. ("KCI"),
Gen-Probe Inc. ("Gen-Probe"), Lincare Holdings, Inc.
("Lincare"), and CareFusion Corp. ("CareFusion").

3.    It was a further part and an object of the conspiracy
that SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the
defendants, and others known and unknown, willfully and
knowingly would and did engage in fraudulent, deceptive, and
manipulative acts and practices in connection with a tender
offer, in that after an offering person had taken substantial
steps to commence a tender offer, SEAN STEWART and ROBERT
STEWART, while in possession of material information relating to
such tender offer, which information they knew and had reason to
know was non-public and which they knew and had reason to know
had been acquired directly and indirectly from the offering
person, the issuer of the securities sought and to be sought by
such tender offer, and an officer, director, partner, and
employee and other person acting on behalf of the offering
person and such issuer, would and did (a) purchase and sell, (b)
cause to be purchased and sold, and (c) communicate such
material, non-public information under circumstances in which it
was reasonably foreseeable that such communication would likely
result in the purchase and sale of, such securities and
securities convertible into and exchangeable for such securities
and options and rights to obtain and to dispose of any of the
foregoing securities, without public disclosure by the purchaser
or seller by press release or otherwise of such material, non-

2

public information within a reasonable time prior to such
purchase and sale, in violation of Title 15, United States Code,
Sections 78n(e) and 78ff; and Title 17, Code of Federal
Regulations, Sections 240.14e-3(a) and 240.14e-3(d), to wit, the
defendants and others known and unknown conspired to commit
insider trading in connection with the proposed tender offer by
Linde AG ("Linde") for the securities of Lincare.

<u>Overt Acts</u>

4.    In furtherance of the conspiracy, and to effect the
illegal objects thereof, SEAN STEWART and ROBERT STEWART, a/k/a
"Bob," the defendants, and others known and unknown, committed
the following overt acts, among others, in the Southern District
of New York and elsewhere:

      a.    On or about March 2, 2011, SEAN STEWART e-mailed
a colleague to ask about the price of Kendle stock.

      b.    On or about March 3, 2011, ROBERT STEWART
e-mailed an employee of a brokerage firm with directions to buy
Kendle shares.

      c.    On or about June 2, 2011, ROBERT STEWART, using
the proceeds of the sale of Kendle stock, paid a check in the
amount of $10,055 to a photographer who had been hired for the
wedding of SEAN STEWART.

      d.    On or about June 3, 2011, the day before SEAN
STEWART's wedding, ROBERT STEWART spoke to a co-conspirator not
named as a defendant herein ("CW-1") by telephone.

      e.    Also on or about June 3, 2011, approximately two
minutes after the end of the call described in the foregoing
paragraph, CW-1 purchased KCI call option contracts.

      f.    On or about April 20, 2012, CW-1 placed an order
to purchase Gen-Probe call option contracts.

      g.    On or about Sunday, May 27, 2012, SEAN STEWART
and ROBERT STEWART spoke by telephone for approximately two and
a half minutes.

      h.    On or about May 28, 2012, at or about the same
time as a telephone call between ROBERT STEWART and CW-1, CW-1
began entering orders to buy Lincare call option contracts.

       i.   On or about August 19, 2014, ROBERT STEWART met CW-1 in Manhattan, New York.

       j.   Also on or about August 19, 2014, CW-1 placed an order to purchase CareFusion call option contracts.

       k.   On or about March 24, 2015, in Manhattan, CW-1 paid ROBERT STEWART $2,500 in cash proceeds from investments in CareFusion securities.

(Title 18, United States Code, Section 371; Title 15, United States Code, Sections 78j(b), 78n(e), and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.10b5-2, 240.14e-3(a), and 240.14e-3(d).)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud)

5.    From in or about February 2011 through in or about April 2015, in the Southern District of New York and elsewhere, SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States of America, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

6.    It was a part and an object of the conspiracy that SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, the defendants conspired to defraud Kendle, KCI, Gen-Probe, Lincare, and CareFusion of valuable confidential information by deceptively converting that information to their own use in breach of fiduciary and other duties owed to the subject companies.

(Title 18, United States Code, Section 1349.)

### COUNTS THREE and FOUR
#### (Securities Fraud)

7.   From at least in or about February 2011 through at least in or about May 2011, in the Southern District of New York and elsewhere, SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed, and caused others to use and employ, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, on the basis of material, non-public information that SEAN STEWART provided to ROBERT STEWART with the understanding that the information would be used in connection with securities transactions, ROBERT STEWART executed and caused to be executed, and SEAN STEWART caused to be executed, the securities transactions listed below:

| Count | Order Dates | Transactions |
|---|---|---|
| 3 | February 7-March 4, 2011 | Purchases of 2,775 shares of Kendle |
| 4 | May 5-6, 2011 | Purchases of 700 shares of KCI |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.)

### COUNTS FIVE through EIGHT
#### (Securities Fraud)

8.   From at least in or about April 2011 through at least in or about October 2014, in the Southern District of New York and elsewhere, SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities

exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, and caused others to use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing, and causing others to employ, devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, on the basis of material, non-public information that SEAN STEWART provided to ROBERT STEWART with the understanding that the information would be used in connection with securities transactions, SEAN STEWART and ROBERT STEWART caused CW-1 to execute the securities transactions listed below:

| Count | Order Dates | Transactions |
|-------|-------------|--------------|
| 5 | April 21-June 23, 2011 | Purchases of 365 KCI call option contracts |
| 6 | April 18-27, 2012 | Purchases of 320 Gen-Probe call option contracts |
| 7 | May 29-June 28, 2012 | Purchases of 375 Lincare call option contracts |
| 8 | August 19-October 2, 2014 | Purchases of 630 CareFusion call option contracts |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 &
240.10b5-2, and Title 18, United States Code, Section 2.)

