UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

  - v.-                                              :            S1 15 Cr. 287 (LTS)

SEAN STEWART,                               :

                Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

Sarah Eddy McCallum
Brooke E. Cucinella
Assistant United States Attorneys

  -Of Counsel-

## **TABLE OF CONTENTS**

TABLE OF CASES ...................................................................................................ii

BACKGROUND ......................................................................................................1

    I.      THE CHARGES ..........................................................................................1

          A.    Insider Trading in Kendle ...........................................................2

          B.    Insider Trading in KCI................................................................3

          C.    Conclusion of the FINRA Inquiry into Kendle .........................5

          D.    Insider Trading in Gen-Probe ....................................................5

          E.    Insider Trading in Lincare .........................................................6

          F.    Insider Trading in CareFusion ...................................................7

    II.     RECORDINGS MADE BY CUNNIFFE .........................................7

          A.    The March 24, 2015 Meeting ....................................................7

          B.    The April 16, 2015 Meeting ....................................................11

ARGUMENT ........................................................................................................11

    I.      THE MARCH 24, 2015 RECORDING SHOULD BE ADMITTED..............11

          A.    Stewart's Inaudibility Objection Is Untenable .........................12

          B.    The Probative Value of the March 24, 2015 Recording Far Outweighs Any Purported Prejudice........................................................16

          C.    Stewart's Hearsay Objections Are Baseless .............................16

    II.     THE COMPLIANCE POLICIES SHOULD BE ADMITTED ......................20

CONCLUSION......................................................................................................23

## TABLE OF CASES

*Bourjaily* v. *United States*, 483 U.S. 171 (1987) ....................................................16

*Chisholm* v. *Sloan-Kettering*, No. 09 Civ. 8211 (VM),
   2011 WL 2015526 (S.D.N.Y. May 13, 2011) .................................................21

*Hygh* v. *Jacobs*, 961 F.2d 359 (2d Cir. 1992).........................................................21

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................21

*S.E.C.* v. *Happ*, 392 F.3d 12 (1st Cir. 2004)..........................................................21

*S.E.C.* v. *Obus*, 693 F.3d 276 (2d Cir. 2012) .........................................................20

*Spavento* v. *United States*, 939 F. Supp. 233 (S.D.N.Y. 1996) .................................12

*United States* v. *Anderson*, 533 F.3d 623 (8th Cir. 2008).........................................21

*United States* v. *Arango-Correa*, 851 F.2d 54 (2d Cir. 1988) ...........................12, 13

*United States* v. *Ben-Shimon*, 249 F.3d 98 (2d Cir. 2001).........................................13

*United States* v. *Bryant*, 480 F.2d 785 (2d Cir. 1973) .......................................11, 12

*United States* v. *Chalarca*, 95 F.3d 239 (2d Cir. 1996)............................................12

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999)...................................................18

*United States* v. *Evans*, 293 F. App'x 63 (2d Cir. 2008) ..........................................21

*United States* v. *Gupta*, 747 F.3d 111 (2d Cir. 2014) ...........................................17, 18, 19, 20

*United States* v. *Hemmings*, 482 F. App'x 640 (2d Cir. 2012)..................................12

*United States* v. *James*, 712 F.3d 79 (2d Cir.2013) ..................................................19

*United States* v. *Jiau*, 734 F.3d 147 (2d Cir. 2013) ..................................................20

*United States* v. *Leslie*, 658 F.3d 140 (2d Cir. 2011)................................................18

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)...........................17

*United States* v. *Mergen*, 543 F. App'x 46 (2d Cir. 2013) .......................................12

*United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014) ...........................................20

*United States* v. *North*, No. 06 Cr. 323 (CFD),
   2007 WL 1630366 (D. Conn. June 5, 2007)....................................................21

*United States* v. *Riley*, -- F. App'x --, 2016 WL 158464 (2d Cir. Jan. 14, 2016)....................19

*United States* v. *Riley*, No. 13 Cr. 339 (VEC),
    2014 WL 3435721 (S.D.N.Y. Jul. 14, 2014)........................................................................21

*United States* v. *Rosario*, No. 09 Cr. 415 (VEC),
    2014 WL 6076364 (S.D.N.Y. Nov. 14, 2014)...................................................................16

*United States* v. *Saget*, 377 F.3d 223 (2d Cir. 2004) ............................................................20

*United States* v. *Siddiqi*, No. 06 Cr. 377 (SWK),
    2007 WL 3125313 (S.D.N.Y. Oct. 23, 2007)...................................................................13

*United States* v. *Simmons*, 923 F.2d 934 (2d Cir. 1991)........................................................17

*United States* v. *Walker*, No. 99 Cr. 379 (BSJ),
    1999 WL 777885 (S.D.N.Y. Sept. 29, 1999)............................................................12, 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

  - v.-                                              :              S1 15 Cr. 287 (LTS)

SEAN STEWART,                                 :

              Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*

The Government respectfully submits this memorandum of law in opposition to defendant Sean Stewart's motions *in limine* to preclude admission into evidence at trial of (1) an audio recording and (2) compliance policies.  These motions should be denied.  The audio recording is plainly admissible under governing law, and the compliance policies are admissible subject to a standard limiting instruction.

## BACKGROUND

### I.      THE CHARGES

Superseding Indictment S1 15 Cr. 287 (LTS) (the "Indictment") charges Stewart with nine counts related to insider trading in the securities of five publicly-traded health care companies: Kendle International Inc. ("Kendle"), Kinetic Concepts, Inc. ("KCI"), Gen-Probe Inc. ("Gen-Probe"), Lincare Holdings, Inc. ("Lincare"), and CareFusion Corp. ("CareFusion").  Count One charges conspiracy to commit securities fraud and tender offer fraud, in violation of Title 18, United States Code, Section 371.  Count Two charges conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. Counts Three through Eight charge securities fraud, in violation of Section 10(b) and Rule 10b-5.  And Count Nine charges tender offer fraud, in violation of Title 15, United States

Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d).

