UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

  - v.-                                        :                S1 15 Cr. 287 (LTS)

SEAN STEWART,                              :

                Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

Sarah K. Eddy
Brooke E. Cucinella
Assistant United States Attorneys

   -Of Counsel-

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

   I.       PROCEDURAL BACKGROUND....................................................................2

   II.      THE EVIDENCE AT TRIAL...........................................................................2

         A.     The Kendle & KCI Tips ........................................................................3

         B.     FINRA's Inquiry....................................................................................5

         C.     The Gen-Probe Tips..............................................................................7

         D.     The Lincare Tips....................................................................................7

         E.     The Interim Before CareFusion .............................................................8

         F.     The CareFusion Tips..............................................................................9

   III.     THE DEFENDANT'S TESTIMONY ...............................................................9

   IV.    THE VERDICT ............................................................................................12

   V.     OTHER RELEVANT FACTS.........................................................................12

ARGUMENT.........................................................................................................................13

   I.       THE APPLICABLE GUIDELINES RANGE IS 63 to 78 MONTHS'
          IMPRISONMENT ..........................................................................................13

         A.     The Court Should Reject Stewart's Gain Arguments..............................13

         B.     The Court Should Apply the Two-Point Enhancement for Obstruction ..15

   II.      A SENTENCE WITHIN THE GUIDELINES IS SUFFICIENT BUT
          NOT GREATER THAN NECESSARY TO SERVE THE GOALS OF
          SENTENCING ...............................................................................................17

         A.     The Nature and Circumstances of the Offense
            Warrant a Guidelines Sentence................................................................17

         B.     The History and Characteristics of the Defendant
            Favor a Guidelines Sentence ...................................................................17

         C.     The Goals of Sentencing Can Only Be Served Here
            With A Substantial Prison Term...............................................................18

   CONCLUSION.......................................................................................................20

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Sean Stewart ("Stewart"), which is scheduled for February 17, 2017, at 2:00 p.m.  For the reasons that follow, a sentence of imprisonment within the properly-calculated United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") of 63 to 78 months is necessary to serve the interests of justice in this case.

Stewart committed grave, serial breaches of the fiduciary duties he owed his clients and employers.  On five separate occasions, he tipped his father with the most closely-guarded, most valuable information entrusted to him, anticipating that his father would use that information to trade securities for profit.  Stewart did so with impunity and without remorse, working to cover his tracks with a carefully crafted web of lies—to an employer that nearly exposed his crimes, to the Financial Industry Regulatory Authority ("FINRA"), to the Securities and Exchange Commission ("SEC"), and, finally, to the jury and the Court during his trial.  Stewart's conduct was brazen, and it spanned many years.

In light of these facts, the goals of sentencing—particularly just punishment, promotion of respect for the law, and adequate deterrence—can only be served by a term of imprisonment within the Guidelines range.  And a Guidelines range predicated on a gain totaling between $550,000 and $1.5 million, as reflected in the Probation Office's calculations, is correct.[1]  Stewart's insistence that he could not reasonably have foreseen profits of $1.16 million flowing from sure bets on five separate mergers and acquisitions runs contrary to both the evidence and common sense.

---

[1] The Government's calculation of the Guidelines range differs from that of the Probation Office only insofar as regards enhancements.  As is customary, the Probation Office offers no view on whether an enhancement for obstruction of justice is warranted based on the defendant's trial testimony.  (*See* Presentence Investigation Report dated Jan. 24, 2017 ("PSR"), at ¶ 160).  For the reasons discussed below, the enhancement should be applied.  As also discussed below, an additional two-level enhancement is warranted for Stewart's abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3.

Finally, while the Government does not question that a Guidelines sentence would work a hardship on Stewart's family, and particularly his son, that reality is not unique to this case. Defendants' crimes often cause the most grief and harm to those closest to them. That Stewart proved willing to risk such hurt to others by engaging in a sustained course of criminal conduct only underscores the need for a very substantial sentence here.

## STATEMENT OF FACTS

### I.     PROCEDURAL BACKGROUND

Superseding Indictment S1 15 Cr. 287 (LTS) (the "Indictment"), filed on July 15, 2015, charged Stewart and his father, Robert Stewart ("Robert"), with nine counts related to insider trading in the securities of five publicly traded health care companies. Count One charged conspiracy to commit securities fraud and tender offer fraud, in violation of Title 18, United States Code, Section 371. Count Two charged conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. Counts Three through Eight charged securities fraud, in violation of Section 10(b) and Rule 10b-5. Count Nine charged tender offer fraud, in violation of Title 15, United States Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d).

On August 12, 2015, Robert pled guilty to Count One pursuant to a plea agreement with the Government. On May 4, 2016, the Court sentenced Robert to a term of four years' probation.

