UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,          :
                                   :
                                   :  MEMORANDUM IN
                                   :  AID OF SENTENCING
     -against-                     :
                                   :  Docket No:  15-CR-287 (LTS)
                                   :
RICHARD CUNNIFFE,                  :
                                   :
          Defendant.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# DEFENDANT RICHARD CUNNIFFE'S
# MEMORANDUM IN AID OF SENTENCING

On May 14, 2015, this Court unsealed an information against Richard Cunniffe, which described a scheme in which he traded securities based upon material non-public information. The same day, Mr. Cunniffe waived prosecution by indictment and pled guilty. In the months and years since, Mr. Cunniffe has cooperated extensively with the government's efforts to prosecute the parties involved in the illegal trading. He wore a wire (twice) to record a meeting with the initial leaker's father—a tipster and defendant himself; he engaged in marathon sessions with the United States Attorney's Office and the FBI providing information and synthesizing financial records; and he was a critical witness in a jury trial against the initial leaker, in a case that ultimately led to a conviction. Since then, he has also been diagnosed with prostate cancer.

Mr. Cunniffe respectfully submits this Memorandum in Aid of Sentencing to request a sentence of one year of probation, forfeiture, and 200 hours of community service.

1

## BACKGROUND

### General Overview

Richard Cunniffe is a sixty-three year old married man living in Medford, New York. Born in New York City, he had three older siblings—two brothers and one sister. His older brothers are 83 and 81 years old, a retired architect and a retired engineer. And his sister passed away nine years ago after a bout with cancer. As the government would likely acknowledge, he is strikingly mild-mannered and humble. He has devoted his life to teaching, finance, and family. And he arrives here on the heels of the worst mistakes of his life.

### Early Beginnings

Mr. Cunniffe grew up in a loving middleclass household in Astoria. He spent most of his immediate-family time with his parents and sister, as his brothers were old enough to have moved out of the house by the time he came of age. By the time Richard was nine years old, all his siblings had left. The family thus moved into a one-bedroom apartment. So at night, Mr. Cunniffe's parents slept in the bedroom and he slept on the family's pullout couch.

In early grammar school, Richard attended "P.S. 85" until his parents transferred him to Immaculate Conception catholic school. In his new surroundings, Richard was often picked on because he was a "public-school kid." He was an average student, but he loved Chess and bowling. So he ultimately became president of the Chess Club and taught bowling as part of the school's youth program.

From these beginnings, Richard devoted himself to getting an education. To that end, in 1972, he pursued a college education at Buffalo State University. There, he majored in Earth Science Secondary Education. And met his first wife, Margaret.

## Richard Graduates from College and Pursues a Career in Teaching
## While his Personal Life Falls Apart.

After graduating college in 1977, Richard began applying for teaching positions in New York City. The process was difficult, and there were initially no openings. But after several years taking other jobs to pay the bills, he finally achieved his goal: He became a high school science teacher (at the Ursuline School in New Rochelle). He blossomed. In addition to teaching, he became active in the school's track and basketball programs. He chaperoned dances and proms. He counseled students that came from broken homes. And he stepped up to be a "surrogate dad" for fatherless students at the school's annual father-daughter dance.

While his teaching career began taking off, his personal life was suffering. Shortly after marrying Margaret, she started cheating on him. This continued with one affair after another—which he knew about, and heart-wrenchingly tried to get her to stop. But she didn't. He put up with the infidelity for years, mostly because he had developed a close relationship with the rest of Margaret's family. But in 1984, he finally had enough and filed for divorce.

### Richard's Father falls Sick, and Richard steers into Graduate School.

In January 1987, Richard's father became ill due to complications stemming from treatment for heart disease. His father had begun investing in the stock market, and Richard knew he would have to be the executor of his father's portfolio when he passed away. Since he had to go to graduate school for his teaching career anyway, he decided that in graduate school he would pursue a degree in Investment Management.

This was a difficult time in Richard's life. When his father was initially hospitalized, he spent days—all day and night—in the hospital with him, sleeping on the waiting room couch.

His father never made it back home, dying in the wintertime. Having finalized his divorce, Richard moved back in with his mother for three years and helped her adjust to life as a widow.