COUNT NINE
(Securities Fraud in Connection with a Tender Offer)

9.     From in or about May 2012 through in or about June 2012, in the Southern District of New York and elsewhere, SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, willfully and knowingly engaged in fraudulent, deceptive, and manipulative acts and practices in connection with a tender offer, in that after an offering person had taken substantial steps to commence a tender offer, SEAN STEWART and ROBERT STEWART, while in possession of material information relating to

such tender offer, which information they knew and had reason to
know was non-public and which they knew and had reason to know
had been acquired directly and indirectly from the offering
person, the issuer of the securities sought and to be sought by
such tender offer, and an officer, director, partner, and
employee and other person acting on behalf of the offering
person and such issuer, (a) purchased and sold, (b) caused to be
purchased and sold, and (c) communicated such material,
non-public information under circumstances in which it was
reasonably foreseeable that such communication would likely
result in the purchase and sale of, such securities and
securities convertible into and exchangeable for such securities
and options and rights to obtain and to dispose of any of the
foregoing securities, without public disclosure by the purchaser
or seller by press release or otherwise of such material,
non-public information within a reasonable time prior to such
purchase and sale, to wit, SEAN STEWART provided ROBERT STEWART
with material, non-public information about Lincare, which was
to be the subject of a tender offer, and ROBERT STEWART
communicated such information to CW-1, who, on the basis of such
information, and caused to do so by SEAN STEWART and ROBERT
STEWART, executed the securities transactions listed below:

| Count | Order Dates | Transactions |
|---|---|---|
| 9 | May 29–June 28, 2012 | Purchases of 375 Lincare call option contracts |

(Title 15, United States Code, Sections 78n(e) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.14e-3(a) &
240.14e-3(d), and Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

10.  I have been a Special Agent with the FBI for
approximately five years.  I am currently assigned to a squad
responsible for investigating violations of the federal
securities laws and related offenses.  I have participated in
investigations of such offenses, and have made and participated
in arrests of individuals who have committed such offenses.

11.  The information contained in this Complaint is based
upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources, including, but not limited to: (a) business records and
other documents, including trading records, bank records,
telephone records, and records of electronic communications

provided by various entities and secured by means of search warrants; (b) publicly available documents; (c) conversations with representatives from the United States Securities and Exchange Commission ("SEC"); and (d) interviews with CW-1, a co-conspirator not named as a defendant herein.[1]  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Relevant Entities and Individuals

12.  At all times relevant to this Complaint:

a.  Investment Bank A was the investment banking advisory arm of a global bank headquartered in Manhattan, New York.

b.  Investment Bank B was an independent investment banking advisory firm with its principal place of business in Manhattan, New York.

13.  From at least in or about December 2010 through in or about October 2011, SEAN STEWART, the defendant, held the position of Vice President in Investment Bank A's Healthcare Investment Banking Group.  For the remainder of the period relevant to this Complaint, SEAN STEWART was employed as a Managing Director of Investment Bank B.

14.  ROBERT STEWART, a/k/a "Bob," the defendant, is the father of SEAN STEWART, the defendant.

15.  At all times relevant to this Complaint, CW-1 was a friend and business associate of ROBERT STEWART, a/k/a "Bob," the defendant.

16.  At all times relevant to this Complaint:

---

[1] On May 12, 2015, CW-1 pleaded guilty, pursuant to a cooperation agreement, to charges relating to the conduct set forth herein. CW-1 is cooperating with the Government in the hopes of obtaining leniency at sentencing.  He has thus far provided reliable and credible information that has been corroborated.

a.    Kendle was an Ohio corporation that provided clinical development services to the biopharmaceutical industry. Kendle's securities traded under the symbol "KNDL" on the NASDAQ Stock Exchange ("NASDAQ").

b.    INC Research, LLC ("INC") was a global contract research organization that was privately held by Avista Capital Partners and the Ontario Teachers' Pension Plan.

c.    KCI was a medical technology company headquartered in San Antonio, Texas.  KCI's securities traded under the symbol "KCI" on the New York Stock Exchange ("NYSE").

d.    Apax Partners ("Apax") was a private equity investment group operating in the United States, Europe, and Asia.

e.    Hologic, Inc. ("Hologic") was a developer, manufacturer, and supplier of medical diagnostic, imaging, and surgical products headquartered in Bedford, Massachusetts. Hologic's securities traded under the symbol "HOLX" on the NASDAQ.

f.    Gen-Probe was a molecular diagnostic products company headquartered in San Diego, California.  Gen-Probe's securities traded under the symbol "GPRO" on the NASDAQ.

g.    Linde was an industrial gas supplier headquartered in Munich, Germany.

h.    Lincare was a Florida corporation that provided in-home respiratory services.  Lincare's securities traded under the symbol "LNCR" on the NASDAQ.

i.    Becton, Dickinson & Co. ("Becton") was a New Jersey medical technology company.  Becton's securities traded under the symbol "BDX" on the NYSE.

j.    CareFusion was a medical technology company headquartered in San Diego, California.  CareFusion's securities traded under the symbol "CFN" on the NYSE.

## Summary of the Insider Trading Scheme

17.    As set forth below, there is probable cause to believe that SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the

defendants, used material non-public information about impending mergers and acquisitions (including a tender offer) that SEAN STEWART acquired as part of his employment to (a) make and cause to be made profitable trades in a brokerage account belonging to ROBERT STEWART; and (b) cause the execution of profitable trades in brokerage accounts belonging to CW-1.

18.   Specifically, in advance of and in connection with five separate mergers and acquisitions involving companies in the health care industry, SEAN STEWART tipped ROBERT STEWART, a/k/a "Bob," the defendant, with material, non-public information.   SEAN STEWART learned about the first two deals as part of his employment with Investment Bank A, which represented the companies to be acquired in the transactions.   He learned about the three remaining deals as part of his employment with Investment Bank B, which represented the acquiring companies in two of the transactions and the company to be acquired in the third.

19.   Having learned the secret information about these impending transactions, SEAN STEWART, the defendant, in breach of fiduciary duties and other duties of trust and confidence owed to the sources of the information, tipped his father, ROBERT STEWART, a/k/a "Bob," the defendant, so that ROBERT STEWART could use the information to his pecuniary advantage and confer a pecuniary advantage upon SEAN STEWART.   Among the pecuniary benefits that SEAN STEWART received as part of the insider trading scheme was payment by ROBERT STEWART, from the proceeds of the scheme, of more than $10,000 in expenses related to SEAN STEWART's wedding in or about June 2011.

20.   ROBERT STEWART, a/k/a "Bob," the defendant, used the material non-public information that he received from SEAN STEWART, the defendant, to make profitable trades in his own brokerage account and also to cause his friend and business associate, CW-1, to make profitable options trades in accounts controlled by CW-1.   When CW-1 executed trades in his own brokerage accounts based on information originating from SEAN STEWART, CW-1 paid ROBERT STEWART his portion of the proceeds in small increments over time, typically in cash, to avoid detection.

21.   ROBERT STEWART, a/k/a "Bob," the defendant, and CW-1 reaped approximately $1.16 million in ill-gotten gains from this scheme.