As described in the Indictment and the underlying criminal complaint, Stewart worked as an investment banker in the health care field—first at the investment banking advisory arm of a global bank headquartered in Manhattan ("Investment Bank A"), and then at an independent investment banking advisory firm with its principal place of business in Manhattan ("Investment Bank B," and, together with Investment Bank A, the "Investment Banks"). Both banks had explicit written policies against divulging material nonpublic information about the banks' clients—including, among other things, information related to mergers and acquisitions. Stewart repeatedly and blatantly violated those policies by leaking information about upcoming mergers and acquisitions to his father, Robert Stewart ("Robert"), who then traded on the information supplied and caused a co-conspirator, Richard Cunniffe, to conduct trades on his behalf.

### A.   Insider Trading in Kendle

The first such tip occurred in 2011. While a Vice President in Investment Bank A's Healthcare Investment Banking Group, Stewart worked on a transaction that would culminate in Kendle's acquisition by INC Research, LLC ("INC"). He represented Kendle. The deal was not announced publicly until May 4, 2011. Meanwhile, in early February 2011, approximately two weeks after Stewart remarked in an internal email to a colleague that Investment Bank A was "just officially mandated to sell Kendle," Stewart's father Robert began purchasing Kendle stock for the very first time. (Compl. ¶ 23(b)).[1] Telephone records confirm that Stewart and Robert communicated a few days before these purchases. In early

---

[1] "Compl." refers to the May 13, 2015 criminal complaint filed against Stewart and Robert, a copy of which is attached as Exhibit A hereto; "Stewart Mem." refers to the memorandum Stewart filed in support of his first motion *in limine*, seeking to exclude the March 24, 2015 audio recording; and "Stewart Compliance Mem." refers to the memorandum Stewart filed in support of his second motion *in limine*, seeking to exclude evidence of the Investment Banks' compliance policies.

March 2011, Robert bought more Kendle stock, this time while he and Stewart were staying together at a hotel, and shortly after Stewart had inquired by email to a colleague about Kendle's stock price. Robert's instruction to his broker this time was to sell his entire position in another stock and "reinvest all proceeds into KNDL." (Compl. ¶ 23(h)).

When the INC/Kendle deal was announced two months later, Kendle's share price rose—as the stock of a company to be acquired typically does—and Robert sold all his Kendle stock for a profit of approximately $7,900. As Robert would later admit to an employee of the Securities and Exchange Commission ("SEC") who interviewed him about his Kendle trades, Robert used the proceeds of this trading to help fund Stewart's wedding a month later.

Also after the INC/Kendle deal was announced, Robert learned that his friend and colleague Richard Cunniffe had made money by investing in Kendle stock options, based on a tip that "news" had been expected about Kendle, relayed to Cunniffe from a mutual acquaintance of Cunniffe's and Robert's ("Acquaintance 1"). (Compl. ¶ 30(a)-(b)). Upon hearing this, Robert claimed credit for the tip to Acquaintance 1, telling Cunniffe he had been behind it.

### B.    Insider Trading in KCI

A few weeks after his March 2011 hotel stay with Robert, Stewart learned of another health care company merger deal that Investment Bank A was working on: the proposed acquisition of KCI by private equity group Apax Partners ("Apax"). Although not assigned to the deal, Stewart was kept apprised of its progress from April 2011 through July 13, 2011, when the acquisition was announced publicly.

Meanwhile, during this period, Stewart's father, Robert, approached Cunniffe to tell him that "news" was expected about KCI and to ask Cunniffe to purchase KCI call options "in the 60s" (meaning in the $60 strike price range) with May expiration dates on Robert's

3

behalf.  (Compl. ¶ 30(c)).  Because KCI stock was trading at $55.58 per share at this time, Robert's proposed option order reflected confidence that KCI's stock price would soon rise. To explain why he could not purchase these call options in his own brokerage account, Robert told Cunniffe that he was "too close to the source."  (*Id.*).  Beginning in April 2011, Cunniffe followed Robert's instructions, and also mirrored Robert's trades in Cunniffe's own account.  Cunniffe had never purchased KCI stock or options before.

At the same time, in early May 2011, Robert was purchasing a modest amount of KCI stock—stock he had never owned before—in his own account.  That halted abruptly, however, when the Financial Industry Regulatory Authority ("FINRA") announced to Stewart's employer, Investment Bank A, that it was reviewing trading in advance of the INC/Kendle deal's public announcement and listed Stewart's name as among those who had been privy to inside information in advance of the announcement.  On June 1, 2011, after Stewart became aware of FINRA's inquiry, and the same day that Stewart and Robert had a flurry of phone calls with one another, Robert sold all his KCI stock at a slight loss.  His brokerage records reflect no trading in any individual company stocks from that date forward, all the way to February 2015, the date of the last of the records the Federal Bureau of Investigation ("FBI") reviewed for Robert's account.

Cunniffe's KCI trading on his own and Robert's behalf, by contrast, proceeded apace, with heavy purchases of KCI call options reflecting a confidence that KCI's stock price would soon rise.  When KCI announced on July 13, 2011 that it was being bought out by Apax, its stock price jumped, and Cunniffe cashed out his and Robert's call options for a combined profit of approximately $107,790.