Stewart elected to proceed to trial. Trial commenced on July 25, 2016, and ended on August 17, 2016, when the jury returned a verdict of guilty on all counts of the Indictment.

### II.     THE EVIDENCE AT TRIAL

The evidence at trial established that Stewart, an investment banker first at J.P. Morgan Chase & Co. ("J. P. Morgan") and then at Perella Weinberg LLP ("Perella"), tipped his father with material non-public information about five separate mergers and acquisitions

2

of publicly traded health care companies.  Robert used these tips to generate $1.16 million in trading profits for himself and a co-conspirator, Richard Cunniffe, whom he enlisted to assist with the trading.[2]

### A.     The Kendle & KCI Tips

The charged insider trading scheme spanned from February 2011 through April 2015. The first of the illegal tips charged related to the acquisition of Kendle International Inc. ("Kendle"), an Ohio clinical development services company, by INC Research, LLC ("INC"), a global contract research organization.  (*See* Tr. 497-98).[3]  Stewart, who was then at J.P. Morgan, represented Kendle in negotiations toward the acquisition.  (Tr. 503).  In blatant breach of the duties of trust and confidence he owed Kendle and J.P. Morgan, Stewart tipped his father about the impending acquisition long before public announcement of the deal on May 4, 2011.  (*See* GX 900 (acquisition announcement)).  He did so first over a weekend spent with his parents.  (GX 511, 11).  Based on that first tip, Robert immediately bought Kendle shares and also instructed a colleague, Mark Boccia, to purchase Kendle call options for him.  (Tr. 361-64, 370; GX 11, 12;[4] *see also* GX 1200-T at 3-4 (transcript of recording in which Robert discusses tipping Boccia)).  Stewart's tip was so specific that

---

[2] On May 12, 2015, Cunniffe pled guilty to securities fraud, conspiracy to commit securities fraud and tender offer fraud, tender offer fraud, and conspiracy to commit wire fraud, pursuant to a cooperation agreement with the Government.  He testified at Stewart's trial, and has not yet been sentenced.

[3] "Tr." refers to the transcript of Stewart's trial; "GX" refers to a Government exhibit admitted at trial; "Stewart Mem." refers to the sentencing memorandum Stewart filed with the Court on February 6, 2017; and "Robert Sentencing Tr." refers to the transcript of Robert's sentencing, dated May 18, 2016.

[4] When an investor buys a call option relating to a particular stock, he or she is betting that the stock price will rise above a certain "strike price" before the expiration date of the option. (Tr. 359, 454-55, 641-42).  If the price has not risen to the strike by the expiration date, the option expires worthless and the investor loses the price paid for the option.  (Tr. 360, 455-56).

Robert was able to direct Boccia to buy Kendle call options for him with expiration dates in May 2011—just after what would be the public announcement of the Kendle deal, when Kendle's stock price would be at its height. (Tr. 362, 370). Stewart kept his father informed about the progress of the Kendle deal, tipping him again over a holiday weekend, and then while he and his father were in Long Island together awaiting the hospital discharge of Stewart's mother. (GX 11, 537, 807; *see* Tr. 1198-1200). Robert made approximately $9,290 in profits on his Kendle trades, and received profits from Boccia's Kendle options trading as well. (GX 6-A, 6-C; Tr. 367). Robert used some of these proceeds to pay expenses related to Stewart's July 2011 wedding. (GX 566, 569, 3005, 3008, 3009, 3011-13, 3067, 58 at 73).

Before the Kendle deal was announced publicly, Stewart began tipping his father about another J.P. Morgan deal—one he was not even assigned to, but knew about because of his role in staffing junior people to the deal: the acquisition of Texas medical device company Kinetic Concepts, Inc. ("KCI") by private equity group Apax Partners. (*See* Tr. 120-21, 144-45, 148-49, 158). J.P. Morgan represented KCI in the negotiations. (Tr. 477-78). Using tips he received from Stewart about the impending deal, Robert bought KCI stock in his own account, and again entreated Boccia to purchase call options for him. (GX 15, 16; *see* Tr. 369-70). Robert also approached cooperating witness Richard Cunniffe, who would become his insider trading partner over the years to come. (Tr. 648). Cunniffe, like Boccia, agreed to buy KCI call options on Robert's behalf, and also bought some for himself. (GX 17; Tr. 644-46). Robert told Cunniffe the reason he could not trade options in his own account was that he was "too close to the source." (Tr. 623). Ultimately, following the July 13, 2011 public

announcement of the KCI deal, Cunniffe generated over $102,000 in profits for himself and Robert.  (GX 7-B).[5]