### Mr. Cunniffe enters the world of Finance.

Having obtained a graduate degree in Investment Management, Mr. Cunniffe entered the world of finance in 1989. The next twenty-five years marked his career's rise and fall—and then its tragic descent into the illegal trades in issue.

Mr. Cunniffe's rise happened quickly. In 1989 he was an entry-level analyst; in 1991, he was promoted to second-in-command in his unit; and by 1996, he was the head of his department. During this time, he built a software program to help investors monitor their holdings. And in 1997, Mr. Cunniffe took a new job and built his own proprietary model for investing in "convertible" securities. To this day, apparently, this model still holds up as being very useful.

While Mr. Cunniffe achieved success professionally, he also found his soulmate personally. Having met his loving wife, Kim, over a game of pool in 1989, they married in 1998. They are together to this day.

The decline of Mr. Cunniffe's career began in September 2001. After returning from a trip to Niagra Falls with Kim, he came into the office and learned that his entire department was being terminated. In that instant, he went from being Director of Convertible Research to unemployed. While he landed a job several months later, his mom became ill in 2002 with congestive heart failure. She was put into a nursing home, where he visited her every day. And when his new employer wanted to ship him out to Chicago, he declined to leave his mother behind. So he resigned. And once again Mr. Cunniffe became unemployed.

Toward the end of 2003, Mr. Cunniffe's industry began changing. The skills he had crafted became second-rate in comparison to the new power of computers. So he was out of work for nearly two years. Making matters worse, in 2004, his mother passed away. And about a year later, his sister came down with pancreatic cancer—a battle she waged for four years before she died.

By the time Mr. Cunniffe was getting back onto his feet professionally, he himself had been diagnosed with a blocked heart-artery and developed a condition in which his heart would "skip beats"—which is to say, not beat—sometimes for seven seconds at a time.[1] And of course, by the time the late-aughts hit, the Great Recession had emerged. And in 2010, he was once again unemployed, and this time collecting unemployment insurance.

**Mr. Cunniffe Meets Bob Stewart and Agrees to Participate in the Scheme in Issue.**

Later in 2010, Mr. Cunniffe joined a company called Stafford Partners. Other than making some money from investing in the company itself, however, Richard initially earned no money there. Beyond earning some returns on his investment, he did not begin earning enough money for him to label it a "salary" until about early 2012. Even then, payments were unpredictable. His boss had gone months and months before without paying him a dime, and the choppiness remained. Out of this confusion, Mr. Cunniffe remained on unemployment until the Spring of 2012. He thus collected about three-to-four months' worth of unemployment coverage in 2012 that he likely should not have collected. While this failure did not come to light until he later testified, our understanding is that even the government does not believe he withheld this

---

[1] While his condition has improved, his heart still skips beats in his sleep.

information from anyone maliciously.  Mr. Cunniffe is also in the process of working out a repayment plan for any payments to which he was not entitled.

While at Stafford, however, Mr. Cunniffe did meet and get to know the CFO of the company—a man named Bob Stewart.

One day at work, Mr. Stewart asked Mr. Cunniffe if he (Stewart) could make some trades in Cunniffe's brokerage account.  After all, he said, he had certain "tips" on the market.  Initially thinking these tips were just rumors, Mr. Cunniffe eventually learned that the tips were truly material inside information—and that Stewart's son had a high-powered job and had been leaking this information to Bob.  Together, Mr. Cunniffe and Mr. Stewart invested more and more in four companies based on this inside information—which was about undisclosed plans for mergers and acquisitions.

For this behavior, Mr. Cunniffe was arrested in May of 2015.  He pled guilty on May 14, 2015—the same day the Court unsealed the accusatory instrument against him.  And he has agreed with the government to forfeiture equaling $900,000.00.

**Mr. Cunniffe Cooperates Extensively with the Department of Justice and the FBI.**

Between May 2015 and August 2016, Mr. Cunniffe met with the government whenever he was needed.  He helped the government understand how his scheme had worked.  He helped them account for the monies that had been invested.  He agreed to meet with Bob Stewart while secretly recording their conversation for the government's benefit.  And he ultimately testified on the government's behalf at a jury trial against Sean Stewart.  There, he withstood vigorous cross-examination, but ultimately played a critical role in helping the government obtain a conviction.