## The Investment Banks' Confidentiality Policies

22.     Based on a review of records supplied by Investment Bank A and Investment Bank B, I have learned that:

a.     At all times relevant to this Complaint, Investment Bank A and Investment Bank B both had written policy statements, which were distributed to all personnel, that prohibited use of material, non-public information received during the course of employment to trade in any security or to advise anyone else to trade in any security based on such non-public information.

b.     Investment Bank A's policy statement instructed personnel to consider all information to be "nonpublic" "unless it is clearly public."  It defined "material" information as information that "could have an impact on the market price of securities involved or [as to which] it is likely that a reasonable investor would consider the information important in deciding whether to purchase or sell securities."

c.     In 2010 and again in 2011, SEAN STEWART, the defendant, received specific training from Investment Bank A regarding the above-described policy statement.

d.     Investment Bank B's policy statement instructed all personnel to consider information "non-public unless the information has been generally disseminated to the public, such as disclosure in a press release or over a wire service, in newspapers or in publicly filed documents."  It further instructed that information "should be considered material if [its] public disclosure . . . would likely affect the price of an issuer's securities."

e.     Investment Bank B's policy statement identified non-public information about "mergers," "acquisitions," and "prospective tender offers" as among the "Inside Information" that company employees were strictly prohibited from trading upon or using to "advis[e], procur[e] or encourag[e] relatives, friends or other persons to trade" upon.

f.     Every year that he was employed with Investment Bank B, SEAN STEWART was required to certify that he was in compliance with the above-described policy statement of Investment Bank B.

11

## Insider Trading in Kendle Stock

23. Based on my review of (a) documents, including e-mail communications, supplied by Investment Bank A, (b) trading records for a brokerage account held in the name of ROBERT STEWART, a/k/a "Bob," the defendant, (c) toll records for telephones subscribed to SEAN STEWART, the defendant, and ROBERT STEWART, and (d) publicly-available documents, including SEC filings, I have learned the following, in substance and in part:

     a. On or about December 20, 2010, as part of his employment with Investment Bank A, SEAN STEWART learned that Kendle, a clinical development services provider, was interested in seeking out potential acquirers. SEAN STEWART was assigned to work on the matter.

     b. On or about January 21, 2011, SEAN STEWART sent an e-mail to a colleague at Investment Bank A noting that Investment Bank A was "just officially mandated to sell Kendle" and that SEAN STEWART planned to start calling potential acquirers, including Avista Capital Partners (an owner of INC, the entity that would ultimately acquire Kendle), within about a week.

     c. On or about Saturday, February 5, 2011, a cellular telephone subscribed to SEAN STEWART ("SEAN CELL-1") had 10 short calls with a cellular telephone subscribed to ROBERT STEWART ("ROBERT CELL-1"). SEAN CELL-1 and ROBERT CELL-1 also exchanged three text messages that day.

     d. On or about the morning of February 7, 2011, the first trading day following these telephone communications, ROBERT CELL-1 called the number for a representative of a brokerage firm at which ROBERT STEWART had opened a trading account in or about December 2010 (the "Brokerage"). Approximately one minute later, at or about 10:00 a.m., 475 shares of Kendle were purchased for ROBERT STEWART's Brokerage account. ROBERT STEWART had never purchased Kendle stock for this account (or any other of which I am aware) before.

     e. Following another telephone call between ROBERT CELL-1 and a Brokerage representative on or about February 22, 2011, another 1,550 shares of Kendle were purchased for ROBERT STEWART's Brokerage account.

12

f.    Approximately eight days later, on or about March 2, 2011, at 6:28 p.m., SEAN STEWART sent an e-mail message to a colleague from Investment Bank A asking how Kendle stock had "done in after hours."  The colleague responded that it was "flat with where it closed in the aftermarket."

g.    The next day, on or about March 3, 2011, SEAN STEWART and ROBERT STEWART exchanged e-mail messages in which SEAN STEWART asked for ROBERT STEWART's "Room number," and ROBERT STEWART replied, "344 North."  ROBERT STEWART also informed SEAN STEWART that he was picking up food "in case you are hungry."  Based on my review of these e-mail communications, I believe that ROBERT STEWART and SEAN STEWART met at a hotel on or about March 3, 2011.

h.    A few hours after this e-mail exchange, ROBERT STEWART sent an e-mail message to a Brokerage representative to say: "I want to execute a trade as early as possible . . . . [T]he trade is to sell my position in [another stock] and reinvest all proceeds into KNDL . . . which was down almost 15% today -- want to pick up some at the lower price to bring down my average price."

i.    The next morning, on or about March 4, 2011, at approximately 9:33 a.m., 750 shares of Kendle were purchased for ROBERT STEWART's Brokerage account.

j.    Approximately four days later, on or about March 8, 2011, INC, the entity that would ultimately acquire Kendle, submitted an initial purchase bid for Kendle.  SEAN STEWART received the bid by e-mail at or about 10:50 a.m.  Approximately half an hour later, at or about 11:24 a.m., ROBERT CELL-1 called a telephone number assigned to SEAN STEWART at Investment Bank A ("SEAN WORK LINE-1") for 12 seconds.  Then, at or about 11:38 a.m., SEAN WORK LINE-1 called ROBERT CELL-1 for two minutes.[2]  At or about 11:52 a.m., ROBERT CELL-1 called SEAN WORK LINE-1 for two minutes.

k.    On or about April 26, 2011, at approximately 7:42 p.m., INC submitted a revised, all-cash bid of $15 per share for Kendle, which was at the time trading at approximately $10 per share.

l.    On or about May 4, 2011, INC announced publicly an agreement to acquire Kendle for $232 million, or $15.25 per

---

[2] All telephone call durations reported herein are approximate.

13

share.   By market close on May 5, Kendle's stock price had risen approximately 58% from the day before, to $14.98 per share.

      m.   On or about May 5, 2011, ROBERT STEWART sold all of his Kendle shares for a profit of approximately $7,900.

### ROBERT STEWART's Use of Kendle Profits to Fund SEAN STEWART's Wedding Expenses

    24.   Based on my review of Brokerage account and bank account records for accounts in the name of ROBERT STEWART, a/k/a "Bob," the defendant, and of the public announcement of the wedding of SEAN STEWART, the defendant, I have learned the following, in substance and in part:

      a.   On or about May 16, 2011, approximately two weeks after selling all of his Kendle stock, ROBERT STEWART transferred $20,000 from his Brokerage account to his checking account.   On or about June 2, 2011, ROBERT STEWART wired another $21,000 from his Brokerage account to his checking account.

      b.   Also on or about June 2, 2011, ROBERT STEWART wrote a check for $10,055 to the photographer who was hired for SEAN STEWART's wedding.

      c.   SEAN STEWART's wedding took place on or about June 4, 2011.