After the Apax/KCI deal was announced, Cunniffe remarked to Robert how impressive it was that he had had two acquisition tips in a row—first Kendle and then KCI. When Robert responded that the tips were from his son, Cunniffe asked to be kept in the dark

about the particulars of the source, explaining that he wanted to have plausible deniability in the event of a law enforcement inquiry.  Robert obliged.  Moreover, citing concerns that his telephone was being tapped, Robert suggested to Cunniffe that the two avoid discussing their trading over the phone or email.  For those times when phone or email could not be avoided, the two adopted a "golf"-related code to discuss their trades.

### C.    Conclusion of the FINRA Inquiry into Kendle

On July 19, 2011, shortly after the Apax/KCI deal was announced, after Robert and Cunniffe had cashed out on their Kendle and KCI investments, and after the proceeds of the Kendle trading had been used to help fund Stewart's wedding, FINRA moved forward with its Kendle trading investigation by supplying Investment Bank A with a list of names of people who had engaged in potentially suspicious trading in advance of the INC/Kendle deal's announcement, and asking that it be circulated to Investment Bank A personnel to see whether they had connections to the listed people.  Robert's name was on the list.  Yet Stewart, to whom the list was circulated, failed to identify Robert.  Only after FINRA pressed Investment Bank A to inquire once more of Stewart whether he knew his own father's name did Stewart confess that he did, and claim that he had simply overlooked it earlier.

### D.    Insider Trading in Gen-Probe

In October 2011, several months after the Apax/KCI deal was announced, Stewart left Investment Bank A.  Soon thereafter, he joined Investment Bank B as a Managing Director. In the spring of 2012, Robert finally introduced Stewart to Cunniffe, and explained to Cunniffe that Stewart had been the source of the tips on which they had been trading. (Before this, Cunniffe had been under the mistaken impression that Robert's other son, who also worked in the financial industry, was the source.)  Cunniffe reiterated that he did not want details about the source of the tips.

5

Stewart's next tip came right around the time of this meeting.  In March 2012, Investment Bank B was selected to serve as advisor to Hologic, Inc. ("Hologic") in connection with its contemplated acquisition by another health care company, Gen-Probe. Stewart was assigned to work on the deal.  After a month of frequent communication between Stewart and Robert, and in the immediate wake of a call between Robert and Cunniffe on April 18, 2012, Cunniffe began buying Gen-Probe call options, reflecting an expectation that Gen-Probe's stock price would soon rise.  It did so—immediately after Gen-Probe and Hologic announced their agreement publicly on April 30, 2012.  When, in early May, Cunniffe sold all of the Gen-Probe call options he had accumulated for Robert and himself, the two reaped profits of approximately $180,590.

### E.      Insider Trading in Lincare

In May 2012, a German health care company called Linde AG ("Linde") hired Investment Bank B to serve as an advisor in connection with its proposed tender offer acquisition of a U.S. company, Lincare.  At the end of that month, following telephone communications between Stewart and Robert and then between Robert and Cunniffe, Cunniffe began accumulating Lincare call options reflecting an expectation that Lincare's share price would soon rise.  These purchases continued through June 2012.  After the Linde/Lincare deal was announced publicly on July 1, 2012, Cunniffe cashed out his and Robert's Lincare options for a whopping profit of approximately $407,573.

### F.      Insider Trading in CareFusion

In March 2014, Investment Bank B was retained to advise health care company CareFusion in connection with its potential acquisition by Becton, Dickinson & Co. ("Becton"), another health care company.  Stewart became aware of the proposed acquisition on March 7, and, as reflected in email correspondence between himself and Robert, worked on the deal.

On August 19, 2014, following telephone communications between Stewart and Robert earlier in the month, Robert met with Cunniffe at a restaurant in Manhattan to inform him of the proposed acquisition of CareFusion. The same day, Cunniffe began buying CareFusion call options, reflecting an expectation that CareFusion's stock price would soon rise.  These purchases continued through early October 2014, when the Becton/CareFusion deal was finally announced publicly.  Cunniffe cashed out his and Robert's call options for a combined profit of approximately $446,448.  As of early 2015, Cunniffe still owed Robert $2,500 of Robert's share of the proceeds from this trading.

## II.    RECORDINGS MADE BY CUNNIFFE

In early 2015, the FBI approached Cunniffe, who then began cooperating with the investigation in this case.  As part of that cooperation, Cunniffe recorded (among other encounters) two meetings and a phone call that he had with Robert.

### A.      The March 24, 2015 Meeting

The first recorded meeting occurred on March 24, 2015.  Cunniffe, at the FBI's direction, carried a listening device into a restaurant where he was meeting Robert, and also carried an envelope with $2,500 in cash, supplied by the FBI, which Cunniffe was to pay Robert in satisfaction of the outstanding CareFusion debt.  The raw recording of this meeting is difficult to hear because it captures significant background noise.  The FBI, however, created an enhanced version of the recording that filters out a substantial amount of the

background noise.[2]  The resulting enhanced audio is audible with headphones.  While there are some words and phrases that cannot be clearly made out, most of the conversation is discernible.  The entire recording is approximately 70 minutes long.  The Government intends to introduce at trial only the third segment of the recording (hereinafter the "March 24, 2015 Recording"), which lasts approximately 16 minutes, because that is the only segment during which anything of relevance to this case was discussed.  The March 24, 2015 Recording is included as Exhibit B hereto, and an accompanying draft transcript is attached as Exhibit C.

The key passage from the recording follows immediately after the point during the meeting when Cunniffe hands Robert the $2,500 in cash for the CareFusion tip:

STEWART:    This guy. . .  Oh, thank you. I appreciate it.

CUNNIFFE:    This um. 2,500.

STEWART:    Oh, okay.

CUNNIFFE:    And uh, you know this is the rest of the [*indiscernible*].

STEWART:    Yup.