Robert had sold off his own KCI stock long before the KCI announcement—but not out of lack of confidence that the deal would go through.  (*See* GX 7-A).  Rather, he and Stewart had been spooked.  On May 25, 2011, Stewart received an alert that FINRA was investigating trading in Kendle stock in advance of the INC acquisition announcement.  (GX 1003-J).  Stewart was no stranger to FINRA investigations, which were common in the wake of acquisitions of publicly traded companies.  (*See* Tr. 905).  He knew that the next step would be for FINRA to circulate a list of Kendle stock traders to professionals, including Stewart, who had worked on the deal, and ask if they recognized any names.  (*See* Tr. 907).  Stewart knew that, for the first time, his own father would be on that list.  He spoke with Robert that day, and many more times over the days to come.  (GX 2-A).  On June 1, 2011, less than an hour after getting off the phone with Stewart, Robert sold off all his KCI stock.  (*Id.*; GX 7-A).  He would never again buy individual stocks of any kind.  (Tr. 1054).  From then on, he would make sure Stewart's tips were exploited under Cunniffe's name, and in the form of options trading, which FINRA did not monitor.  (*See* Tr. 268).

### B.       FINRA's Inquiry

This pivot came too late, however.  As Stewart had feared, FINRA circulated its Kendle trader list, and Robert's name was on it.  (GX 1003-O, 1803).  Although Stewart no doubt reviewed the list with special care, knowing that his father had traded Kendle, he denied to J.P. Morgan and FINRA that he recognized any names on the list.  (GX 1003-M (email response from Stewart: "don't know anyone")).

---

[5] The KCI deal took longer than expected to announce.  (Tr. 156, 486).  Boccia lost confidence and sold off his options before public announcement of the deal.  (GX 7-C; *see* GX 903).

That did not, however, end the matter.  FINRA staff made the family connection between Stewart and Robert, and pressed J.P. Morgan about whether Stewart had truly denied knowing his own father's name.  (Tr. 264-65, 820).  J.P. Morgan, in turn, pressed Stewart.  (Tr. 820, 825).  He finally acknowledged that his father was on the list, and agreed to an interview about the matter the next day with J.P. Morgan lawyers.  (Tr. 825-26; GX 581).

Two minutes later, Stewart called his father to start getting their stories straight.  (*See* GX 30).  The two men had already made plans to meet that evening, and they followed through with those plans.  (GX 3068, 580).  Later the same night, the evening before Stewart's interview with J.P. Morgan lawyers, Robert sent to Stewart's personal email account a detailed resume of Robert's financial career.  (GX 716).

The next day, August 26, 2011, Stewart submitted to his interview.  (Tr. 892).  He recited nearly verbatim the resume his father had supplied—listing Robert's jobs in internal audit at Chase, and at companies called Lois USA, Yada Yada, Orion, and 3D.  (Tr. 901).  This recitation gave the impression of a savvy financial professional who might have stumbled across Kendle on his own.  Stewart also suggested that his father left his investment decisions in the hands of "money managers," including Robert's Merrill Lynch broker, who had been "at Blackrock."  (Tr. 901-02).

Next, Stewart lied to the J.P. Morgan lawyers about his interactions with his father.  He claimed he spoke with his parents only once or twice a week, did not visit his parents' house at any time between January and May 2011, and spent no vacations with his parents.  (Tr. 902).  In fact, Stewart's communication with his parents was extremely frequent.  (GX 1A, 2A; Tr. 1037).  And he had, in truth, spent the holiday weekend immediately preceding his father's first Kendle trades with his parents.  (*See* GX 511).  Stewart denied ever having even discussed his work with his father, much less having discussed the Kendle deal with him.  (Tr. 893, 902).

6

Stewart's lies worked.  Neither FINRA nor J.P. Morgan took any action against him. (Tr. 903).  A few months later, in October 2011, Stewart made a successful move to Perella. (Tr. 282, 408).  There, clients continued to entrust Stewart with sensitive inside information, and he continued to betray that trust by tipping his father.

### C.    The Gen-Probe Tips

The first of the Perella deals involved the acquisition of San Diego-based medical diagnostics company Gen-Probe Inc. ("Gen-Probe") by Massachusetts medical diagnostics company Hologic, Inc. ("Hologic").  (*See* Tr. 296-97).  Stewart represented Hologic in the negotiations toward the deal, which began in earnest on March 7, 2012.  (GX 686; Tr. 301-03).  A key meeting between top management of the two companies was scheduled to begin April 18, 2012.  (GX 2000; Tr. 315-16).  Days before, Stewart tipped his father, and Robert, in turn, told co-conspirator Cunniffe that Gen-Probe would be the target of a takeover.  (Tr. 709-13).  Cunniffe immediately began buying Gen-Probe call options.  (GX 19; Tr. 713-14). When the deal was announced, on April 30, 2012, Cunniffe made over $181,000 in profits for himself and Robert.  (*See* GX 905, 8).