In advance of Mr. Cunniffe's sentencing, a variety of friends, family, and former colleagues have stepped forward to write letters on his behalf. As these letters show, Richard Cunniffe is a compassionate, modest, and dependable family man who committed an indefensible offense. He respectfully requests that the Court take this broader view of him into perspective in devising his sentence, and impose a sentence of one year of probation, forfeiture, and 200 hours of community service, which will be sufficient but not greater than necessary to comply with the goals of federal sentencing.

## DISCUSSION

### I. The Requested Sentence Comports with the Factors Described in Title 18, United States Code, Section 3553(a).

#### A. Legal Standard

Under 18 U.S.C. Section 3553(a), the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The statute then provides that in determining the sentence to be imposed, the Court shall consider the following:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed to
   a. reflect the seriousness of the offense, promote respect for the law, and provide for just punishment,
   b. afford adequate deterrence to criminal conduct,
   c. protect the public from further crimes of the defendant, and
   d. provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established [in the Sentencing Guidelines];

(5) Any pertinent policy statement [issued by the Sentencing Commission];

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution to any victims of the offense.

*See* 18 U.S.C. Section 3553(a).

### B. Seriousness of the offense, respect for the law, and providing just punishment

Mr. Cunniffe understands the seriousness of his offense. Insider trading causes enormous financial harm. At its most direct level, it shortchanges investors in a company who play by the rules. By buying and selling ahead of them—based on information they do not yet possess—insider trading steals profits away from honest investors. It also sows distrust into the financial system in general. People invest money in businesses because they trust that they are getting a fair price. Insider trading undermines that trust. It thus curtails people's willingness to invest capital, undermining the strength of financial marketplaces overall.

So the type of fraud involved here affects not only individualized shareholders in a company, but also the market for securities in general. As someone who has dedicated his life to bringing accurate price-discovery to markets, the fact that Mr. Cunniffe committed a crime that undermined those very same marketplaces is mortifying. In his words, "I have added and reinforced the idea that Wall Street professionals have an unfair advantage over individual investors and ... have shaken people's confidence in the market being fair." *See* Exhibit A.

This same sobriety is evident from the wide variety of glowing reference-letters on his behalf. On one side is an array of former colleagues from his days in finance. According to one,

"[t]he most productive years of [his] four-decade career were spent working hand-in-hand with Rick Cunniffe."  *See* Exhibit B (letter from F. Barry Nelson, CFA).  "Rick's character was beyond reproach," he "was a person of integrity who did not play politics," and he proved "forthright, trustworthy, and dependable."  *Id*.  So on one hand, recited this colleague, Mr. Cunniffe helped run an investment fund that "rose to Number One among its peers"; but on the other hand, he also realized that an investment publication that ran weekly—the *Options Survey*—had become inadequate because of volatility that emerged daily.  So "Rick directed the creation of an online *Daily Options Survey* that provided timely information."  *Id*.  Mr. Cunniffe was clearly in love with the inner workings of finance.  But now "Richard Cunniffe's investment career is over."  *Id*.

As other former colleagues add, Mr. Cunniffe "always set a high ethical standard" even when "research teams were under pressure to inflate ratings to produce investment banking revenue."  *See* Exhibit C (letter from Larry Rothman).  He was "a mentor and friend."  *Id*.  He was "so supportive," "completely insensitive to the glamour that often surrounded investor banking," and in the face of others' greedy attempts to promote "more favorable valuations, he would steadfastly refuse and stick to what he had calculated as being a fair price."  *See* Exhibit D (letter from Suzanne VandenBrink).    He was the type of person who read a co-worker's "master's thesis on his own time."  *See* Exhibit C.  But now, deservedly, "he will obviously never work in Finance again" (Exhibit D).

On the other side of Mr. Cunniffe's life are his family and friends, who echo an equally telling depiction of his remorse.  According to one of his older brothers, "[h]is involvement in that activity is completely uncharacteristic of him and our family upbringing."  *See* Exhibit E.  "He is the kind of person who never puts himself first," adds a friend.  *See* Exhibit F (letter from

9

Tom Nestor). "He is a good person with a kind heart," and he "has often expressed deep regret over the poor decisions that he ha[s] made." *See* Exhibit G (letter from Janice Panaro).