    25.   As part of my investigation in this matter, I have learned from an SEC representative that on or about May 16, 2013, another SEC representative questioned ROBERT STEWART, a/k/a "Bob," the defendant, about his trades in Kendle stock, and notes were made of that interview.   According to the SEC representative with whom I spoke, ROBERT STEWART stated the following, in substance and in part:

      a.   He purchased Kendle stock because he always followed medical companies and had noticed a run-up in Kendle's stock price which suggested to him that it was a good time to invest.

      b.   He did not talk to his son, SEAN STEWART, the defendant, about anything work-related.

      c.   He used the proceeds of his Kendle investment to help pay for SEAN STEWART's wedding.

## Beginning of the Insider Trading in KCI Stock

    26.  Based on my review of the materials identified in paragraph 23, above, and of trading records for brokerage accounts held in the name of CW-1, I have learned the following, in substance and in part:

    a.  On or about March 29, 2011, KCI, a medical technology company, forwarded to Investment Bank A an unsolicited letter from private equity group Apax proposing to purchase all of KCI's outstanding stock for a price in the range of $63 to $65 per share.

    b.  By no later than March 30, 2011, SEAN STEWART, the defendant, had learned of the proposed transaction between Apax and KCI.  Based on my review of email correspondence between SEAN STEWART and others at Investment Bank A from in or about April 2011 through in or about July 2011, I know that SEAN STEWART was kept informed about developments with the proposed transaction.

    c.  On or about April 21, 2011, CW-1 placed an order to purchase 40 KCI call option contracts with strike prices of $60 and May expiration dates.[3]  The records I have reviewed reflect no earlier trading by CW-1 in KCI securities before this.  Based on my experience with the stock market generally and in investigating financial crimes, I know that when someone purchases a call option contract (called a "call option" for short) at a particular strike price — here, $60 per share — he or she is betting that the subject stock price will rise above the strike price by no later than the date upon which the option contract expires (a specified date within the month used to identify the contract – here, May).  At market close on April 21, 2011, KCI's stock was trading at $55.58 per share.

    d.  On or about May 4, 2011, Apax increased its offer for KCI to a range of $70 to $72 per share.  The same day, ROBERT CELL-1 called SEAN WORK LINE-1 for two minutes.

    e.  The next day, on or about May 5, 2011, approximately 450 shares of KCI were purchased for ROBERT STEWART's Brokerage account.  ROBERT STEWART had never purchased

---

[3] These call options would later expire, on or about May 20, 2011, at which time CW-1 would replace them with June call options.

15

KCI stock for this account (or any other of which I am aware) before.

      f.   After the close of trading on or about May 5, 2011, ROBERT CELL-1 called SEAN CELL-1 for six minutes.

      g.   The next day, on or about May 6, 2011, 250 more shares of KCI were purchased for ROBERT STEWART's Brokerage account.

      h.   On or about May 9, 2011, KCI and Apax executed an exclusivity agreement — that is, an agreement to deal with one another and no others — until June 12, 2011.  The parties also began their due diligence process.

      i.   On or about May 11, 2011, ROBERT STEWART sold 350 shares of KCI stock, for a small profit.

      j.   Between on or about May 16, 2011 and May 24, 2011, CW-1 placed orders to purchase 150 KCI June $62.50 call option contracts and 5 KCI June $60 call options.  During this period, KCI's daily closing price ranged from $57.35 per share to $59.51 per share.

## FINRA's Inquiry Into Kendle Trading

    27.   Based on my review of documents supplied by Investment Bank A, representations made by an attorney representing Investment Bank A, and toll records for telephones subscribed to SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, I have learned the following, in substance and in part:

      a.   On or about May 20, 2011, four days after ROBERT STEWART transferred $20,000 from his Brokerage account to his checking account, the Financial Industry Regulatory Authority ("FINRA"), a not-for-profit, self-regulatory organization for financial institutions, sent a letter to Investment Bank A in which it gave notice that it was reviewing trading in Kendle that had occurred in advance of that company's acquisition by INC.  FINRA's letter requested, among other things, a list of all individuals involved in the Kendle deal at Investment Bank A.

      b.   No later than on or about May 25, 2011, SEAN STEWART was copied on correspondence responding to the Kendle FINRA request.  His name was among those identified by

Investment Bank A to FINRA as having been privy to details about the Kendle transaction.

  c. On or about June 1, 2011, there were five short calls between SEAN CELL-1 and ROBERT CELL-1, two short calls between SEAN WORK LINE-1 and ROBERT CELL-1, three calls between SEAN CELL-1 and a second cellular telephone subscribed in the name of ROBERT STEWART ("ROBERT CELL-2"), and four more calls between SEAN WORK LINE-1 and ROBERT CELL-2.

  d. The same day, on or about June 1, 2011, ROBERT STEWART sold all of his remaining KCI stock at a slight loss, well in advance of the proposed acquisition about which SEAN STEWART had learned.  These sales began approximately one minute after the end of a ten-minute call from ROBERT CELL-1 to a Brokerage representative.

  e. From on or about June 1, 2011 through in or about February 2015, the date of the last of the records for ROBERT STEWART's Brokerage account that I have reviewed, there was no further trading of any individual company stocks in ROBERT STEWART's account.

### CW-1's Continued Trading in KCI Options

28. Based on my review of (a) trading records for brokerage accounts held in the name of CW-1, and (b) toll records for telephones subscribed to SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and CW-1, I have learned the following, in substance and in part:

  a. On or about Friday, June 3, 2011, the day before SEAN STEWART's wedding, two days after ROBERT STEWART sold his remaining KCI stock and ceased trading in individual company stocks, and approximately two minutes after a call between ROBERT CELL-1 and a cellular telephone used by CW-1 ("CW-1 CELL"), CW-1 began placing orders to purchase 50 KCI July $60 call options.  The next morning, CW-1 entered orders to purchase 100 KCI July $62.50 call options.  At market close on June 3, 2011, KCI stock was trading at $56.24 per share.

  b. On or about June 19, 2011, CW-1's KCI June call options expired.

  c. On or about June 22, 2011, at approximately 9:46 p.m., SEAN CELL-1 called a landline telephone number subscribed to ROBERT STEWART (the "ROBERT HOME LINE") for 16 minutes.

17

d.    The next day, on or about June 23, 2011, CW-1 purchased 20 KCI July $60 call options.  At market close that day, KCI stock was trading at $56.51 per share.

e.    On or about July 13, 2011, KCI announced that a consortium of funds including Apax would acquire KCI for $68.50 per share.  KCI's stock price rose from $64.49 per share to $68.23 per share on the date of this announcement.

f.    The next day, on or about July 14, 2011, CW-1 sold all of his remaining KCI call options for a profit of approximately $107,790.