CUNNIFFE:    And basically there's hundreds in there.

STEWART:    Ok, no, that's great.

CUNNIFFE:    I still think it's funny [*indiscernible*] with CFN that I followed it for 6 months.[3]  [*Indiscernible*].

STEWART:    Yup.

CUNNIFFE:    [*Indiscernible*].

STEWART:    I don't know what, you know it's funny I don't hear from him. He just gets so busy, you know. He's just uh, he's absent-minded about all this stuff.  He's like, well [*indiscernible*] one

---

[2] The Government also secured another enhanced version of the audio from an outside vendor.  Because the FBI enhancement is generally clearer, that is the one the Government intends to introduce at trial.  Both enhanced versions have been provided to the defense.

[3] CFN is the ticker symbol for CareFusion.

day he called like after 2 weeks.  But, I think I'd left a message for him to call his grandmother.  It was his grandmother's birthday and I didn't hear back from him.  So meanwhile, like a day later, I call him and I said, Sean don't you, don't call us anymore?  What do you mean?  I'm calling here, I'm calling there, I'm calling you know, my grandmother, I'm trying to – I said, you don't call your family.  I said who else do you call?

But I don't know what else, you know, what their uh, I don't know if they've done much [*indiscernible*].  Um, I'm almost afraid to ask.  I always, I always have this strange feeling that they're [*indiscernible*], and they're like to trying to tie things together.  You know, having got one call already, and that was, you know, two years ago.

CUNNIFFE:   [*Indiscernible*] really?

STEWART:   Yeah, did I ever tell you that happened?

CUNNIFFE:  No.

STEWART:   Well, I got nailed [*indiscernible*], it was the very first thing.  The very first, nobody but [Acquaintance 1] [*indiscernible*].  And, I remember I bought some of this stock, then I sold it and I bought it back [*indiscernible*].  Now, I [*indiscernible*] 5,000 dollars on it.  That was it.  But I got – Sean got nailed by FINRA.  Got nailed.  Questioned on it.[4]  It was a big deal.  Because he never changed his address from our house.  So, yeah, they go through the list, and say, okay, who bought and sold stock in the last 10 days after the sale?  I came up with the same address, as his.  So, you know, I kind of washed it away, no way [*indiscernible*].  But then about a year later I got a call from the [*indiscernible*].  And they said, we're looking at this and [*indiscernible*].  And I was like dumbfounded.  Now, I think, I'm just guessing that all that might have gone back to the IRS.  'Cause I think the IRS tapped my phone.  And um. You know I was doing those phone card things.  They um, that's when the IRS approached me and they, you know, like [*indiscernible*].  And they picked me up at my house and then interviewed me.  I was in my pajamas.  And uh, then he started talking about the investigation.  They went through all my bank accounts and my credit cards.  I don't know what they were looking for.  And, I don't know if it was – I was afraid to use the phone.  And it goes back, probably 5 years.  Probably yeah 5, 4, 5 years ago.  And uh, I was at Pete's at the time.  And I thought that it had something to do with Pete, and that's when

---

[4] The original draft of the transcript of the March 24, 2015 Recording supplied to the defense omitted the words "by FINRA."  As Stewart notes in his motion, the words "by FINRA" appear in the criminal complaint.  They were omitted by mistake in the first draft transcript.

> I, when I literally stopped seeing Pete.  I'm like, you know, you get me in trouble there.  But um.

CUNNIFFE:  I remember that [*indiscernible*].

STEWART:  It was that very first thing . . .  You might have bought a little bit.  You may, I think, I think [Acquaintance 1] bought a little bit.  No I don't think you did.  No, I don't think. [Acquaintance 1] did.  He bought like, he bought a bunch of options.  And uh, you know, what I . . . I remember when the IRS said we see you've done [*indiscernible*] – they questioned me on how I was doing [*indiscernible*].  They said . . . they were going after guys doing the phone card stuff because there were a lot of them [*indiscernible*] the firm, and a lot of them ended up in prison.  And so I was filing for like a million dollar refund.
. . .

STEWART:  And then like about a year later I get a call from the SEC questioning me on that transaction.

STEWART:  [*Indiscernible*] 5,000 dollar transaction.  What are they gonna do?  And then nothing happened.  I don't know what they're doing now.  I figure it's a 3 year statute, you know, 4 year, 5 year whatever it it's way way over that. But it pretty much put a fear in me in that [*indiscernible*].

CUNNIFFE:  Would scare the shit out of me [*indiscernible*] that's for sure.

STEWART:  Yeah.  I mean I still remember being [*indiscernible*] years ago. Sean would always say, ah I can't believe you [*indiscernible*]. Said I can't believe it.  I handed you this on a silver platter and you didn't invest in this, and you know.  I said, Sean, did you ever get a call from the SEC, like I'm gonna actually do this [*indiscernible*], and he says [*indiscernible*].  I mean [Laughter]. Yeah, that [*indiscernible*].  But, you know, [*indiscernible*] talk to the IRS. . . it's so over-, overwhelming.

(Ex. C at 4-8).

In addition to introducing the recording of this passage and providing the jury with an accompanying transcript, the Government also expects to elicit at trial testimony from Cunniffe about the conversation.  Attached as Exhibit D hereto is a redacted version of an FBI summary of an interview conducted with Cunniffe, duringwhich Cunniffe discussed the conversation he had with Robert during the March 24, 2015 meeting.