### D.    The Lincare Tips

Stewart then tipped his father again about an acquisition target.  This time, not only was the target not Perella's client (Perella represented the acquirer), but Stewart was not on the deal team.  Perella's client was a German industrial gas supplier, Linde AG ("Linde"), that wanted to acquire a Florida respiratory services company called Lincare Holdings, Inc. ("Lincare").  (*See* Tr. 515-16, 792-93).  The Friday before Memorial Day weekend, Stewart was asked to work on the case.  (Tr. 794-95; GX 621).  He declined to join the deal team because his son's birth was imminent.  (Tr. 795-97).  Before bowing out, however, Stewart learned the key facts surrounding the anticipated deal, and immediately, over Memorial Day weekend, told his father that Lincare was going to be acquired.  (GX 621, GX 2257).  Robert

relayed the news to Cunniffe, who started trying to buy Lincare call options before the holiday weekend was even over.  (GX 713; Tr. 723-28).  Stewart got his next update about the deal on June 12, 2012.  (GX 625).  The same day, having received an update from Robert that "everything was going okay," Cunniffe made more Lincare trades.  (Tr. 733-34).

When Linde's acquisition of Lincare by means of tender offer was finally announced, on July 1, 2012, Cunniffe and Robert profited to the tune of approximately $414,000.  (*See* GX 909, 9).

### E.   The Interim Before CareFusion

The Linde-Lincare deal was the last in advance of which Robert and Cunniffe would trade for some time.  Throughout the rest of 2012 and into early 2013, Stewart would not become privy to any imminent acquisition announcements involving publicly traded companies.  (*See* GX 1674; Tr. 285-87).  Not coincidentally, Stewart and his father during this period had a serious disagreement over money.  Robert, who often struggled financially, asked Stewart for cash in the fall of 2012.  (GX 2157, 2160).  Stewart obliged, wiring $35,000 on his father's behalf to an entity that Robert had designated.  (GX 2160, 2163, 336 at 2, 337).  When Robert failed to promptly repay the loan, Stewart became incensed.  He threatened legal action and refused to attend an important family event unless the money were repaid in advance.  (GX 2170, 2179).  Eventually, Robert paid back at least part of the money.  (GX 708, 330 at 131, 335 at 29).

Then, on May 15, 2013, Kendle reared up once more to spook Stewart and his father. An SEC investigator who wanted to know why Robert had traded as he had in Kendle left a message at Robert's home.  (*See* GX 31; Tr. 215).  At some point later that day, Robert retrieved the message—likely either directly from the home answering machine or from his wife.  (*See* GX 203 at 1161).  He also spoke with Stewart.  (GX 31).  Not until having done so did Robert then call back the SEC investigator and tell a series of lies that matched the lies

8

Stewart had told J.P. Morgan back in 2011.  (*See id.*; Tr. 215-18).  Robert claimed that his

Kendle trades had been based on his own research (Tr. 216), and that he had never discussed

work with Stewart (Tr. 217).

Again, the lies worked; the SEC closed its investigation.  (Tr. 218).  But Robert was

concerned.  As he would later report to Cunniffe, during in-person discussions that Robert

had no idea were being recorded, Robert declined for some time to invest in tips Stewart

continued to provide.  (GX 1200-T at 6; *see also* GX 1209-T at 5 ("He has actually told me

about some other ones and I just say that, you know what, I don't want to know about it.")).

When Stewart chastised Robert for failing to trade on the tips, chiding, "I handed you this on

a silver platter and you didn't invest in this," Robert asked, "Sean, did you ever get a call

from the SEC, like I'm gonna actually do this."  (GX 1200-T at 6).

### F.      The CareFusion Tips

Robert's greed eventually overcame his newfound reluctance to trade based on

Stewart's information, however.  In the summer of 2014, a San Diego medical device

company called CareFusion Corp. retained Perella to assist in negotiations toward its

acquisition by a New Jersey medical device company, Becton, Dickinson & Co.  (Tr. 321-23,

529, 531).  Stewart was on Perella's deal team (Tr. 323, 531), and he caused his father and

Cunniffe to start trading in the target company's stock just when the deal seemed likely to go

through—around the time of the key management meeting, scheduled for mid-August 2014.

(Tr. 751-56; *see* Tr. 329-31, 533-34 (testimony regarding management meeting)).  When the

deal was announced on October 5, 2014, Cunniffe's well-placed and well-informed trades

generated over $444,000 in profits.  (*See* GX 911; GX 10).

## III.   THE DEFENDANT'S TESTIMONY

Stewart testified in his own defense at trial.  He admitted what he could not deny: that,

in breach of the duties of trust and confidence owed to his clients and his employers, he had

repeatedly leaked material non-public information about upcoming mergers and acquisitions to his father.  What Stewart denied was that he had acted with criminal intent.  (*See, e.g.*, Tr. 1129 ("I never gave my father any information so that he could trade on it or so that he could cause someone else to trade on that information.")).  He admitted that he spoke with his father about his work, but asserted that he did so simply because he "liked discussing what some of our clients were doing to impact patients' lives."  (Tr. 1184).