That is why Mr. Cunniffe pled guilty the same day the government unsealed its accusatory instrument, why he has worked vigorously to help the government unearth the details of his crimes, why he wore a wire to record a conversation to help the government prosecute others, and why he prepared for and testified at trial in a high-stakes case with vigorous cross-examination: exactly because he respects the law and understands the seriousness of his offense.

### C. Adequate deterrence

The requested sentence—one year of probation, forfeiture, and 200 hours of community service—would provide adequate deterrence to future individuals in Mr. Cunniffe's position. For one thing, the financial penalties associated with Mr. Cunniffe's requested sentence will utterly devastate the well-being of him and his family. The forfeiture alone is more than 30% larger than his net worth. Paying it back will likely take the remainder of his life. *See* PSR ¶197. Moreover, Mr. Cunniffe will never be allowed to work in his chosen field again. He had dedicated decades of his life to learning finance. It is what made him proud. It gave his life professional meaning. And now that is over. After desperately trying to find any type of employment at all, for example, Mr. Cunniffe was recently grateful to land a job at Home Depot. A man in his 60s with cancer, heart disease, and a Master's degree, he was sending off shoppers all day in the parking lot—helping them unpack items into their trunks before they left. He performed this job humbly, the best he could, until he suffered an on-the-job injury carrying heavy equipment. To any third-party observing the steepness of this professional fall—from financial manager and educator to being unable to hold down a job as a parking lot attendant—the story of Richard Cunniffe will prove a harsh deterrent.

At the same time, the requested sentence will contribute to a virtuous cycle in the field of law enforcement.  By granting Mr. Cunniffe a sentence below the Guidelines range, the Court will encourage wrongdoers like him to become cooperators with the same degree of haste and vigor that Mr. Cunniffe demonstrated here.  As the government will likely corroborate, he met repeatedly with the FBI and Department of Justice, testified before a jury in federal court, and helped the government obtain a sophisticated felony conviction.  So the requested below-Guidelines sentence would make such cooperation more likely in the future—saving resources for the government and crime-victims alike.

### D.  Protection of the public

The behavior that led to the present criminal charges is indefensible, but Mr. Cunniffe's community would not be served by sentencing him to prison.  After all, fellow members of his community are well aware of Mr. Cunniffe's crimes, but have still come forward on his behalf for the very purpose of explaining his value, rather than threat, to those fortunate enough to have him in their lives.

One example of his community value is told best by his niece.  "[T]here will always be a little bit of the High School teacher in him," she explains.  When her own mother battled cancer, "he was there to give support and care, both to my parents and to my sisters and me."  *See* Exhibit H (letter from Debra Connelly).  A former colleague reports the same type of compassion:  when their professional department was "eliminated in 2001, he [Cunniffe] was always genuinely concerned with my family, especially the children."  *See* Exhibit C.  As reports yet another family member: Richard "has been one of the most influential people throughout my life" and "a source of great strength and support during my mother's fatal illness."  *See* Exhibit G.  "His absence from our family would be devastating."  *Id*.  "He is a value to his wife, his

11

extended family, and to his community...." Exhibit H.  *See also* Exhibit I ("he was always a contributing member of society").

Overall, Mr. Cunniffe has no criminal history prior to this incident, and he lives a life of compassion, respect, and humility that has drawn a variety of relatives, friends, and colleagues to his side even in his darkest time.  Perhaps the government will even acknowledge that Mr. Cunniffe poses virtually zero likelihood of recidivism.  His community of friends, family, and neighbors will benefit, rather than suffer, from having Mr. Cunniffe back in their lives rather than behind bars.

### E. Educational and vocational training, and medical care and treatment.

Mr. Cunniffe has been diagnosed with prostate cancer.  *See* PSR at ¶182.  *See also* Exhibits J and K (letters from physician).  He also suffers from an irregular heartbeat, and has had a stent "surgically inserted into his heart valve."  *Id.* at ¶183.  He is prescribed medication for hypertension, high cholesterol, and for his prostate.  So if Your Honor imposes a term of imprisonment for Mr. Cunniffe, it is respectfully requested that these medical conditions be taken into account.