## Continuation of FINRA's Inquiry Into Kendle Trading

29.   Based on my review of (a) documents supplied by Investment Bank A, (b) toll records for telephones subscribed to SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and (c) documents supplied by FINRA, I have learned the following, in substance and in part:

a.    On or about July 19, 2011, FINRA sent another letter to Investment Bank A attaching a list of individuals and entities that had traded in Kendle in advance of the announcement that it would be acquired by INC, and asking that all personnel who were privy to events leading up to the acquisition review the list and identify any familiar names. ROBERT STEWART's name was on the list.

b.    In response to this inquiry, SEAN STEWART did not identify his own father's name as being on the list.  On or about August 23, 2011, Investment Bank A conveyed its response to FINRA, without any indication that SEAN STEWART knew ROBERT STEWART.

c.    On or about August 26, 2011, FINRA asked for confirmation from Investment Bank A that SEAN STEWART had indeed failed to identify his father on the FINRA list for Kendle trading.

d.    On or about August 28 and 29, 2011, SEAN CELL-1 called ROBERT CELL-1 for five minutes and 13 minutes, respectively.

e.    On or about August 31, 2011, Investment Bank A delivered an amended response to FINRA's Kendle list, reporting

18

that SEAN STEWART had overlooked his father's name on the list during the first review, had identified it during a second review, and had denied discussing Kendle with his father.

      f.    On or about October 12, 2011, SEAN STEWART was terminated voluntarily from Investment Bank A.  A few months later, he joined Investment Bank B.

### The Profit-Sharing Agreement Between ROBERT STEWART and CW-1

      30.  As part of my investigation in this matter, I have spoken with CW-1, a friend and sometime business associate of ROBERT STEWART, a/k/a "Bob," the defendant.  CW-1 has stated the following, in substance and in part:

      a.    The first time CW-1 learned that ROBERT STEWART had access to valuable information about stocks was in or about the spring of 2011.  At that time, CW-1 heard from someone who worked with both ROBERT STEWART and CW-1 that "news" was expected regarding Kendle, and purchased Kendle call options based on that tip.[4]

      b.    Following the May 4, 2011 announcement that Kendle would be acquired by INC, discussed above, CW-1 made a profit of approximately $7,100.  When ROBERT STEWART learned that CW-1 had made this profit, ROBERT STEWART informed CW-1 that he, ROBERT STEWART, had been behind the Kendle tip.

      c.    Also in or about the spring of 2011, ROBERT STEWART told CW-1 that "news" was expected concerning KCI, and asked CW-1 to purchase on ROBERT STEWART's behalf, in CW-1's trading account, KCI call options in "the 60s" with May expiration dates.  ROBERT STEWART assured CW-1 that he would reimburse CW-1 for any losses associated with the trades.  ROBERT STEWART also explained to CW-1 that the reason he could not trade KCI options in his own account was that he was "too close to the source."

      d.    CW-1 agreed to purchase KCI call options for ROBERT STEWART in CW-1's brokerage account, based on ROBERT STEWART's directions, and also purchased KCI call options for himself that mirrored those purchased for ROBERT STEWART, as

---

[4] Records for CW-1's brokerage accounts show that on or about April 26, 2011, CW-1 entered an order to purchase 30 Kendle May $12.50 call options.  At the time, Kendle was trading at approximately $10 per share.

19

described in paragraphs 26(c) and (j) and 28(a) and (d), supra.
CW-1 had never traded in KCI securities before this.

     e.    When KCI's acquisition was announced on or about
July 13, 2011, CW-1 remarked to ROBERT STEWART how impressive it
was that he had had two tips in a row that had translated into
acquisition announcements.  ROBERT STEWART then informed CW-1
that the source of these tips had been his son, whom CW-1 at
this time mistakenly believed referred to the brother of SEAN
STEWART, the defendant (who, like SEAN STEWART, worked in the
financial industry).  Upon hearing this, CW-1 told ROBERT
STEWART that he did not want to know anything further about the
source of the tips, because he wanted to be able to claim, if
asked, that he had not knowingly traded on inside information.
ROBERT STEWART indicated to CW-1 that he understood CW-1's
concern.

     f.    Later, in or about the spring of 2012, CW-1 met
SEAN STEWART for the first time.  Around the time of that
meeting, ROBERT STEWART explained to CW-1 that SEAN STEWART was
the source of the tips upon which they had been trading, and
that SEAN STEWART worked on Wall Street, on the "sell side."
CW-1 told ROBERT STEWART, again, that he did not want to learn
any further details about the source of the tips.

     g.    At ROBERT STEWART's suggestion, in part because
he was (as he told CW-1) worried that his telephone calls were
being intercepted, ROBERT STEWART and CW-1 avoided explicit
discussions over the telephone and in e-mail about their trading
based on SEAN STEWART's information.  They instead sought to
confine their discussions of these matters to in-person
meetings.  When they communicated over the telephone or by
e-mail about the trading, they were vague and sometimes even
used "golf"-related code to mask their communication.

     h.    For the KCI trading, ROBERT STEWART and CW-1
agreed in advance that ROBERT STEWART would get whatever profits
were made on the particular options that he had directed CW-1 to
purchase.  After the KCI tip proved to be valuable, ROBERT
STEWART and CW-1 agreed that in the future CW-1 would decide
what options to purchase based on the tips ROBERT STEWART
received from his son, and ROBERT STEWART and CW-1 would split
the profits of any trading conducted in CW-1's principal
brokerage account, minus a percentage representing the taxes
that CW-1 likely would have to pay on the proceeds.  (CW-1 also
conducted mirror trades in an IRA account that he controlled.)
The two further agreed that CW-1 would pay ROBERT STEWART his

portion of the proceeds in small cash increments over time to avoid detection.

        i.    CW-1 and ROBERT STEWART generally followed this arrangement with respect to trading in advance of the acquisitions discussed below (namely, the acquisition of Gen-Probe by Hologic, the acquisition by tender offer of Lincare by Linde, and the acquisition of CareFusion by Becton) – each of which ROBERT STEWART learned about from SEAN STEWART before the deals were announced publicly.

        j.    Before the trading in securities of Gen-Probe, Lincare, and CareFusion described elsewhere below, CW-1 had never traded in any of those securities.  In making the subject trades, CW-1 employed strategies designed to avoid detection, including spreading trades over multiple options series, buying options that were relatively heavily traded, and refraining from purchasing options too close to the expected public announcements of the deals.

        k.    CW-1 and ROBERT STEWART generally honored their payment agreement.  CW-1 would pay ROBERT STEWART his portion of the proceeds in small increments over time, typically in cash but sometimes by check.