### B.      The April 16, 2015 Meeting

At the second recorded meeting between Cunniffe and Robert, on April 16, 2015, Cunniffe asked Robert why Stewart had been tipping them, and Robert responded that he believed Stewart "gets angry at times"—"[a]ngry at the industry."  (Compl. ¶ 37(d)).  Pressed further by Cunniffe for details about why Stewart had supplied the inside information, Robert retreated, claiming—contrary to his earlier "silver platter" report—that he never told Stewart he had "done anything" with the tips.  (Compl. ¶ 37(e)).  As he would acknowledge in a phone call with Cunniffe a few days later, Robert became suspicious during this second meeting—correctly worrying that authorities were setting Cunniffe up to question him:

> After we met . . . you'll probably laugh about this, but . . . couple of the questions you asked me, uh, when we were at lunch . . . I tried to give you a call back and I couldn't get you, I'm like, 'oh my god,' I wonder if, uh, there was something going on there, now I can't get [Cunniffe] because they got [Cunniffe] somewhere, where I can't talk to him and . . . for about two weeks, I didn't sleep at night . . . I'm like, 'oh my god,' uh, you know, something's going on, something bad's going on, and all this stuff . . . .

(Compl. ¶ 37(f)).[5]

### ARGUMENT

## I.      THE MARCH 24, 2015 RECORDING SHOULD BE ADMITTED

The Court should reject Stewart's three-pronged attack upon the admissibility of the March 24, 2015 Recording.  It is no surprise that Stewart wants this evidence excluded; it is highly probative of his participation in the charged conspiracy, and of his guilty state of mind.  But the objections Stewart raises are meritless.  The recording is mostly audible, prejudicial only in the colloquial sense that it strongly supports the Government's case, and admissible over any hearsay objection both because it contains statements in furtherance of the charged conspiracy and because it contains relevant statements against Robert's penal interest.

---

[5] Stewart has not moved to exclude any recording other than the March 24, 2015 Recording.

### A.    Stewart's Inaudibility Objection Is Untenable

There is no question that the voices captured on the March 24, 2015 Recording are faint, and that, even as enhanced, the recording captures substantial background noise. But a fair review of the recording, and of the accompanying transcript, reveals that the discussion is largely audible, certainly with the assistance of headphones (with which the Government intends to supply the jurors). *Cf. United States* v. *Bryant*, 480 F.2d 785, 790 (2d Cir. 1973) (approving use of headphones by jurors); *Spavento* v. *United States*, 939 F. Supp. 233, 238 (S.D.N.Y. 1996) (same). Under these circumstances, Stewart's inaudibility objected must be overruled.

The Second Circuit has articulated "a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." *United States* v. *Arango-Correa*, 851 F.2d 54, 58 (2d Cir. 1988); *United States* v. *Walker*, No. 99 Cr. 379 (BSJ), 1999 WL 777885, at *3 (S.D.N.Y. Sept. 29, 1999). "The mere fact that some portions of a tape recording are inaudible does not by itself require exclusion of the tapes," *United States* v. *Arango-Correa*, 851 F.2d at 58, "'[u]nless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy,'" *id.* (quoting *United States* v. *Bryant*, 480 F.2d at 790); *see United States* v. *Mergen*, 543 F. App'x 46, 49 (2d Cir. 2013) (summary order) (remanding case where district court precluded defense from offering recording that was largely inaudible; explaining that "the fact that some portions of a recording may be inaudible is not a proper basis for exclusion under the authentication rule," and "[t]he question is not whether there are 'ambiguous' or 'inaudible' portions in the recordings, but whether the audible portions of the recordings retain probative value").

Applying the presumption in favor of admissibility, courts in this Circuit routinely admit recordings that contain multiple inaudible or indecipherable segments, very faint voices, and strong background noise. *See, e.g.*, *United States* v. *Hemmings*, 482 F. App'x

12

640, 642 (2d Cir. 2012) (summary order) (affirming admission of enhanced recordings where "large portions of the recordings offered by the government were inaudible," but where district court narrowed admissible portions to those that were generally audible and only "contained inaudible portions"); *United States* v. *Chalarca*, 95 F.3d 239, 241, 246 (2d Cir. 1996) (affirming admission of enhanced recording containing key statement which "the district court was unable to discern" but as to which the parties offered competing transcripts); *Arango-Correa*, 851 F.2d at 56, 58-59 (affirming admission of recordings of conversations conducted "entirely in whispers," where recordings "had several inaudible and unintelligible passages"); *United States* v. *Siddiqi*, No. 06 Cr. 377 (SWK), 2007 WL 3125313, at *2 (S.D.N.Y. Oct. 23, 2007) (admitting, over inaudibility objection, Punjabi recordings on which "the voices [we]re often faint, especially compared to the volume of other noise," and in which "the most pronounced occasions of background noise often coincide[d] well with the portion of the Government's English-language transcript that the defendant's interpreter ha[d] identified as unintelligible"); *United States* v. *Walker*, 1999 WL 777885, at *3 (admitting, over inaudibility objection, 24 minutes that the Government chose to offer of a three-hour recording, even though there were "occasional inaudible sections"); *cf. United States* v. *Ben-Shimon*, 249 F.3d 98, 101-02 (2d Cir. 2001) (affirming admission of transcripts of conversations in English and Hebrew where defendant had "specifie[d] no inaccuracy" but simply objected generally to transcript's reliability).

The March 24, 2015 Recording, as enhanced and heard through headphones, is mostly audible and, contrary to Stewart's objections, plainly coherent and relevant.  During the key passage, excerpted above, Robert begins by talking about Stewart, saying that he has trouble getting him on the phone, and is "almost afraid to ask" him questions.  The questions Robert is afraid to ask presumably concern deals Stewart is working on, because the next thing Robert does is recount for Cunniffe the incident, following Robert's illegal Kendle trading in

2011, when the SEC questioned him about the trades and "Sean got nailed by FINRA[,] [q]uestioned on it."  That Robert is referring to Kendle is clear because, as the Government's other evidence will show, (1) the "first time" to which Robert alludes, during which Acquaintance 1 acted on a tip from Robert (and, ultimately, from Stewart), involved Kendle; (2) the SEC in fact questioned Robert about his Kendle trading more than a year after the trading occurred, in 2013; and (3) Stewart "got nailed by FINRA" for failing to identify his father's name on the FINRA Kendle "list."  (*See* Ex. C at 6).