The only unauthorized disclosures that Stewart acknowledged recalling with any specificity related to Kendle.  Stewart claimed that he spoke to his parents and his then-wife, a litigator at a large New York firm, about the Kendle acquisition before it was announced.  (Tr. 1184-88).  The principal reason he did so, Stewart claimed, was because "the expected time line of the transaction coincided directly with [his] marriage and subsequent honeymoon."  (Tr. 1186).  (This was so even though the transaction was, as long planned, announced a month *before* Stewart's wedding, which occurred on June 4, 2011.  In February 2011, Robert directed Boccia to buy May 2011 Kendle call options that would have expired worthless had the announcement of the deal coincided with Stewart's wedding or honeymoon.  (*See* Tr. 362, 370).)

Stewart testified that he had no idea his father would trade on the Kendle information, and learned of that trading only after J.P. Morgan asked him to take a second look at the FINRA Kendle list, on August 25, 2011.  (Tr. 1233-34).  According to Stewart, during his meeting with Robert on the evening of August 25, the two spoke for the very first time about Robert's Kendle trading, and Robert lied, saying he "had seen a news article about a potential rumor including a sale of Kendle, and that's why he had invested."  (Tr. 1235).  Stewart testified that he did not believe this lie—that he was "confused, ashamed, taken aback," and "wanted to know why [Robert] would do something so foolish, so stupid."  (*Id.*; *see also* Tr. 1340).  "A couple of days later," Stewart purportedly called his father and "told him never to

10

do that again, and he promised that he would not." (Tr. 1237). Stewart denied having spoken to his father ever again about Kendle before his arrest—including in May 2013, when the SEC called Robert. (*Id.*; Tr. 1308). Stewart also denied any recollection of the August 25, 2011 email Robert had sent him containing Robert's detailed resume, or what had prompted it. (Tr. 1238).

Stewart's narrative for the remainder of the charged scheme was that he continued after the FINRA incident to discuss his work with his father, and was "not as careful as [he] should have been" (Tr. 1247) because of the supposed promise his father had made not to trade again (Tr. 1251). Concerning his disclosure of the KCI merger, Stewart said he recalled "saying Kinetic Concepts" in speaking with Robert about a large leveraged buyout J.P. Morgan was working on. (Tr. 1248). Although he initially testified that he would not have mentioned to his family "the name of companies that [he] might not be working with but that were part of something that Perella was working on" (Tr. 1247), Stewart then said that he identified Lincare, a target company not represented by Perella, to his father in the context of a generalized discussion about companies wanting to consolidate in the wake of "Obamacare." (Tr. 1249-50). For Gen-Probe (another target not represented by Perella), and for CareFusion, Stewart asserted a complete lack of recollection concerning the disclosures, aside from a certainty that he had not disclosed the timing or price of either deal. (Tr. 1252-53, 1255-56).

Finally, Stewart addressed his father's surreptitiously recorded report to Cunniffe that Stewart had chided Robert for failing to trade on illegal tips after the May 2013 call from the SEC, saying, "I handed you this on a silver platter and you didn't invest in this." (*See* GX 1200-T at 6). Asked by his counsel, "Did you ever say to your father that you handed him tips on a silver platter?," Stewart responded, "No, I've never said anything like that." (Tr. 1328).

11

## IV.    THE VERDICT

On August 17, 2016, the jury returned a verdict of guilty on all counts of the Indictment.  In doing so, the jury necessarily rejected Stewart's testimony that he did not anticipate his father would trade on the information related to any of the deals.  Put differently, the jury concluded, beyond a reasonable doubt, that Stewart either knew or consciously avoided learning that his father intended to use these incredibly valuable deal tips to trade securities, and that Stewart acted willfully in tipping his father.

## V.    OTHER RELEVANT FACTS

Throughout this case, Stewart has exhibited an utter lack of remorse and responsibility for his actions—extending well beyond mere proclamations of innocence.  In May 2015, shortly after his arrest, Stewart was released on a bond secured by $250,000 in cash or property.  The security he chose to post was $250,000 in cash residing in a UBS account.  Rather than honor his sworn commitment to keep those funds inviolate, Stewart chose to liquidate them for his own benefit.  That he did so in willful disregard of a court order is evident from his own trial testimony, in which Stewart offered as explanation that he believed he "had done nothing wrong," and "was innocent"—beliefs that, in his view, gave him license to take matters into his own hands.  (Tr. 1315-16).[6]

More recently, after the jury's verdict in this case, Stewart sent unsolicited emails to his former employer proclaiming his innocence, blaming others for his conviction, and even trying to tar his former colleagues.  These communications, again, go well beyond disputing his conviction, and reflect an extraordinary lack of remorse and responsibility.