### II.   The Court should Depart from the Sentencing Guidelines Range.

As this Court is aware, since *United States v. Booker*, 543 U.S. 220 (2005), the United States Sentencing Guidelines have been advisory rather than mandatory.  In this regard, federal jurisprudence has begun to expose the inherent problems with Guidelines offense levels based on "loss amounts" for financial offenses.  As Judge Gleeson identified, "I begin from the principle that offenders who commit similar offenses and have similar criminal histories should be sentenced similarly . . .[b]ut the fact that two fraud defendants have similar or even identical *Guidelines ranges* does not necessarily mean they committed similar offenses."  *United States v.*

*Ovid*, 2010 WL 3940724, at *7 (E.D.N.Y. 2010) (emphasis in original).  "Sentencing is not scientific," and a defendant's "pure intention at the outset, or his lack of personal profit from the scheme, or his confessions and apologies to his congregation and the SEC, are matters of judgment, not precise calibration." *Id*. at 8.

Here, the requested sentence, which is below the Guidelines range, would be appropriate for three reasons.  One is the extensive set of measures that Mr. Cunniffe undertook in the aftermath of his offense to cooperate with the government, to help it gather audio-recorded evidence, and to testify at trial in a case that ultimately resulted in a conviction.  We understand the government will be submitting a 5K1 letter to the Court describing these efforts.  We respectfully request that the Court consider this degree of cooperation in fashioning its sentence.

Second, the requested sentence accounts for Mr. Cunniffe's behavior in comparison to the other individuals indicted alongside him.  By comparison, the only other party to this scheme who pled guilty was Bob Stewart.  Yet Mr. Stewart did not help the government obtain evidence for trial, nor did he testify.  And Mr. Stewart received a non-prison sentence.  With cooperation efforts that far exceeded Mr. Stewart's, the requested sentence will account for the scale of different roles they played in the government's prosecutions.

Third, finally, Mr. Cunniffe's health further warrants a downward departure.  The Sentencing Guidelines specifically account for defendants' "[p]hysical condition ..., [which] may be relevant in determining whether a departure is warranted ... if ... present to an unusual degree and distinguish[able] ... from the typical cases covered by the guidelines."  *See* USSG § 5H1.4. That is why a "downward departure from the Guidelines" was granted in *United States v. Vaughan*:  because of "the special circumstance of [defendant]'s cancer and family circumstances." 1993 WL 119704, at *2 (S.D.N.Y. 1993).  *See also United States v. Iosifidis*,

13

2016 WL 3267329, at *1 (S.D.N.Y. 2016) (noting "variance downward ... because [defendant] suffers from congestive heart failure"); *United States v. Velasquez*, 762 F. Supp. 39, 40 (E.D.N.Y. 1991) (government agreeing that "defendant's cancer [was] a 'mitigating circumstance'").

Here, Mr. Cunniffe is battling prostate cancer <u>and</u> coronary artery disease. These illnesses—cancer and heart disease—are what killed his mother and sister, respectively. Mr. Cunniffe has undergone a "Cyberknife Radiation Therapy," which has fortunately removed evidence of prostate cancer from his body; but, of course, prostate cancer can recur. *See* Exhibit J. And his heart disease remains. *See* Exhibit K. If the Court decides that some type of incarceration is appropriate for Mr. Cunniffe, then, he respectfully requests that that term be served via home-confinement.

Accordingly, Mr. Cunniffe respectfully requests that the Court consider these efforts in fashioning his sentence—as indicative of his respect for the law, his unlikelihood of recidivism, and his profound remorse.

## CONCLUSION

For the foregoing reasons, Mr. Cunniffe respectfully requests a sentence of one year of probation, forfeiture, and 200 hours of community service.

Dated: Garden City, New York
September 28, 2017

                                                        Respectfully,

                                                        /s/ Bruce Barket
                                                      Bruce Barket, Esq.
                                                      Alexander R. Klein, Esq.
                                                      BARKET MARION EPSTEIN & KEARON, LLP
                                                      666 Old Country Road, Suite 700

Garden City, New York 11530