    31.    Based on my review of bank records for accounts held by CW-1 and ROBERT STEWART, a/k/a "Bob," the defendant, I have learned that from in or about July 2012 through in or about October 2012, following the announcement of the Gen-Probe and Lincare deals, discussed below, CW-1 paid ROBERT STEWART checks totaling $23,000.[5]

## Insider Trading in Gen-Probe Stock

    32.    Based on my review of (a) documents supplied by Investment Bank B, (b) documents supplied by FINRA, (c) trading records for brokerage accounts held in the name of CW-1, (d) toll records for telephones subscribed to SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and CW-1, and (e) publicly-available documents, including SEC filings, I have learned the following, in substance and in part:

        a.    On or about March 7, 2012, the Chief Executive Officers of Gen-Probe and Hologic, both medical supply and

---

[5] I have learned from CW-1 that, of these checks, one, in the amount of $1,500, was unrelated to the insider trading scheme described herein.

services companies, met to discuss a potential acquisition by Hologic of Gen-Probe for between $80 and $85 per share. Investment Bank B was selected to serve as an advisor to Hologic.

b.   Between March 10, 2012 and April 16, 2012, there were over 45 calls between a cellular telephone subscribed to SEAN STEWART ("SEAN CELL-2") and either ROBERT CELL-1 or ROBERT CELL-2.

c.   On or about April 18, 2012, CW-1 called ROBERT CELL-1 for a minute and a half.  The same day, CW-1 placed an order to purchase 20 Gen-Probe August $75 call options.  At market close on April 18, Gen-Probe stock was trading at $66.69 per share.

d.   Two days later, on or about Friday, April 20, 2012, CW-1 placed another order to buy 20 Gen-Probe May $70 call options.  Less than an hour after this order was placed, ROBERT CELL-1 called CW-1 CELL for six minutes.  At market close on April 20, Gen-Probe stock was trading at $68.52 per share.

e.   On or about April 21, 2012, a Saturday, Gen-Probe delivered a preliminary draft merger agreement to Hologic.  The same day, SEAN CELL-1 called ROBERT CELL-1 for six minutes. Within two hours of that call, CW-1 began entering orders to purchase 80 Gen-Probe August $75 call options and 40 Gen-Probe May $75 call options.  After these orders were placed, SEAN CELL-1 called ROBERT HOME LINE for 15 minutes.

f.   On or about April 22, 2012, a Sunday, there were three short calls between SEAN CELL-1 and ROBERT CELL-1, and two more short calls between SEAN CELL-1 and ROBERT CELL-2.

g.   The next day, on or about April 23, 2012, Gen-Probe and Hologic agreed to recommend to their respective boards a purchase price of $82.50 per share.  On or about April 28, 2012, the agreed-upon price rose to $82.75 per share.

h.   Meanwhile, on or about April 26 and 27, 2012, CW-1 purchased 20 Gen-Probe May $80 call options, 30 Gen-Probe June $80 call options, 70 Gen-Probe June $75 call options, and 40 Gen-Probe June $70 call options.  At this time, Gen-Probe stock was trading at approximately $68.75 per share.

i.   On or about April 30, 2012, Gen-Probe and Hologic announced publicly that Hologic had agreed to purchase Gen-Probe

22

for approximately $3.7 billion in cash.  The day of the announcement, CW-1 CELL and ROBERT CELL-1 had a three-minute call.  Also the same day, SEAN STEWART sent an e-mail to his parents in which he acknowledged that he had been "pretty busy on [the Hologic/Gen-Probe] deal."

    j.   The day that Hologic's acquisition of Gen-Probe was announced, Gen-Probe's stock price rose from $68.715 per share to $81.55 per share.

    k.   Beginning the day after the announcement, from on or about May 1, 2012 through on or about May 9, 2012, CW-1 placed orders to sell all of the Gen-Probe call options he had accumulated since April 18, 2012.  He reaped profits of approximately $180,590 from these sales.

### Insider Trading in Lincare Stock

    33.   Based on my review of (a) documents supplied by Investment Bank B, (b) documents supplied by FINRA, (c) trading records for brokerage accounts held in the name of CW-1, (d) toll records for telephones subscribed to SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and CW-1, (e) publicly-available documents, including SEC filings, and (f) e-mail communications to and from personal e-mail accounts used by ROBERT STEWART and CW-1, I have learned the following, in substance and in part:

    a.   On or about May 25, 2012, Linde, a German industrial gas supplier, made known to an investment bank its desire to arrange a meeting regarding a potential acquisition of Lincare, an in-home respiratory services provider.  Investment Bank B was hired to serve as one of Linde's advisers in connection with the proposed transaction, which would take the form of a tender offer.

    b.   On or about Sunday, May 27, 2012, ROBERT STEWART e-mailed CW-1 to say, "might have an opportunity to play golf-but would need to book the reservation as soon as the *office opens Tuesday morning.  Let me know if you have time to discuss and if necessary I might be in the area tomorrow.*"  (Emphases in original.)[6]  Approximately eight minutes after ROBERT STEWART

---

[6] As discussed above, ROBERT STEWART and CW-1 sometimes used "golf" references as code to discuss insider trading over e-mail.

sent this e-mail, ROBERT CELL-2 had a two-and-a-half-minute call with SEAN CELL-1. Less than 20 minutes later, ROBERT CELL-2 had a two-minute call with CW-1 CELL.

      c. The next day, on or about May 28, 2012, ROBERT CELL-1 and CW-1 CELL communicated four times. At approximately the same time as the last of these calls, CW-1 began entering orders to buy Lincare June and July $24 and $25 call options. The next morning, he cancelled these orders and replaced them with similar ones. Specifically, on or about May 29, 2012, CW-1 began buying the following call options: 50 Lincare June $24 call options; 50 Lincare June $25 call options; 45 Lincare July $24 call options; 50 Lincare July $25 call options. At market close on May 29, 2012, Lincare was trading at $23.17 per share.[7]

      d. On or about June 10, 2012, SEAN CELL-2 called ROBERT CELL-2 for four minutes. Two days later, on the afternoon of on or about June 12, 2012, ROBERT HOME LINE called CW-1 for eight minutes, and, 20 minutes later, ROBERT CELL-1 called CW-1 CELL for three and a half minutes. Within approximately 20 minutes of that call, CW-1 began placing orders for 30 Lincare July $24 call options and 40 Lincare July $25 call options. At market close on June 12, Lincare was trading at $23.91 per share.

      e. On or about June 20, 2012, Linde offered to purchase Lincare in a tender offer for $37 per share. Also on or about June 20, ROBERT CELL-1 had two short calls with CW-1 CELL.

      f. The next day, on or about June 21, 2012, CW-1 bought 30 Lincare July $26 call options and 60 Lincare July $27 call options. At market close on June 21, Lincare was trading at $25.07 per share.

      g. On or about June 27, 2012, a newspaper reported that Linde might be buying Lincare. In response to this news, Lincare's stock price rose from $25.26 per share at market close on June 26 to $31.17 per share on June 27. Approximately two hours after the article was published, CW-1 CELL called ROBERT CELL-1 for a minute and a half. A few hours later, ROBERT CELL-2 called SEAN CELL-2 for five and a half minutes.