Robert continues his story for Cunniffe by referring to a separate investigation that the Internal Revenue Service ("IRS") had conducted—one during which Robert suspected the IRS "tapped [his] phone."  (*Id.*).  Robert speculates that the SEC's inquiry into Kendle might have stemmed from the IRS's interest.  (*Id.* ("I'm just guessing that all that might have gone back to the IRS.")).  He notes that at the close of the IRS's inquiry the agents warned him that "we might refer you to other civil organizations," "[a]nd then like about a year later I get a call from the SEC questioning me on that [*i.e.*, the Kendle] transaction."  (Ex. C at 7-8).  Robert concludes his musings about the SEC's Kendle questioning by noting his belief that the statute of limitations has run on the Kendle-related conduct.  (Ex. C at 8).  Cunniffe responds that if he had been approached as Robert had, it "[w]ould scare the shit out of me." (*Id.*).

Immediately following this response, Robert says to Cunniffe that he recalls Stewart telling him:  "I can't believe it.  I handed you this on a silver platter and you didn't invest in this, and you know."  (Ex. C at 8).  Robert reports that he responded to his son as follows:  "I said, Sean, did you ever get a call from the SEC, like I'm gonna actually do this [*indiscernible*]."  (Ex. C at 8).  Particularly when viewed in the context of the statements that precede it, the comment Stewart made to Robert, as recounted by Robert to Cunniffe, concerned a tip of material nonpublic information that Stewart had deliberately given to

14

Robert but upon which Robert had failed to act (in his own brokerage account, at least). Stewart was chastising his father for failing to profit from a tip "handed to [him] on a silver platter." What is more, the chastisement plainly occurred sometime during the charged conspiracy, because Robert's response to it incorporated a reference to the SEC's "call," which, as described in the Background section above, occurred in the middle of the conspiracy. What Stewart's chastisement of his father reveals is that Stewart knew very well that he was divulging material nonpublic information to Robert, in blatant breach of fiduciary duties owed to his employers and his clients, with the expectation that Robert would profit from trading on that information.

In short, there is no merit to Stewart's objection that the occasional indecipherable portions of the key passage from the March 24, 2015 Recording rob the statements therein "of any trustworthiness or probative value." (Stewart Mem. at 9). The probative value of these statements is palpable and devastating to Stewart. Moreover, even if the inaudible portions of the recording did inject some ambiguity into the meaning of the words Robert uses—and the Government submits that they do not—that would not be grounds for precluding the evidence. It would merely supply a good faith basis for a defense argument disputing the Government's interpretation. The defense is, after all, free to offer the jury its own understanding—even its own transcript—of the recording, and to argue therefrom.

Finally, on the issue of audibility, Stewart requests in the alternative that the Court conduct an "audibility hearing" out of the presence of the jury. (*Id.* at 10). The Government of course agrees that the Court should listen to the March 24, 2015 Recording before ruling on Stewart's motion, and should review the accompanying transcript. Because the recording is in English, no more elaborate process is warranted, and the Government does not understand the defense to be suggesting otherwise.

### B.     The Probative Value of the March 24, 2015 Recording Far Outweighs Any Purported Prejudice

As discussed above, the probative value of the March 24, 2015 Recording is high. Stewart's insistence to the contrary reduces to nothing more than a competing—and, the Government submits, illogical—theory about the meaning of the statements made on the recording.  (*See id.* at 11 (arguing, contrary to all indications in the recording itself, that the "silver platter" comment must refer to an illegal tip given before the charged conspiracy began)).  Even if Stewart's theory were correct that the "silver platter" comment related to an illegal tip Stewart gave Robert not after but before the Kendle tip, that would hardly be "irrelevant."  (*Id.*).  To the contrary, it would demonstrate that, even prior to the Kendle tip, Stewart acted with deliberate intent that his father trade on material nonpublic information that Stewart was disclosing in breach of his duties.  That is damning proof, and clearly pertinent.

Whereas the probative value of the evidence at issue is high, the only purported "prejudice" Stewart claims will flow from admitting that evidence is the danger that the jury will reject the defense's competing theory and agree with the Government that the "silver platter" comment is indeed as inculpatory as it appears.  "Prejudice" of this kind—that is, an increased likelihood of conviction resulting from the potency of the subject proof—is not something against which a defendant can properly shield himself through invocation of Rule 403.  *See, e.g.*, *United States* v. *Rosario*, No. 09 Cr. 415 (VEC), 2014 WL 6076364, at *3 (S.D.N.Y. Nov. 14, 2014) ("This is not the sort of prejudice against which Rule 403 guards.").

### C.     Stewart's Hearsay Objections Are Baseless

Finally, the statements from the March 24, 2015 Recording are not hearsay.  Those attributed by Robert to Stewart, including the "silver platter" comment, are nonhearsay statements of a party opponent (Stewart), relayed through statements of a co-conspirator

(Robert) made in furtherance of the conspiracy.   *See* Fed. R. Evid. 801(d)(2)(D) (statements "made by a party" are not hearsay); Fed. R. Evid. 801(d)(2)(E) (statements "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay); *see also Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987).  The statements made by Robert which do not repeat statements made by Stewart are likewise admissible as nonhearsay statements of a co-conspirator in furtherance of the conspiracy, again under Rule 801(d)(2)(E).  Both sets of statements are also admissible under the hearsay exception for statements against the declarant's (here, Robert's) penal interest.  *See* Fed. R. Evid. 804(b)(3).