---

[6] Stewart also claimed during his trial testimony that "at the time" he violated his bail conditions by liquidating the relevant funds—that is, in roughly mid- or late 2015—he told his former attorney, Tai Park, Esq., that he was doing so.  (Tr. 1316).  In fact, as Mr. Park explained to the Government in bringing the violation to its attention in January 2016, it was not until then that he learned of the liquidation.

<u>ARGUMENT</u>

I.    **THE APPLICABLE GUIDELINES RANGE IS 63 to 78 MONTHS' IMPRISONMENT**

The Guidelines, as properly calculated to account for the reasonably foreseeable consequences of Stewart's breaches of fiduciary duty, his abuse of a position of trust, and the perjury he committed at trial, yield a range of 63 to 78 months' imprisonment.  The calculations are as follows:

The base offense level is eight, pursuant to U.S.S.G. § 2B1.4(a).  To that base, 14 levels are added because the offense generated gains of no less than $550,000 and no more than $1,500,000.  *See* U.S.S.G. §§ 2B1.1(b)(1)(H), 2B1.4(b)(1).  Next, two more levels are added, pursuant to U.S.S.G. § 3B1.3, because Stewart abused a position of trust in committing his crimes.  Specifically, he was employed "in a position that involved regular participation or professional assistance in" securities transactions.  U.S.S.G. § 2B1.4, cmt. n.2; *see also id.* (contrasting defendant who is "a clerical worker in an investment firm," to whom enhancement would not apply).  Finally, two additional levels are added to reflect Stewart's perjury at trial in this matter, pursuant to U.S.S.G. § 3C1.1.  This yields a total offense level of 26.  Because he is in criminal history category I, the applicable Guidelines range is therefore 63 to 78 months' imprisonment.

A.    **The Court Should Reject Stewart's Gain Arguments**

The Court should reject Stewart's argument that he is not responsible for the total amount of profits generated by his tips—that is, approximately $1.16 million.  Gain, for these purposes, is defined as "the total increase in value realized through trading in securities by the defendant *and persons acting in concert with the defendant or to whom the defendant provided inside information*."  U.S.S.G. § 2B1.4, cmt. background (emphasis added).  The Government assumes, arguendo, that gains are capped at those which were "reasonably

13

foreseeable" to the defendant. *But see United States* v. *Kluger*, 722 F.3d 549, 558-59 (2d Cir. 2013) (holding that this limitation does not apply).

Stewart was acting in concert with, and certainly provided inside information to, his father, Robert.  Robert initially used the tips to trade stocks under his own name.  As Stewart was well aware, however, Robert could not continue trading under his own name and avoid appearing on a FINRA list.  He had to have others trade on his behalf.  Stewart knew this—the circumstantial evidence at trial overwhelmingly demonstrated that he discussed this problem with Robert, and that the two agreed Robert would trade under someone else's name going forward.[7]  Indeed, even if the two had never discussed the matter, Robert's exploitation of the information using another's name and account would have been obvious to Stewart, who (as the jury found) anticipated that his father would trade on his tips even after the FINRA inquiry into Kendle, and never saw his father's name on another FINRA list.  Stewart would also necessarily have foreseen that whoever was agreeing to place Robert's trades likely also exploited the tips for his own benefit.  Accordingly, Stewart "provided inside information" not just to Robert, but to Cunniffe as well.  U.S.S.G. § 2B1.4, cmt. background.  Both Robert's and Cunniffe's profits are therefore attributable to Stewart's breaches—even if one assumes that Robert never explicitly discussed Cunniffe's role in the scheme with Stewart.  *See United States* v. *Riley*, 638 F. App'x 56, 64 (2d Cir. 2016) (affirming district court's attribution to insider defendant of tens of millions of dollars in insider trading gains to hedge fund that tippee relayed information to, where, on a preponderance of the evidence, court could infer that insider knew tippee would pass information to fund); *United States* v. *Martoma*, 48 F. Supp. 2d 555, 564-65 (S.D.N.Y. 2014) (holding tipper defendant liable for

---

[7] Stewart is correct that Robert engaged in some pre-FINRA-inquiry trading in others' accounts.  (Stewart Mem. at 6).  But that in no way undercuts the ineluctable inference that Stewart was aware Robert was using at least one other to make his trades.  Not until the FINRA inquiry hit, and Stewart discussed the inquiry with Robert, did Robert cease trading in his own account entirely and use Cunniffe exclusively.

14

profits generated by fund which was not alleged conspirator of defendant but to which defendant's tippee foreseeably passed inside information).