---

[7] On or about June 14 and 15, 2012, just as his Lincare June options were about to expire, CW-1 sold all 50 of his Lincare June $24 call options, and all 50 of his Lincare June $25 call options. He made a small profit on these sales.

h.   The next day, on or about June 28, 2012, CW-1 bought 20 Lincare July $35 call options.  A few hours later, CW-1 CELL had the first of two short calls that day with ROBERT CELL-1.  At market close on June 28, Lincare stock was trading at $32.30 per share.

i.   On or about Sunday, July 1, 2012, Dow Jones announced that Linde planned to acquire Lincare for approximately $4.6 billion — about $41.50 per share.  The next trading day, Lincare's stock price rose from $34.02 per share at market open to $41.34 per share at market close.

j.   On or about July 6, 2012, CW-1 sold all of his Lincare July call options, reaping a profit of approximately $407,573.

k.   That same day, within just a few minutes of selling off his Lincare options, CW-1 sent an e-mail message to ROBERT STEWART's personal e-mail account telling him, "I have some good news for you when you get back."  Approximately twenty minutes later, ROBERT STEWART responded, "Thanks [CW-1]- saw local story about high cost of golf reservations since a foreign company purchased all- even more expensive than imagined."

34.   As part of my investigation in this matter, I have spoken with CW-1 about the July 6, 2012 e-mail described in the foregoing paragraph.  CW-1 has stated, in substance and in part, that he understood the comment made by ROBERT STEWART, a/k/a "Bob," the defendant, about "golf" and "a foreign company" to be a coded reference to the fact that a German company (Linde) had announced its acquisition of Lincare, and that ROBERT STEWART's observation that the "reservations" were "even more expensive than imagined" was a coded reference to the higher-than-expected price per share that Linde had agreed to pay for Lincare.

### Payments from ROBERT STEWART to SEAN STEWART

35.   Based on my review of (a) bank records for accounts held in the names of SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the defendants, and (b) e-mail communications between SEAN STEWART and ROBERT STEWART, I have learned, among other things, that in or about December 2012, ROBERT STEWART made payments to SEAN STEWART totaling at least $15,000.

## Insider Trading in CareFusion Stock

36.   Based on my review of (a) documents supplied by
Investment Bank B, (b) documents supplied by FINRA, (c) trading
records for brokerage accounts held in the name of CW-1, (d)
toll and historical cell site location records for telephones
subscribed to SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the
defendants, and CW-1, (e) publicly-available documents,
including SEC filings, (f) e-mail communications to and from
personal e-mail accounts used by ROBERT STEWART and CW-1, and
(g) documents supplied by a midtown Manhattan restaurant, I have
learned the following, in substance and in part:

        a.   On or about March 7, 2014, representatives of
Becton and CareFusion, both medical technology companies, had a
telephone call in which Becton indicated it might be interested
in acquiring CareFusion.  CareFusion representatives prepared
for this call with the assistance of Investment Bank B
personnel, and SEAN STEWART became aware of Becton's interest on
the same day as the call.

        b.   On or about April 23, 2014, Investment Bank B
signed an engagement letter as financial advisor to CareFusion
in connection with the proposed transaction.

        c.   On or about August 1, 2014, Becton transmitted
its preliminary bid of $53 to $55 per share for CareFusion.

        d.   On or about August 5, 2014, a landline telephone
number assigned to SEAN STEWART by Investment Bank B ("SEAN WORK
LINE-2") called ROBERT CELL-1 for two and a half minutes, and
ROBERT CELL-1 called SEAN WORK LINE-2 for 10 minutes.

        e.   On or about Sunday, August 17, 2014, CW-1 and
ROBERT STEWART exchanged e-mail messages in which they agreed to
meet sometime in the coming week.

        f.   On or about August 18, 2014, after CareFusion
indicated that the Becton bid was insufficient, the parties to
the proposed transaction entered into a non-disclosure agreement
and began the due diligence process.

        g.   Also on or about August 18, 2014, CW-1 sent an
e-mail to ROBERT STEWART noting that he would be "in the city
tomorrow, probably late morning," to which ROBERT STEWART
responded "let me know and we can meet up quickly."

26

h.   On or about August 19, 2014, at approximately
2:00 p.m., ROBERT CELL-1 and CW-1 CELL were, according to
historical cell site location data, both located in the same
area of midtown Manhattan, New York.

i.   Later the same afternoon, at approximately 3:53
p.m., CW-1 placed an order to purchase 10 CareFusion December
$48 call options.  At market close on August 19, CareFusion
stock was trading at $44.93 per share.

j.   From on or about August 21, 2014 through on or
about September 3, 2014, CW-1 placed orders to purchase 300
CareFusion call options with strike prices ranging from $46 to
$50 per share and expiration dates ranging from September to
December.  During this period, CareFusion stock was trading at
between $45.05 per share and $46.29 per share.  Also during this
period, CW-1 CELL had four calls and seven text messages with
ROBERT CELL-1.

k.   On or about September 3, 2014, Becton submitted a
revised bid to CareFusion of $56 per share.  On or about
September 10, 2014, that bid was revised upward to $58 per
share.

l.   On or about September 4, 2014, ROBERT CELL-1 had
two calls with SEAN WORK LINE-2 and one with SEAN CELL-2.  The
following day, September 5, 2015, ROBERT CELL-1 called CW-1 CELL
for eight minutes.  A few minutes after that call ended, ROBERT
CELL-1 and SEAN WORK LINE-2 had a call that lasted three and a
half minutes.

m.   From on or about September 12, 2014 to on or
about September 25, 2014, CW-1 placed orders to purchase another
300 CareFusion call options, with strike prices ranging from $46
to $49 per share and expiration dates ranging from October to
December.[8]  During this period, CareFusion's stock price ranged
from $45.60 per share to $46.75 per share.

n.   On or about September 28, 2014, CW-1 CELL and
ROBERT CELL-1 had an 11-minute call.  On or about the next day,
SEAN CELL-2 called ROBERT CELL-1 for two minutes.  Then, on or
about September 30, ROBERT CELL-1 and SEAN WORK LINE-2 had two
two-minute calls with one another.