>    i.    *Robert's Statements Are Statements of a Co-Conspirator in Furtherance of the Conspiracy*

To admit a statement pursuant to the co-conspirator rule, "'the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'"   *United States* v. *Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (quoting *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990)).  "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself."  *Id.*  Moreover, "[w]hile idle chatter between co-conspirators does not further a conspiracy," the Second Circuit has "recognized that statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy, further the ends of a conspiracy."  *Id.* (citations, quotation marks, and alteration marks omitted); *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States* v. *Maldonado-Rivera*, 922 F.2d at 958-59.  The foundational facts—*viz.*, that the statement at issue was made in furtherance of a conspiracy that included both the declarant and the party

17

against whom it is offered—need only be established by a preponderance of the evidence. *See Gupta*, 747 F.3d at 124.

That there was an insider trading conspiracy which included both Robert and Stewart is amply established by proof wholly independent of the March 24, 2015 Recording, the contents of which the Court may in any event consider in determining whether these foundational facts have been proved. Stewart's contrary assertion that the "silver platter" comment is the *only* evidence "that implicates Sean Stewart in the conspiracy" is preposterous. (Stewart Mem. at 14). The material nonpublic information on which Robert and Cunniffe traded plainly came from Stewart. Cunniffe will testify that Robert told him as much, and the coincidence of trades with communications between Stewart and Robert will corroborate Cunniffe's testimony. Robert and Cunniffe traded in advance of five separate deals in the healthcare industry, all of which Stewart either worked on or was monitoring. This is strong evidence of Stewart's participation in the insider trading conspiracy. If more were needed to lay the evidentiary foundation (and it is not), the Court need look no further than the fact that Stewart, having been confronted by his employer and FINRA alike with the fact that his father had traded profitably in advance of the Kendle deal, *kept leaking information to Robert* about mergers and acquisitions thereafter, in connection with four separate deals.

Nor can there be any real question that Robert's statements on the March 24, 2015 Recording were in furtherance of the conspiracy—meaning that they informed Cunniffe of "the status of the conspiracy" and were intended to "preserve trust and cohesiveness" among the co-conspirators. *Gupta*, 747 F.3d at 125. The March 24, 2015 meeting occurred only a few months after the latest of the five illegal trading episodes (involving CareFusion), and there is no indication that the conspiracy had ended as of this time, or that Robert had withdrawn from it. *See United States* v. *Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (defendant

must show that he "performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators"); *see also United States* v. *Diaz*, 176 F.3d 52, 98 (2d Cir. 1999) (absent such a step, a defendant's participation in a conspiracy is "presumed to continue until the last overt act by any of the conspirators").[6]  Quite to the contrary, at this very meeting, Robert accepted a $2,500 cash installment of insider trading proceeds.  Moreover, although in the above-excerpted passage Robert is recounting historical events, he is also conveying facts important to preserving Cunniffe's trust, maintaining the integrity of the conspiracy, and preventing its detection.  He is communicating to Cunniffe, among other things, that Stewart has been a willing—even zealous—participant in the illegal trading scheme, and that Robert is being careful not to expose the scheme to authorities.  Statements such as these routinely are viewed as having been made in furtherance of the conspiracy.  *See, e.g.*, *United States* v. *Riley*, -- F. App'x --, 2016 WL 158464, at *4 (2d Cir. Jan. 14, 2016) (affirming admission as co-conspirator statement of recorded call between two members of conspiracy other than defendant, in which declarant states that he is planning to meet defendant on a certain date); *Gupta*, 747 F.3d at 125 (affirming admission of statements made by one co-conspirator to another concerning the timing of a tip from a third member of the conspiracy); *United States* v. *James*, 712 F.3d 79, 105-06 (2d Cir. 2013) (holding that statement providing information about status of conspiracy can be in furtherance thereof).

     *ii.*     *Robert's Statements Are Admissible As Statements Against Penal Interest*

     Finally, even if Robert's statements to Cunniffe were not admissible under Rule 801(d)(2)(E), they would nonetheless be admissible pursuant to the hearsay exception for

---

[6] The fact that *Cunniffe* had, unbeknownst to Robert, withdrawn from the conspiracy and begun cooperating with the Government is of no relevance to the analysis.  *See, e.g.*, *Gupta*, 747 F.3d at 125 (Rule 801(d)(2)(E) does not require that person to whom statement is made also be a member of conspiracy).

statements against penal interest, under Rule 804(b)(3).  The relevant portion of the March 24, 2015 Recording consists of Robert's admissions that his investment banker son has deliberately conveyed material nonpublic information to him, that he traded on some such information (the Kendle tip), that he profited as a result, that "Sean got nailed" for that tip, and that Robert himself was questioned by the SEC about the tip Stewart provided him.  All of these statements tend to prove Robert's guilt of insider trading, are corroborated by other evidence, were made to someone whom Robert "'believe[d] [wa]s an ally,'" and were otherwise made in circumstances that give no reason to doubt the statements' reliability.  *See Gupta*, 747 F.3d at 127 (quoting *United States* v. *Saget*, 377 F.3d 223, 230 (2d Cir. 2004)); *id.* at 128-29 (in insider trading case, affirming admission of recorded statements made by defendant's co-conspirator to other members of the conspiracy under the statement-against-penal-interest exception).  Stewart's hearsay objection therefore cannot be sustained.

## II.     THE COMPLIANCE POLICIES SHOULD BE ADMITTED

The Court should also deny Stewart's motion to exclude from evidence the compliance policies that were in effect at Investment Bank A and Investment Bank B during the periods when Stewart was working at these institutions and leaking highly sensitive information about the institutions' clients and their counterparties to his father.  The Government plans to introduce these policies and related materials, including email circulars reminding Stewart of his employers' insider trading and confidentiality policies, to establish critical elements of the offenses charged.  It should be permitted to do so, and any risk that the jury will be "misled as to the applicable legal standards" (Stewart Compliance Mem. at 1) can be fully addressed through the standard limiting instruction given in insider trading cases where this concern is raised.

To prove Stewart guilty of insider trading, the Government must establish, among other things, that he knowingly breached a fiduciary duty owed to the relevant Investment

Bank and/or its client.  *See, e.g.*, *United States* v. *Newman*, 773 F.3d 438, 451 (2d Cir. 2014);

*United States* v. *Jiau*, 734 F.3d 147, 152-53 (2d Cir. 2013); *S.E.C.* v. *Obus*, 693 F.3d 276,

286-89 (2d Cir. 2012).  Both of the Investment Banks that employed Stewart during the

period of the conspiracy had in place written policies prohibiting the disclosure of

confidential client information and making plain that such disclosure would constitute a

breach of duty by the employee.  Moreover, the Investment Banks kept training logs and

certificates of completion evidencing Stewart's awareness of these policies.  All of these

documents are probative of Stewart's breach and his state of mind, and thus probative of the

charged crimes.  *See S.E.C.* v. *Happ*, 392 F.3d 12, 28-29 (1st Cir. 2004) (insider trading

policy properly admitted because "relevant to establish that Happ had a duty of trust or

confidence, which he violated, to refrain from using material, nonpublic information");

*United States* v. *Anderson*, 533 F.3d 623, 632 (8th Cir. 2008) ("The Zomax corporate policy

regarding sales of its stock by officers was properly admitted into evidence.  It was probative

of the defendant's knowledge of insider-trading laws and of his intent to defraud.").  Not

surprisingly, documents like these are consistently admitted, subject to appropriate limiting

instructions, in insider trading cases in this District.  *See*, *e.g.*, *United States* v. *Riley*, No. 13

Cr. 339 (VEC), 2014 WL 3435721, at *6 (S.D.N.Y. Jul. 14, 2014) (admitting code of ethics

and compliance manual with limiting instruction).[7]  Indeed, the Government is unaware of

*any* insider trading case in which materials of this kind were excluded.[8]

---

[7] Other cases of which the Government is aware in which courts admitted compliance and insider trading policies to prove the elements of breach and knowledge include: *United States* v. *Martoma*, No. 12 Cr. 973 (PGG) (SAC Capital policy and Elan and Wyeth confidentiality agreements); *United States* v. *Steinberg*, No. 12 Cr. 121 (RJS) (SAC Capital policy and public company policies); *United States* v. *Newman*, No. 12 CR 121 (RJS) (Diamondback and Level Global policies and public company policies); *United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (Ropes & Gray policy)*; United States* v. *Contorinis*, No. 09 Cr. 1083 (RJS) (UBS policy); *United States* v. *Gupta*, No. 11 Cr. 907 (JSR) (Goldman Sachs and Procter & Gamble policies); *United States* v. *Fleishman*, No. 11 Cr. 32 (JSR) (policies of numerous public companies); *United States* v. *Whitman*, No. 12 Cr. 125 (JSR) (insider trading policy of

The Government of course does not intend to argue that these policies contain the governing legal standards for the jury to consider, and agrees with Stewart's alternative proposal that the policies be admitted subject to a limiting instruction admonishing the jury not to draw guidance about applicable legal standards from the summaries offered in the policies.  Such an instruction, modeled on the one given by Judge Caproni in the *Riley* insider trading trial, might read as follows:

> During the course of the trial you heard testimony or were shown exhibits regarding the internal compliance policies of [Investment Bank A] and [Investment Bank B].  A violation of a compliance policy or an internal rule is not the same as a violation of the law. You may consider [these] internal polic[ies] as [they] relate[s] to the defendant's state of mind.

*United States* v. *Riley*, No. 13 Cr. 339 (VEC), Trial Transcript at 573.

---

defendant's hedge fund admitted to show defendant's intent; policies of Marvell and Polycom).

[8] None of the cases Stewart cites involved insider trading charges or is otherwise apposite. *See United States* v. *North*, No. 06 Cr. 323 (CFD), 2007 WL 1630366 (D. Conn. June 5, 2007) (excluding "portions" of an antitrust policy that present "legal conclusions as to the scope and meaning of the Sherman Act"; no indication that limiting instruction was requested); *United States* v. *Evans*, 293 F. App'x 63, 68 (2d Cir. 2008) (summary order) (district court properly excluded demonstrative exhibit that "illustrated in graphic form the law of conspiracy as defense counsel understood it"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 544-45 (S.D.N.Y. 2004) (excluding expert opinions "concerning purposed ethical standards based on their personal, subjective views"); *Chisholm* v. *Sloan-Kettering*, No. 09 Civ. 8211 (VM), 2011 WL 2015526, at *8 (S.D.N.Y. May 13, 2011) (excluding administrative law judge's decision); *Hygh* v. *Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (harmless error for district court to admit expert testimony on legal issue in 18 U.S.C. § 1983 action).

## CONCLUSION

The Government respectfully submits that the Court should DENY Stewart's motions to exclude the March 24, 2015 Recording and the Investment Banks' compliance policies.

Dated: New York, New York
       June 10, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney


By:    _____/s/_____
      Sarah Eddy McCallum
      Brooke E. Cucinella
      Assistant United States Attorneys
      Tel.: (212) 637-1033/2477