Moreover, it was certainly foreseeable to Stewart that profits of at least $1.16 million would be generated by trading on tips of the kind he was giving his father.  The information here was not just earnings or sales figures, but forecasts of deals that would ensure a jump in the target company's stock price upon public announcement.  As Stewart himself observed, these were sure bets, handed to Robert "on a silver platter."  And Stewart gave these tips not just once or twice, but *five* times.  He knew that his father had some financial sophistication—indeed, he successfully paraded his father's resume before J.P. Morgan lawyers and compliance personnel to persuade them that Robert had the requisite savvy to identify Kendle as a good investment.  It was plainly reasonably foreseeable to Stewart that Robert, either alone or in concert with whoever he was using to place his trades, would exploit the dynamite tips he was getting to generate very substantial profits.

Against this backdrop, it matters not at all whether Stewart knew Richard Cunniffe's identity, or knew that Robert was using Cunniffe, in particular, to exploit the tips.  (*Cf.* Stewart Mem. at 5-6).  These arguments are red herrings.  The Probation Office has properly calculated the gain under U.S.S.G. § 2B1.4(b)(1).

### B.    The Court Should Apply the Two-Point Enhancement for Obstruction

Under U.S.S.G. §3C1.1, a two-point enhancement for obstruction of justice is warranted because Stewart perjured himself at trial.  He engaged in a "willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition [the Supreme Court has] set out."  *United States* v. *Dunnigan*, 507 U.S. 87, 95 (1993).  More specifically, while "testifying under oath or affirmation," Stewart gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as

a result of confusion, mistake, or faulty memory." *Id.* at 94 (discussing elements of the federal criminal perjury statute, 18 U.S.C. § 1621).

There can be no doubt that these elements are satisfied here. Stewart took the stand and lied deliberately and repeatedly about his interactions with his father. He denied ever having provided material non-public information to Robert with the expectation that that information would be used to trade. Stewart claimed instead that he conveyed information about Kendle because he and his family needed to plan his wedding and honeymoon. (Tr. 1186). This was demonstrably false, because the Kendle transaction was, as long planned, announced a month *before* Stewart's wedding.

To try to explain the other tips, Stewart asserted that his father had promised him not to trade again. (Tr. 1237). Even Robert, in his post-arrest statement to the FBI, would not support this patent lie; he made no mention of any supposed promise, and the jury necessarily rejected Stewart's story about it. Stewart also offered the jury other bogus explanations for his tipping, asserting that he somehow let identities of acquisition targets to slip out as part of general discussions about "Obamacare" (Tr. 1249-50) or in "discussing what some of our clients were doing to impact patients' lives" (Tr. 1184). Stewart even falsely denied having made the comment that Robert—as captured on tape—reported to Cunniffe he had made: "I handed you this on a silver platter and you didn't invest in this." (GX 1200-T at 6). Asked by his counsel, "Did you ever say to your father that you handed him tips on a silver platter?," Stewart responded, "No, I've never said anything like that." (Tr. 1328).

Stewart's testimony, like the lies he told J.P. Morgan and FINRA in 2011, and the lies he coached his father to tell the SEC in 2013, were calculated and intricate. They were certainly willful, and, because they went to the heart of the charges at issue, they were obviously material. The enhancement is warranted.

16

## II.   A SENTENCE WITHIN THE GUIDELINES IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE THE GOALS OF SENTENCING

Applying the factors set forth in Title 18, United States Code, Section 3553(a), a sentence within the applicable Guidelines range of 63 to 78 months' imprisonment is "sufficient, but not greater than necessary" to serve the goals of sentencing.

### A.   The Nature and Circumstances of the Offense Warrant a Guidelines Sentence

First, the nature and circumstances of the offense weigh heavily in favor of a sentence within the Guidelines.  As detailed in the Statement of Facts, Stewart schemed for years to pass highly sensitive and extremely valuable tips to his father.  In doing so, he committed grave breaches of trust and fiduciary duties owed not just to his clients but to his employers as well.  Moreover, Stewart repeatedly used calculated lies to cover up his criminal conduct.

It bears noting that many of these aggravating features of Stewart's conduct are not even reflected in the Guidelines analysis.  The Guidelines calculation would be the same if Stewart had passed just one acquisition tip generating $550,000, and had never lied to anyone before his trial testimony about his conduct.  Yet Stewart persisted with his scheme for years, violating the trust of many different clients and two different employers, and lied to one of those employers and two regulators along the way.

### B.   The History and Characteristics of the Defendant Favor a Guidelines Sentence

The conduct at issue was not a brief aberration for Stewart; it persisted for too long to be classified as such, and the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), are thus reflected in Stewart's sustained scheme.  That history and those characteristics are also reflected in the ease and careful calculation with which Stewart lied to cover his tracks.  When Stewart learned he might get caught in 2011, he worked with his father to get the story straight.  He lied to J.P. Morgan about how much contact he had with Robert, specifically denied having visited with him over the very weekend in which he first

17

tipped him about Kendle, and recited nearly verbatim his father's financial industry credentials to make it appear reasonable that Robert would have identified Kendle as a good investment on his own.  Moreover, having employed these lies with such success, Stewart then persisted in disclosing his clients' and employer's confidences for several years afterward.  His disregard of the duties he owed and his contempt for the law are captured in the communications he had with his father, as relayed by Robert to Cunniffe:  Stewart pressed Robert to trade on tips even after the FINRA inquiry, and chided him when he failed to take advantage of inside information handed "on a silver platter."

Stewart's history and characteristics are also reflected in actions other than the offense conduct proper.  As discussed, Stewart openly flouted a court order requiring him to maintain $250,000 in security for his bond.  He did so not because of a mistake or accident or even desperation, but because, as he stated during his trial testimony, he thought it was his right, given his (purported) belief that he was innocent of the crimes charged.  Stewart has persisted in like manner since his conviction, sending a harassing email to his former employer which tries to point fingers at colleagues.  And Stewart perjured himself at trial, under oath, at great length.  All of these facts support a Guidelines sentence.

### C.    The Goals of Sentencing Can Only Be Served Here With A Substantial Prison Term

In light of the nature and circumstances of the offense, and the history and characteristics of the defendant, a sentence within the properly calculated Guidelines range is necessary to serve the goals of sentencing.  Only a Guidelines sentence will promote respect for the laws Stewart so flagrantly violated, provide just punishment, and adequately deter similar conduct.

Stewart's arguments to the contrary lack merit.  First, a short (or, as Stewart requests, non-existent) prison term would not serve the goals of either specific or general deterrence.  By his own account, as related to the Probation Office, Stewart is actively trying to use

18

headhunters to reenter the financial industry.  (*See* PSR ¶ 194 ("He noted that he had an interview with a private equity firm and has been in discussions with a private financial services company.")).  Particularly in view of his total lack of remorse and prior flouting not just of generally applicable laws but of a court order applicable to him personally, there is no assurance that, absent a substantial prison term, Stewart will abide by the rules going forward.  Nor would a lenient sentence send the appropriate message to others contemplating insider trading; they would see that even a sustained course of criminal conduct, propped up by lies and perjury, warrants little by way of punishment.  Relatedly, the goal of promoting respect for the law would be undercut rather than furthered by a below-Guidelines sentence here.

Second, there is no merit to the argument that an unwarranted sentencing disparity would be effected by imposition of a Guidelines sentence in this case.  (*See* Stewart Mem. at 8).  The Court will recall that it sentenced Robert to a term of probation for reasons very particular to Robert's situation.  Unlike Stewart, Robert accepted responsibility for his crimes.  And Robert, as the Court credited, was the sole caretaker of Stewart's mother— someone Robert represented was ill enough to require near-constant care.  (*See* Robert Sentencing Tr. 29 (Court noting that "[t]he family medical situation is an unusually serious one, and the Court takes at face value the representations which are detailed in the various submissions that other family members are not available to provide regular or even urgent assistance to Mrs. Stewart"); *id.* at 31 ("But for Mrs. Stewart's urgent medical and personal care needs, Mr. Stewart's deliberate and prolonged fraudulent conduct would warrant a custodial term of significant length.")).  The same concerns do not apply here.  The primary caregiver for Stewart's son is his ex-wife.  While his ex-wife understandably hopes, for her son's sake, that Stewart will not serve a substantial prison sentence, it is clear that she is the chief protector of the son's welfare.  The son lives with her, and, as the Probation Office

19

notes, Stewart has been the subject of two separate temporary orders of protection, presumably issued upon his ex-wife's application. (*See* PSR ¶¶ 178 (noting two orders), 181 (noting ex-wife's refusal to discuss the orders)).

Finally, while it is no doubt true that a substantial term of imprisonment will cause grief and hardship to Stewart's family, that factor does not weigh against imposition of a Guidelines sentence. Negative impact on family members is the saddest and also perhaps the most predictable consequence of criminal conduct. Stewart chose to commit his crimes notwithstanding the hurt it would cause those closest to him. The harm he has caused should not inure to his benefit at sentencing.

## CONCLUSION

The Government respectfully submits that a sentence within the Guidelines range of 63 to 78 months' imprisonment is warranted.[8]

Dated: New York, New York
February 10, 2017

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   _____/s/_____
Sarah K. Eddy
Brooke E. Cucinella
Assistant United States Attorneys
Tel.: (212) 637-1033/2477

---

[8] The Government is in contact with the victims of Stewart's breaches about potential restitution, and will provide an update at sentencing.