---

[8] CW-1 also sold 20 September $46 call options and 120 October
$49 call options.

27

o.   On or about October 2, 2014, CW-1 placed orders to purchase 10 CareFusion November $45 call options and 10 CareFusion November $46 call options.   At market close on October 2, CareFusion was trading at $45.34 per share.

p.   On or about October 4, 2014, at approximately 4:30 p.m., SEAN STEWART met ROBERT STEWART, SEAN STEWART's brother, and two others at a restaurant in midtown Manhattan. ROBERT STEWART paid the bill for the meal, which was approximately $266.

q.   On or about Sunday, October 5, 2014, at approximately 4:00 p.m., ROBERT CELL-1 called CW-1 CELL for 13 minutes.

r.   A few hours later, Becton announced publicly that it intended to purchase CareFusion for $12.2 billion, or $58 per share.   The next trading day, October 6, CareFusion's stock price rose from $46.17 per share at market open to $56.75 per share at market close.

s.   Also on October 5, SEAN STEWART forwarded ROBERT STEWART an e-mail attaching the press release announcing the deal, to which ROBERT STEWART responded by saying, "Congrats-great job."

t.   On or about October 7, 8, and 9, 2014, CW-1 sold all of the CareFusion call options he had purchased, reaping a profit of approximately $446,448.

## Contacts Between CW-1 and ROBERT STEWART in 2015

37.   As part of his efforts to cooperate with the Government and potentially secure a more lenient sentence, CW-1 arranged and recorded in-person meetings with ROBERT STEWART, a/k/a "Bob," the defendant, on or about March 24, 2015 and on or about April 16, 2015, and recorded a telephone call with ROBERT STEWART on or about May 4, 2015.   I observed the meetings, the first of which occurred at a restaurant in midtown Manhattan, and the second of which occurred at a diner in Queens.   I have also listened to the recordings of the meetings and the telephone call and spoken with CW-1 about the statements that he and ROBERT STEWART made at the meetings.   Based on my own observations, my review of the recordings, and the statements that CW-1 related to me, I have learned the following, in substance and in part:

28

a.   At the meeting on or about March 24, 2015, CW-1 handed ROBERT STEWART $2,500 in cash, which was the balance of the proceeds owed to ROBERT STEWART for profitable trading executed in CW-1's account in advance of the CareFusion acquisition announcement.

b.   Also at the March 24 meeting, as CW-1 and ROBERT STEWART were discussing their trading on information that SEAN STEWART, the defendant, had provided, ROBERT STEWART told CW-1 that "Sean got nailed by FINRA – they questioned him," and that ROBERT STEWART later received a call from the SEC. ROBERT STEWART said he was "dumbfounded" when that occurred, but that "nothing happened." ROBERT STEWART further told CW-1 that once, after the SEC had called him, SEAN STEWART chastised ROBERT STEWART for failing to make use of a tip, saying, "I can't believe I handed you this on a silver platter and you didn't invest in it."

c.   At the meeting on or about April 16, 2015, CW-1 told ROBERT STEWART he was "concerned" about what the latter had said at the earlier meeting regarding an inquiry from government authorities. In response, ROBERT STEWART told CW-1, among other things, that he had received a call from the SEC following a FINRA inquiry into "the trades." ROBERT STEWART also asked CW-1 whether "we have statute of limitations" with respect to the trading about which the SEC had inquired. When CW-1 responded that he did not know, ROBERT STEWART noted that "it's passed" because it had been "four years since the trade."

d.   Also at the April 16, 2015 meeting, CW-1 asked ROBERT STEWART whether SEAN STEWART had supplied the information for ROBERT STEWART's and CW-1's trades "out of the goodness and kindness of his heart for you." ROBERT STEWART responded, "No, you know what? I think he gets angry at times. Angry at the industry." ROBERT STEWART further claimed that SEAN STEWART had only provided him information "like three – three times," that he did not want to get "too greedy" with the trading based on SEAN STEWART's information, and that "now" ROBERT STEWART "make[s] it very clear, you know, I do tell him now that, you know, I really don't want to know what you are doing."

e.   At the very end of the meeting on April 16, 2015 between CW-1 and ROBERT STEWART, ROBERT STEWART asked CW-1 whether CW-1 had ever received "a call from the SEC" or "anybody," "just in general." CW-1 responded that he had not. A few minutes later, when CW-1 once again asked, "out of curiosity," to "understand[] the relationship," whether SEAN

29

STEWART had offered tips on deals "out of the goodness and kindness of his heart," or if ROBERT STEWART had instead "throw[n] [SEAN STEWART] money," ROBERT STEWART denied the provision of cash to SEAN STEWART.  He also claimed that he never told SEAN STEWART "I've done anything."  Then, referencing CW-1's claim that his questions along these lines were "out of curiosity," ROBERT STEWART asked CW-1, in substance, why he was asking these questions.  CW-1 indicated it was just general curiosity.  A few minutes later, the meeting ended.

      f.   On or about May 4, 2011, CW-1 placed a telephone call to ROBERT STEWART.  During that call, ROBERT STEWART explained to CW-1 that he had become concerned about the questions CW-1 had been asking him at the April 16, 2015 meeting:  "After we met . . . you'll probably laugh about this, but . . . couple of the questions you asked me, uh, when we were at lunch . . . I tried to give you a call back and I couldn't get you, I'm like, 'oh my god,' I wonder if, uh, there was something going on there, now I can't get [CW-1] because they got [CW-1] somewhere, where I can't talk to him and . . . for about two weeks, I didn't sleep at night . . . I'm like, 'oh my god,' uh, you know, something's going on, something bad's going on, and all this stuff . . . ."

### Profits from the Scheme

    38.   Based on my review of trading records for the brokerage accounts held in the names of ROBERT STEWART, a/k/a "Bob," the defendant, and CW-1, I have learned that the total amount of profits reaped from the insider trading scheme described herein was approximately $1.16 million.

WHEREFORE, I respectfully request that arrests warrant be
issued for SEAN STEWART and ROBERT STEWART, a/k/a "Bob," the
defendants, and that they be arrested and imprisoned or bailed,
as the case may be.

ERIC BURNS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
13th day of May 2015

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

ANDREW J. PECK
UNITED STATES       MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK