**Fried, Frank, Harris, Shriver & Jacobson LLP**

**FRIED FRANK**

One New York Plaza
New York, New York 10004
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

Direct Line: 212.859.8592
Fax: 212.859.4000
Email: Steven.Witzel@friedfrank.com

November 26, 2019

**BY HAND AND ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re: *United States v. Sean Stewart*, S1 15 Cr. 287 (JSR)

Dear Judge Rakoff:

On behalf of defendant Sean Stewart, we respectfully submit this letter to assist the Court in his sentencing, which is scheduled for December 3, 2019.

As the Court knows, Sean has already served 13 months' imprisonment in this case. For the reasons set forth below, and as recommended by the Probation Office in the Presentence Investigation Report ("PSR"), a sentence of time served would be a sufficient but not greater than necessary sentence to satisfy the purposes of 18 U.S.C. § 3553(a).

Sean Stewart began working as an investment banker in 2003, steadily accumulating promotions and accolades as he rose through the ranks at JP Morgan and Perella Weinberg. He loved his job, and through a combination of talent and hard work, Sean was poised to be the youngest managing director in Perella Weinberg's history. Sean's future held extraordinary promise.

Sean recognizes that his own actions derailed this bright future. Sean has never disputed that he talked with his father about work and mentioned client names to him, and that he was not forthcoming with his employer once he became aware that his father had purchased Kendle stock. Sean recognizes that he violated his employers' policies and procedures and his duty of confidentiality to his clients, and he acknowledges his failure to change his behavior with his father after Kendle. Sean is determined to do everything in his power to demonstrate that those choices were aberrations and bad judgments within a fraught father-son dynamic, and do not reflect his true character.

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                November 26, 2019
                                                                          Page 2

Sean never executed an improper trade for his own account and did not receive any financial gain from the trading scheme. The division of profits was solely between Robert Stewart and Richard Cunniffe. Sean received nothing, which underscores that his conduct was not venal. There is no allegation that Sean preyed on others or was motivated by his own greed. In fact, Sean was incredibly generous with his time and resources while an investment banker. As the 30 letters submitted to the Court make plain, Sean is a person of faith, a compassionate and generous friend and colleague, and a devoted father. The letter writers have known Sean at every stage of his life, from childhood, to university, to his time as an investment banker, and through fatherhood. In their own words, they explain that even in his darkest time, Sean continues to help others.

Sean has already been punished severely. He was incarcerated for almost 13 months (12 months, 23 days) and has lived in uncertainty since his arrest in May 2015. His relationship with his immediate family has been tested and damaged. He has been deprived of the career he was passionate about, knowing that he will never return to the investment banking work that fulfilled him. Most damaging, he was separated from his young son, whose world was turned upside down by his father's incarceration. Sean does not pose a risk of recidivism, and he is not a danger to the community.

Accepting the jury's verdict, we respectfully submit that given the nature of the offense, Sean's personal history and characteristics, and the punishment he has already suffered, a sentence of time served, as recommended by the Probation Office, is sufficient to satisfy the sentencing purposes of 18 U.S.C. § 3553(a).

## I.    Background

Robert and Sean were both arrested in May 2015. Sean went to trial before the Hon. Laura Taylor Swain, and was convicted in August 2016. He was sentenced to 36 months' imprisonment. At sentencing, Judge Swain recommended that Sean be allowed to spend the maximum amount of time in a halfway house. Sentencing Tr. at 52, *United States v. Stewart*, 15 Cr. 287 (LTS) (S.D.N.Y. Feb. 17, 2017), Ex. 2.

Sean voluntarily surrendered on June 6, 2017. While incarcerated, he incurred no testing or disciplinary infractions. PSR ¶ 11. On June 21, 2018, Sean received a "cop-out" response indicating that his referral packet for a Residential Reentry Center ("RRC") was approved on May 17, 2018, and included a recommendation for up to 12 months in a RRC beginning January 14, 2019. *See* Ex. 3. On June 28, 2018, Sean was released by order of the Second Circuit, having served 13 months of his sentence. The Second Circuit reversed Sean's conviction and remanded the case. Sean was convicted at a retrial in September 2019 before this Court.

It is important and relevant to note that, under the original 36-month sentence, Sean only had limited prison time remaining. Assuming continued good behavior, Sean would have been eligible to transfer to a RRC "halfway house" in just under 200 days. If no RRC had a bed available on January 14, 2019, he would have been forced to stay in prison, despite his eligibility for release, and Judge Swain's recommendation.

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                    November 26, 2019
                                                                              Page 3

In the PSR filed November 26, 2019, the Probation Office recognized that Sean's eligibility for a halfway house was an "important factor[] to be taken into consideration in formulating an appropriate sentence." PSR p.29. Applying the sentencing considerations of 18 U.S.C. § 3553(a), the Probation Office recommended a variance to time served on all counts. *Id.* We respectfully submit that Your Honor should adopt the Probation Office's recommendation and impose a sentence of time.

## II.    Advisory Guidelines Calculation

In determining an appropriate sentence, "[t]he Court's first job [is] to calculate what the sentence would be under the Sentencing Guidelines." *United States v. Adelson*, 441 F. Supp. 2d 506, 508-09 (S.D.N.Y. 2006). The Guidelines are only advisory, and courts may "tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (*en banc*) (citations omitted). Rather than merely accepting a proposed Guidelines sentence as reasonable, a district court must instead "conduct its own independent review of the sentencing factors." *Id.* at 189. For the reasons set forth in Sections III and IV below, "[t]his is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors . . . ." *Adelson*, 441 F. Supp. 2d at 506.

The Probation Office has calculated an advisory guidelines range of 51-63 months based on a total offense level of 24 and a criminal history category of I. This calculation is the result of a base offense level of 8 for insider trading, plus an enhancement of 2 levels for abuse of a position of trust, and an enhancement of 14 levels based on a calculated gain of between $550,000 and $1,500,000. PSR ¶¶ 56-64.

The advisory Guidelines calculation is flawed because it is largely based on a gain calculation of $1.15 million, which includes all of Mr. Cunniffe's profits in both his personal brokerage account and his IRA.[1] PSR ¶ 30. Mr. Cunniffe testified in 2019 that he kept 80 to 90 percent of the trading profits (not including taxes). Ex. 1 at 980:19-21. Mr. Cunniffe testified that he paid Robert Stewart "50 percent of the profits that I made in my personal brokerage account, less any money that I would have to - - anticipate paying for taxes." *Id.* at 737:1-3. Mr. Cunniffe further testified that he did not share with Robert Stewart any of the profits made in his IRA. *Id.* at 737:13-14. Mr. Cunniffe was unable to precisely testify to the amount he shared with Robert Stewart because "[his] hard drive crashed, and basically, [he] lost all the information on [his] computer." *Id.* at 949:12-23. As a result, when asked, "[y]ou don't really know how much money you gave to Bob Stewart on each of the trades?" Mr. Cunniffe answered, "[j]ust a rough estimate, yes." *Id.* at 949:21-23. Mr. Cunniffe's "rough estimate" was that Robert Stewart's profits were "roughly about 125,000" of the total profits of "roughly 1.1 million."[2] *Id.* at 738:1-5.

---

[1]    Sean's objections to the PSR were submitted to the Probation Office and the government on November 14, 2019 and are attached as Ex. 11.

[2]    Robert Stewart's 2016 Consent Order of Forfeiture directed him to forfeit $150,000 as the proceeds of his criminal activity. Dkt. No. 92 at 5, Ex. 12. Mr. Cunniffe testified that he also put $50,000 into a loan on Robert

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                              November 26, 2019
                                                                        Page 4

Under § 2B1.4 of the Sentencing Guidelines, the offense level is increased based on the amount of "gain resulting from the offense." The "gain" is "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . ." United States Sentencing Commission Guidelines Manual § 2B1.4 cmt., backg'd (Nov. 2018) ("U.S.S.G."). While Sean personally received no "gain" from the insider trading, the Guidelines calculation includes the "gain" of those whom the defendant tipped, provided that it was reasonably foreseeable.

The evidence admitted at trial does not support the requisite finding to hold Sean responsible for Richard Cunniffe's trading gains. Under U.S.S.G. § 1B1.3(a)(1)(B), in order for Sean to be held responsible for the acts or omissions of others, those acts or omissions must be "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). As noted in the commentary to U.S.S.G. § 1B1.3(a)(1)(B): "The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." U.S.S.G. § 1B1.3(a)(1)(B) cmt. (n.1). Courts have viewed the "scope of conduct for which a defendant can be held accountable under the sentencing guidelines [a]s significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (citing *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991).

It was not reasonably foreseeable to Sean that Robert Stewart would engage Richard Cunniffe to make trades. And it was certainly not reasonably foreseeable that Mr. Cunniffe would double down by trading in his individual retirement account. Mr. Cunniffe testified he did not know Sean, never spoke with Sean, never emailed Sean or talked to him on the phone, and did not have a relationship with Sean. Ex. 1 at 877:3-4 (Q. "Had you ever spoken directly with Sean before?" A. "No"); *Id.* at 876:4-6 (Q. "At the time you met with the government, did you have a relationship with Sean Stewart?" A. "No, I did not"); *Id.* at 917:21-18:1 (Q. "You don't know Sean Stewart, correct?" A. "No, I do not." Q. "You've never talked to Sean Stewart on the telephone?" A. "No, I have not." Q. "You've never e-mailed with Sean Stewart?" A. "No, I did not").[3] It is undisputed that Mr. Cunniffe never provided any profits to Sean. *Id.* at 866:19-22 (Q. "Over the course of your insider trading activities with Bob Stewart, did you ever provide any of the profits of the trading directly to Sean Stewart?" A. "No, I did not").

There was no evidence at trial of any communication between Sean Stewart and Richard Cunniffe at any point. No evidence at trial suggested even the slightest connection between Sean Stewart and Richard Cunniffe, or that Sean Stewart was ever aware of Richard Cunniffe's

---

Stewart's behalf. Ex. 1 at 964:6-9. At Robert Stewart's sentencing it was stated without objection that, "I believe it is also undisputed that Mr. Stewart . . . received about $100,000, and $50,000 remained with the co-conspirator and never became under Mr. Stewart's control," *i.e.*, the loan. Sentencing Tr. at 5-6, *United States v. Stewart*, 15 Cr. 287 (LTS) (S.D.N.Y. May 4, 2016), Ex. 13. According to the government, "That money is currently being paid back and is being held in escrow with the FBI and it will be ultimately forfeited to the government." *Id.* at 7.

[3]     We note that the government originally and incorrectly submitted, "[i]n the spring of 2012, Robert finally introduced Stewart to Cunniffe, and explained to Cunniffe that Stewart had been the source of the tips on which they had been trading." *See* Dkt. 101 (Gov't's Mem. of Law in Opp. to Def.'s Mots. *in Limine*) at 5.

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                                                                November 26, 2019
                                                                                                                                Page 5

existence, and Mr. Cunniffe's own testimony shows that the two were complete strangers. The same is true for Sean and Mark Boccia. Ex. 1 at 262:25-263:5 (Q. "You've never met Sean Stewart, correct?" A. "Correct." Q. "And you've never communicated with him in any way?" A. "No, no way." Q. "Not by telephone, not by e-mail, right?" A. "Never."). "[T]o be included in an advisory guidelines calculation the intended loss must have been an object of the defendant's purpose." *United States v. Manatau*, 647 F.3d 1048, 1048 (10th Cir. 2011). Cases where courts have ruled trading was reasonably foreseeable involve a completely different set of less attenuated facts. *See, e.g.*, *United States v. Riley*, 638 F. App'x 56, 64 (2d Cir. 2016) (it was reasonably foreseeable that the tippee's employer would trade on information defendant knowingly shared with the tippee); *United States v. Martoma*, 48 F. Supp. 2d 555, 564-65 (S.D.N.Y. 2014) (it was reasonably foreseeable that the portfolio that defendant directed (and other portfolios held by defendant's employer) would avoid losses based on defendant's information).

        As the PSR itself notes, Mr. Cunniffe received information from Robert Stewart— never Sean Stewart, and it was "Robert Stewart [who] enlisted a colleague and friend, Richard Cunniffe, to assist in the insider trading." PSR ¶ 30. There is no evidence that Sean played any role at all with respect to the involvement of Mr. Cunniffe or Mr. Boccia. The government has previously alleged Sean was involved in recruiting Mr. Cunniffe as a result of the Kendle FINRA inquiry. However, that argument makes no sense because the evidence is clear that Richard Cunniffe had traded on two deals using options *prior* to the FINRA inquiry.

        Although Sean maintains he did not discuss deals with his father knowing and intending that Robert Stewart trade on that information, there was evidence at the 2019 trial regarding Sean's awareness of a FINRA inquiry into Kendle stock on which Robert Stewart's name appears. Sean was only aware of one instance in which Robert Stewart traded and had no knowledge concerning Robert Stewart's co-conspirators. Sean should be at most held responsible for Robert Stewart's gains. As Robert Stewart's trading on that occasion amounted to approximately $8,000, *see* PSR p.25, it is that amount, multiplied by the five deals, or $40,000, that could have been clearly foreseeable to Sean. As the Federal Defenders argued at Sean's sentencing before Judge Swain, "We think that the appropriate benchmark since the Court can approximate gain is to look at the trading that Robert Stewart did on his own, which was the initial Kendle trade where he got roughly $8,000. And we think of that as the type of trading that could have been reasonably foreseeable to Mr. Stewart that his father would engage in that. The loss amount should be $40,000." Sentencing Tr. at 4, *Stewart*, 15 Cr. 287, Ex. 2. Alternatively, even including the full extent of Robert Stewart's profits, the offense level would increase by no more than 8 levels because the gain in connection with the offense was more than $95,000 but not more than $150,000. U.S.S.G. § 2B1.1(b)(1)(E). Even assuming *arguendo* that Robert Stewart would enlist another person to assist him in trading after the Kendle FINRA inquiry, and even if Robert's profits were accordingly doubled, or even trebled, or even quadrupled on the subsequent four trades,[4] the offense level would still only increase by the same 8 levels. There is no justification for sentencing Sean based on Mr. Cunniffe's outsized profits.

---

[4]        $8,000 multiplied by four deals yields $32,000. Multiplying that by four again yields $128,000. Adding Robert Stewart's Kendle profits ($8,000) yields $136,000.

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                November 26, 2019
                                                                          Page 6

Accordingly, we respectfully submit that the proper Guidelines calculation would result in an offense level of 18 yielding a sentencing range of 27-33 months.[5]

## III.    A Non-Guidelines Sentence of Time Served is Appropriate

As Your Honor has often noted, the Guidelines are advisory only. The Court must instead carefully consider the factors included in the statute that is the bedrock of federal sentencing, 18 U.S.C. § 3553(a). District judges are directed to "craft an appropriate sentence taking full account of 'the history and characteristics of the defendant,'" *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)), guided by "the judge's own sense of what is fair and a just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Section 3553(a) guides judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of punishment] set forth" in the statute. 18 U.S.C. § 3553(a). We respectfully submit that a sentence within the Guidelines range in this case would be far greater than necessary to satisfy the purposes set forth in Section 3553(a), and that a sentence of time served would be sufficient to accomplish the goals of sentencing.

As the Probation Office recommends, a variance to time served on all counts is appropriate. According to the PSR, "we do not see the purpose in returning the defendant to serve additional prison time and as such, recommend a variance to time served on all counts. We believe the time already served by Stewart addresses the sentencing objectives of punishment and general and specific deterrence. In addition, we feel that it is sufficient but not greater than necessary to comply with the purposes set forth in 18 USC 3553(a)(2)." PSR p.29. Indeed, an analysis of the Section 3553(a) factors strongly favors a sentence of time served for Sean.

---

[5]      The Government has indicated that "based on Stewart's perjury at his first trial, it may be appropriate to add an obstruction enhancement" at his second trial. PSR ¶¶ 51-52. The fact that the jury convicted Sean after he testified in 2016 is not enough to warrant an obstruction enhancement in 2019. Moreover, in order for U.S.S.G. § 3C1.1 to apply, "a district court must review the evidence and make independent findings necessary to establish" that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory" and that the testimony was "part of some greater design to interfere with judicial proceedings." *United States v. Dunnigan*, 507 U.S. 87, 88-89, 93-95 (1993) (citations omitted). Denying guilt under oath, as to the elements of knowledge and intent, as Sean did when he testified in 2016, is not to be treated as "tantamount to obstruction of justice." *United States v. Ben-Shimon*, 249 F.3d 98, 104 (2d Cir. 2001). A defendant has a constitutional right to testify, and there is a "need not to chill a defendant's freedom to assert his constitutional rights . . ." *United States v. Polanco*, 37 F. Supp. 2d 262, 264 (S.D.N.Y. 1999).

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                                November 26, 2019
                                                                                          Page 7

## IV.    Analysis of Section 3553(a) Factors

### A.  Section 3553(a)(1): Sean's History and the Nature and Circumstances of the Offense

Sean was born in 1981, the son of Robert Stewart, a CPA and financial consultant, and Claudia Stewart, a teacher's aide.  He grew up on Long Island with his parents and younger brother, Ryan.  Sean attended Kellenberg Memorial High School, a Catholic school associated with the Marianist brotherhood.  He was also a member of his parish's alter server program. Letter of Rev. Thomas G. Gallagher, Ex. K.

From a young age, Sean had an "amazing drive" that he applied to his entire life from academics, to sports, community activities, and charitable works.  *See* Letter of Claudia Stewart, Ex. V.  Cecile Wren, Sean's elementary school principal, recalled, "Sean was a mature and conscientious student who worked hard to achieve his goals academically, as well as, athletically.  He excelled in his endeavors and was compassionate toward others."  Letter of Cecile Wren, Ex. DD.  He was also a talented athlete whose leadership skills were recognized as he became the captain of several teams.

Despite the effort he put into school work and athletics, ultimately becoming his high school's valedictorian and the president of the National Honors Society, Sean was an active participant in all kinds of charitable activities, volunteering for organizations like Habitat for Humanity, tutoring younger students, and serving at local soup kitchens.  Letter of Claudia Stewart, Ex. V.

Sean continued to excel at Yale University.  And he continued to enjoy helping others. Clinton Dockery, Sean's assigned roommate at Yale writes, "Having a close friend like Sean who was kind, smart, funny, and lacking in pretension made my transition from Kentucky to somewhere entirely different much more tolerable than it could have been.  I will always be grateful to Sean for that."  Letter of Clinton Dockery, Ex. G.  At Yale, Sean also continued to pursue athletics, as a member of the nationally ranked heavyweight crew team.

Sean spent his last summer during college participating in JP Morgan's summer program, and was hired to return after graduation.  And Sean was happy to help others get there with him: Another Yale classmate, David Affinito, recalled Sean using what he knew about the firm from the summer program to help David prepare and succeed in receiving an offer from JP Morgan the next year.  He writes, "I am grateful to this day for Sean's excellent coaching through several rounds of intense interviews."  Letter of David Affinito, Ex. A.

Once at JP Morgan, like most junior investment bankers, Sean worked 80-90 hours a week.  But he loved what he was doing.  He eventually joined the health care group, where he developed a specialty in healthcare devices, and where he found a mentor in Chris O'Connor, a senior healthcare banker.  They worked on numerous deals together, and Sean became a trusted professional.

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                                November 26, 2019
                                                                                         Page 8

At the bank generally, Sean was recognized as a talented leader and good person to have on the team by senior and junior colleagues alike. Saim Korlu, a colleague who oversaw Sean's work recalled, "After a few short projects together, I was so impressed by certain attributes of him that I used whatever levers I had to get him staffed on every project I was on." Letter of Saim Korlu, Ex. S. Sean "loved the business and enjoyed practicing it" and created a positive working environment. *Id.* "Never once did I receive any complaints, actual or hinted whatsoever, from anyone Sean interacted with, colleagues and clients alike. On the contrary, both clients and co-workers liked and respected him." *Id.* Kumar Patodia, another former colleague who was junior to Sean, described him as:

> [O]ne of the most dedicated, hardworking and committed persons I've had the pleasure of working with in any capacity. He is also compassionate, kind and never misses the opportunity to help others. On numerous occasions, I have personally seen him step up to help those around him whenever required.
>
> Sean is the type of person you can count on to keep a cool head in a stressful situation, and his positive attitude is contagious. He was always positive, inspiring, and enthusiastic. Even in difficult situations, he is able to think positively and work towards an amicable solution.

Letter of Kumar Patodia, Ex. U.

In 2011, Sean left JP Morgan to join Chris O'Connor at Perella Weinberg, where he was the second person hired to build out the new healthcare group. Over the next few years the group became very successful for the firm. Despite being an incredibly busy healthcare banker, Sean continued to practice the values instilled in him in his youth, and used his skills and privilege to help others. He was a mentor for Bigs & Littles NYC Mentoring (formerly known as Catholic Big Sisters and Big Brothers) for two years. Letter of Ana Melo, Ex. T. Sean registered his dog Riley as a therapy dog so that he could join the Pet Partners Therapy Animal Program and bring comfort to adults living in senior assisted living facilities and patients at Memorial Sloan Kettering Cancer Center. Sean also used his athletic ability for good, by working with Achilles International, an organization which enables people with disabilities to train for and participate in running events by matching them with volunteers who guide them. Sean also served as a lector at the Church St. Ignatius of Loyola.

Sean married his wife, Elizabeth in 2011. The two were busy -- Sean as a banker and Elizabeth as a judicial law clerk and litigation associate -- but they happily started a family and their son, ███████, was born in 2012. While the two separated in 2014, they continue to work closely together as co-parents to ██████. Elizabeth explains, "We speak nearly every day about parenting matters, and confer with each other concerning all decisions relating to ██████." Letter of Elizabeth Stewart, Ex. W. Adrienne Wing, Associate Director of ██████'s preschool, described the two as "united in their care for their son," and remembers Sean being an active member of the school community, someone who "regularly participated in all aspects of school life, volunteering in the classroom and Book Fair, chaperoning class trips, engaging in parent-

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff

November 26, 2019
Page 9

teacher conferences and attending our many school events." Letter of Adrienne Wing, Ex. CC. Sean's divorce attorney remembers that after the indictment, Sean's foremost concerns related to ████ and Elizabeth's wellbeing, and in particular, "his fear that he would not be able to spend the precious time that a father has with a son during the formative years of a young boy." Letter of Michael Freeman, Ex. J.

As Elizabeth's letter makes clear, Sean is a loving and caring father to ████. "Sean is at the center of our young son's universe; ████ and Sean love each other greatly and have an exceptionally strong bond. . . . Sean's love for ████ is deep and unwavering. He is an exceptionally devoted, attentive and responsible father." Letter of Elizabeth Stewart, Ex. W. Sean and ████ have a special relationship. "████ absolutely adores his father. He shares everything with Sean, often calling him multiple times per day. His father is his best friend, his confidante, and his hero." *Id.* As Elizabeth Stewart explains, "Sean is involved in all aspects of ████'s life." *Id.*

Sean's friends also describe him as a "devoted father"; "an active participant in his son ████'s life." Letter of David Hathaway, Ex. R. As one friend observed, "When I see them together, it is clear that ████ and Sean deeply love each other, and that Sean has been a critical factor in ████'s development." *Id.*

Sean's incarceration was extremely hard on his son, who looks up to him and relies on him for emotional support. Adrienne Wing recalled, "The uncertainty of the first trial and consequent incarceration were understandably challenging for ████, who still struggles to make sense of his family's situation." Letter of Adrienne Wing, Ex. CC. Elizabeth Stewart remembers, "Sean's year-long incarceration after his first conviction was terribly traumatic for ████, and so I know that losing his father a second time would be completely devastating." Letter of Elizabeth Stewart, Ex. W. She writes of the toll Sean's incarceration took on their son:

> I will never forget the day ████, age five, said goodbye to his father when he reported to prison in June 2017. Tears streaming down his cheeks, ████ clung to Sean, not wanting to leave his embrace. It was heart-wrenching to see the anguish on his young face. The ensuing year was difficult for ████. He missed his father terribly, asking about him constantly and struggling to understand his absence. ████'s behavior became erratic and emotional, shifting from overly clingy, to quiet and withdrawn, to irritated and angry. His teachers took note as well and recommended that we consult a therapist as he was clearly missing his father. I did consult a child therapist, who provided guidance and reassured me that ████'s behavior was "a healthy response by a healthy child to an *unhealthy* situation."
>
> Sean's incarceration also took a toll on ████'s physical health. In the fall of 2017, ████ suddenly developed high fevers that would at times reach 105 degrees and that would last several days, recurring approximately every three

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                    November 26, 2019
                                                                      Page 10

weeks. ████████'s pediatrician and specialists informed us that the fevers were not
caused by any infection and the treatment options were limited.

Although ████████ missed his father terribly, he dreaded visiting Sean in prison,
which entailed a nearly four-hour drive each way in a borrowed car. The visits
were traumatic for ████████, who had to see his father confined in a dismal
institution among strangers, wearing prison clothes, supervised by uniformed
prison guards who often ordered us around in harsh tones. ████████ bravely faced
these circumstances with a quiet fortitude (although he sometimes vomited in the
car). However, the day after each prison visit, ████████ would have a violent
temper tantrum, lashing out and crying inconsolably when, for example, he was
asked to put aside a ball that he had played with at the prison with Sean the day
before. Anticipating these outbursts, I tried to plan the prison visits for Saturdays
so that ████████ would be able to stay home the next day. ████████ now tells
people that he "*hates* Pennsylvania" (where the prison was located).

*Id.*

        Once Sean was released from prison, "it was as though a heavy weight had been lifted
from ████████. His behavioral issues immediately disappeared and the recurring fevers stopped
just as abruptly as they had started." *Id.* Today, ████████ is a happy and thriving seven year old.
If Sean were to be incarcerated for a second time, Adrienne Wing notes, "[t]he potential distress
that a repeat outcome would have on ████████ at now age 7, is concerning to me as an educator, a
mother, and a citizen. A second separation would surely cause significant trauma for ████████."
Letter of Adrienne Wing, Ex. CC.

        In addition to being a father, Sean is also a loyal son through the good times and bad,
a constant for others in times of need, someone who always lends a hand, and shows up. As
Claudia Stewart offered, "I invite you to come to our old neighborhood and assure you that those
you meet who know Sean would have nothing but good things to say." Letter of Claudia
Stewart, Ex. V. Sean was raised in an extremely close family that was accustomed to talking on
the phone almost every day (and usually more than once), emailing constantly, and spending
time together as a family. During difficult times, Sean has helped his mother through multiple
serious illnesses and medical procedures. Claudia Stewart recalled Sean's help to her as a
caregiver, someone who was present at her surgeries, and who "often altered his schedule" so he
could be there. *Id.* When his grandmother was suffering from Alzheimer's disease, Sean was
always present. Claudia Stewart recalled, "Up to her final days, Sean always made the time and
effort to call or visit my mother despite how hectic his schedule was." *Id.*

        While tensions occasionally ran high between Sean and his father Robert, they loved and
supported one another unconditionally, and were trusted confidants. As Rev. Thomas G.
Gallagher writes, "some of [Sean's] present difficulties have come about by reason of the
comfort provided him by his familial and father-son relations." Letter of Rev. Thomas G.
Gallagher, Ex. K. Though it will always be a source of deep regret, as a feature of the close

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                    November 26, 2019
                                                                     Page 11

father-son relationship, Sean shared confidential information about his work with Robert, and is
the reason Sean stands before this Court.

Since his arrest in May 2015, Sean's life has been defined by uncertainty. As Ryan
Stewart describes, "While Sean was incarcerated in 2017 and 2018 . . . he has essentially been
mentally, emotionally and physically 'incarcerated' for the last four-and-a-half years." Letter of
Ryan Stewart, Ex. Y. Sean's friend C. Tyler Webb echoes the same sentiment: "As Sean's
friend, the last five years have been difficult to witness . . . For the last five years, his life has
been on hold." Letter of C. Tyler Webb, Ex. BB. Sean has been unable to put the past behind
him and secure steady employment as his case continues to work its way through the courts. But,
even after this almost five year long ordeal, Sean is still a young man, and he has tried to make
the best of his present situation. As Rev. Thomas G. Gallagher writes of Sean's incarceration:

> I, along with a fellow priest, Fr. Floyd Caesar, took it upon myself to visit him
> several times. I left those visits deeply impressed with his personal willingness to
> fulfill that aspect of the court's decision. The visits were totally devoid of any
> rancor and consisted of discussions of current events, family, friends and past
> experiences that we had shared or had knowledge about. His attitude buoyed up
> my spirits that he was coming out of this experience a better man. Letter of Rev.
> Thomas G. Gallagher, Ex. K.

Since his first conviction, Sean has tried to find meaning and give back through work,
family, and service. As his former principal writes, "I believe that Sean realizes the importance
of being a life-long learner." Letter of Cecile Wren, Ex. DD. In 2016, the school hired Sean to
be the head coach of a girls' crew team. Unfortunately, they were forced to let him go a week
later when a parent raised issues about this case and objected to allowing him to coach her child.
PSR ¶ 100. While he will never again work as an investment banker, Sean has done his best to
try to continue the work that he loves, consulting for two separate companies. Michael Breault,
the CEO of SPRiZZi Drink Company writes of the "great pleasure" that it was to work with
Sean:

> As the CEO of SPRiZZi and having recently completed a major investment
> initiative with the Chinese government, I can tell you in 7 ½ years with SPRiZZi,
> Sean is the most professional and trustworthy individual I have worked with
> among my entire team and partners from around the world.
>                                  ***
> Sean has had access to extremely confidential information and has added another
> level of experience and professionalism that is hard to find without extensive
> executive searching. Needless to say, we would really love to continue working
> with Sean in the future as his important insights and strategic thinking has given
> us a fresh perspective that I feel we were missing before him coming aboard. I
> would also say I would refer even my closest business associates to Sean for
> added value to similar projects or positions.

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                November 26, 2019
                                                                 Page 12

Letter of Michael Breault, Ex. E. Eric Stoppenhagen, president of Spartan Micro, Inc., similarly writes, "He has been a great help to my company over the last year. I find him very trustworthy and rely on him for his insight and judgement. His work at Spartan Micro involves capital financing and M&A process. He has been a very productive member of this confidential process. I wish to work with him for many years to come." Letter of Eric Stoppenhagen, Ex. Z. Unfortunately, it has not been financially sustainable for Sean to continue working with SPRiZZi and Spartan Micro at present, but he is eager to pursue similar opportunities. PSR ¶ 98.

Today, Sean spends as much time as he can with ████, volunteering at his school and coaching his sports teams. Ryan Hawkins, Director of Baseball for the Yorkville Youth Athletic Association writes that Sean was "incredibly helpful, often coaching the team by himself, he never missed a week and I could always rely on him to have his team ready for game day. My overall experience of Sean for the time we spent together is that he is a great father and good example for the kids he coached." Letter of Ryan Hawkins, Ex. N.

Sean also is a "loving uncle" and "responsible godfather" and "an extremely active figure" in the lives of his nieces and nephews, someone who is "constantly helping me out by watching and interacting with them." Letter of Ryan Stewart, Ex. Y. Marissa Stewart similarly describes Sean as a "fantastic role model" who "plays baseball with my son ████, plays dolls with my daughter ████ and dresses up in costumes with my daughter ████. My children look up to him and he is such a positive influence on their lives." Letter of Marissa Stewart, Ex. X.

Sean also continues his volunteer work. Since September 2019, he has also done his best to face the future while continuing to help others learn from his mistakes by volunteering his time to speak with business and law students. Debra Cutler, a professor at Rutgers University writes of having Sean participate in her Ethics in Business class:

> During his presentation [on October 9, 2019] he stressed the importance of reading, understanding, and adhering to codes of conduct. He took complete ownership for his lack of professional judgement in sharing confidential information without his firm or client consent with the hope that he could have an impact on student's professional careers by emphasizing the importance of client confidentiality.
>
> Mr. Stewart admitted that what he did was wrong with sincerity and remorse and I had a strong sense that he was trying to find a way to remediate for his past actions.

Letter of Debra Cutler, Ex. F. James Angel, professor at Georgetown University McDonough School of Business agreed, "He very candidly discussed his conviction for insider trading [on October 3, 2019] . . . He was very remorseful, and yet effective in communicating the seriousness of his offense and the consequences. Letter of James Angel, Ex. B. Timothy P. Headley, professor at Fordham University also agreed concerning Sean's October 9, 2019 presentation: "For about 30 years I have been teaching full- and part-time and I can say that I

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                    November 26, 2019
                                                                     Page 13

have had few guest speakers who delivered such a powerful message about the importance of professional obligations and judgment." Letter of Timothy P. Headley, Ex. O. All three professors described their students as being moved by Sean's words. Sean also has upcoming speaking arrangements with law and business students at the University of Alabama, University of New Mexico, Northeastern, and Yale. PSR ¶ 99.

Sean has been upfront about the mistakes he did make. But, "his qualities and traits of caring for others, giving of himself and putting the welfare of others ahead of himself far outweigh any negative." Letter of Claudia Stewart, Ex. V.

In light of the nature of the offense, his time already spent incarcerated, and the roughly five years his life has been on hold, as well as Sean's background, continued good works, and family circumstances, a sentence of time served would be appropriate.

### B. Section 3553(a)(2)(A): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

In light of the facts of the case, particularly the undisputed evidence regarding who financially benefitted from the fraud, the 13 months Sean has already served is sufficient punishment. He also had just under 200 days remaining at the time of release before he would be eligible to go to a RRC. *See* Ex. 3.

Sean will carry with him nine felony convictions that will permanently prevent him from returning to the career he loved and worked extraordinarily hard at for over a decade. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 182, 194 (E.D.N.Y. 2016) (Block, J.) ("The collateral consequences of a felony conviction form[ed] a new civil death" and prevented defendant from pursuing her chosen career). As noted *supra* Section IV.A, Sean has also been in limbo for the past five years, prevented from moving forward with his life.

As also noted *supra* Section II, the bulk of the Guidelines calculation (14 levels) relates to the gain in connection with the offense. Any additional prison time based on that calculation of gain would be unjust under these circumstances. As this Court has stated elsewhere, "What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss . . . " *Adelson*, 441 F. Supp. 2d at 509 (citing Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)).

Rather, as this Court has explained, the "Guidelines loss calculation "plays an overwhelming role that is contrary to . . . elementary notions of justice or even common sense." Sentencing Tr. at 4, *United States v. Rosen,* 11 Cr. 300 (JSR) (S.D.N.Y. May 7, 2012), Ex. 4. *See also* Sentencing Tr. at 13, *United States v. Pinto-Thomaz,* 18 Cr. 579 (JSR) (S.D.N.Y. July 29, 2019), Ex. 5 (Noting the Guidelines "give inordinate weight to the amount of loss"); Sentencing Tr. at 43, *United States v. Gupta,* 11 Cr. 907 (JSR) (S.D.N.Y. Oct. 24, 2012), Ex. 6 (Noting the illogic of assigning defendant "no fewer than 18 points for the resultant but

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                      November 26, 2019
                                                                Page 14

unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny"); Sentencing Tr. at 7, *United States v. Whitman,* 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 14, 2013), Ex. 7 ("I find that the guidelines place far too much emphasis on the alleged monetary gain and don't really address the more important aspects of sentencing reflected in Section 3553(a), which is binding on the court.").

Here, where Sean received no financial benefit whatsoever, it is particularly illogical to base the sentence on financial gain. In November 2014, this Court, as part of an ABA Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes ("ABA Task Force"), submitted a report proposing revisions to the Guidelines. The report recommended that courts consider the "amount of the loss" and its impact on victims. Ex. 8 at 6. Here, as the PSR notes, "There are no identifiable victims in this case and therefore restitution is not an issue." PSR ¶ 50. The ABA Task Force would also require a court to consider "the correlation between the amount of loss and the amount of the defendant's gain," and recommended that an offense be considered less serious if "the defendant's gain from the offense is less than the loss"—here, it is nothing. Ex. 8 at 1, 6-7. As noted above, the Government's cooperating witness and immunized witness both testified they did not know Sean Stewart. Sean did not engage in or control any trading, was not in charge of running the scheme, and did not share in any proceeds of the trading.

Sean has been published severely. A sentence of time served will satisfy the purposes of sentencing; an order to return again to prison, even for a brief period of time, would go far beyond just punishment.

### C. Section 3553(a)(2)(B)&(C): The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public

A sentence of time served would be more than adequate to deter Sean from future criminal conduct. For a father who deeply values his family, the 13 months Sean already spent separated from his young son has caused deep emotional pain. As discussed *supra* Section IV.A, Sean pays a critical role in ██████ 's life and development. He has already missed pivotal life moments with his son—a year is a long time in a young child's life. Nothing could be more motivating for Sean than staying away from any behavior or activity that would have the potential to separate him from ██████ again and ██████ has already been deeply affected by the stress of Sean's prior incarceration.

Furthermore, Sean has tried to move on with his life and find gainful employment. While it has been difficult in light of the uncertainty of the legal proceedings that have overshadowed his life for the past five years, he has tried his best to keep working. There is no doubt that Sean is intelligent and highly capable, and wants to be a productive member of society. There is no evidence that he needs additional specific deterrence to prevent him from sharing confidential information with others—the two employers he has worked for since his incarceration have made clear that they find Sean to be trustworthy. Sean has learned from his mistakes and is eager to keep moving forward. He has already been striving to do good in light of his

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                        November 26, 2019
                                                                          Page 15

conviction, and presenting his cautionary tale to a wide range of business and law students. PSR p.29. Society will be better off with Sean finding gainful employment, co-parenting ████, and caring for his family, as opposed to further incarceration.

The amount of press and reporting on the trial has been relentless and inescapable. For the past five years, Sean's photo has been published in major newspapers worldwide and online, and his name has been inextricably linked to this case and the jury verdicts. Sean's reputation has been permanently damaged, which makes it extremely unlikely that he would recidivate. *Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

The Probation Office also agrees that a variance from the advisory guidelines range to a sentence of time served is appropriate in Sean's case. The Probation Office considered many of the same factors we have set forth in our submission—Sean's limited criminal history, that he is a non-violent offender, his family circumstances, and that he poses a low risk for recidivism. PSR p.29. Further incarceration is not necessary to deter Sean who for the past five years has had his life on hold, particularly when it would mean sending Sean back to prison for the second time. Sean "is unlikely to repeat his transgression, and no further punishment is necessary to achieve [specific deterrence]." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).

Finally, regarding general deterrence, this proceeding has been widely covered in the press. But to the extent that "the only meaningful deterrent to insider trading is prison time," that has already been accomplished by Sean's 13 months spent in prison. Sentencing Tr. at 42, *Pinto-Thomaz*, Ex. 5. This is a meaningful amount of time and is a strong deterrent to insider trading. *See id.* at 43-44 ("I don't think a sentence of anything less than one year sends the necessary general deterrence message, but I'm not convinced that much more, if anything, is necessary to achieve the various functions I have referred to . . . . the court will impose a sentence of 14 months."). The Court has also previously indicated, "common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not. Thus, even a relatively modest prison term should be 'sufficient, but not more than necessary,' for this purpose." Sentencing Tr. at 54, *Gupta*, Ex. 6. As the Probation Office specifically recognized, "the time already served by Stewart addresses the sentencing objectives of . . . general and specific deterrence." PSR p.29.

### D. Section 3553(a)(6): The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct

In determining the correct sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The individuals who profited from this insider trading scheme were Mark Boccia, Richard Cunniffe, and Robert Stewart. Robert Stewart and Richard Cunniffe were both sentenced to probation. Mark Boccia received

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                                November 26, 2019
                                                                                        Page 16

immunity for his testimony. Sean indisputably did not profit from the trading, and to date has served 13 months in prison. Although Sean may have been in a position of trust unlike the others, even a sentence of time served would result in a significant -- if not unwarranted -- disparity.

Regarding sentencing disparities with similarly situated defendants, Sean's original sentence was also an anomaly. Even ignoring Sean's personal character and circumstances, objectively, his sentence involved more prison time than sentences of other insider trading defendants who did receive or were to receive a financial benefit from the insider trading. For example:

- *United States v. Pinto-Thomaz*, 18 Cr. 579 (JSR): Sebastian Pinto-Thomaz was sentenced to 14 months' imprisonment followed by three years of supervised release and a $15,000 fine. Sentencing Tr. at 44, *Pinto-Thomaz*, Ex. 5. Unlike Sean, Mr. Pinto-Thomaz shared tips with the expectation that "there was going to be financial remuneration as a result," an arrangement which he discussed with the tippee in advance. *Id.* at 6.

- *United States v. Whitman*, 12 Cr. 125 (JSR): Doug Whitman was sentenced to 24 months' imprisonment followed by one year of supervised release and a $250,000 fine. Sentencing Tr. at 29, *Whitman*, Ex. 7. Unlike Sean, Mr. Whitman earned approximately $1 million in illegal profits trading technology stocks including Google and Polycom.

*See also United States v. Oakford Corp.*, 98 Cr. 144 (JSR), 1999 WL 1201725, at *10 (S.D.N.Y. Dec. 13, 1999) (downward departure warranted where the offense level for each defendant who pled guilty was increased based on a $15 million gain calculation, but where "each of the defendants personally realized only a small portion of the overall gain or profits").

The 36-month sentence Sean received is one of the longest sentences we are aware of, in the Southern District of New York or elsewhere, for a defendant who did not benefit financially from similar crimes of which they were convicted. Other such defendants were sentenced to significantly less prison time. For example:

- *United States v. McDermott*, 00 Cr. 61 (KMW): James McDermott was sentenced to 8 months' imprisonment followed by two years of supervised release, and a $25,000 fine. Sentencing Tr. at 52, *United States v. McDermott*, 00 Cr. 61 (KMW) (S.D.N.Y. Aug. 3, 2000), Ex. 9. At sentencing, Judge Wood noted, "It is true that Mr. McDermott did not personally receive money as a result of these crimes . . . . However, he derived an important relational benefit through helping a woman with whom he had an intimate relationship, and these profits [of approximately $72,000] likely conferred upon him the financial benefit of diminishing the cash he otherwise would have given her directly." *Id.* at 50.

**Fried, Frank, Harris, Shriver & Jacobson LLP**

Hon. Jed S. Rakoff

November 26, 2019
Page 17

- *United States v. Gansman*, 08 Cr. 471 (MGC):  James Gansman was sentenced to 12 months' imprisonment followed by 6 months of supervised release.  At sentencing, although Mr. Gansman was convicted of tipping on five different occasions, Judge Cedarbaum noted that Mr. Gansman did not personally gain from the trading, and that as a result, "some consideration must be given to the nature and circumstances of this crime to the fact that the defendant did not personally gain" (although the tippee made approximately $390,000).  Sentencing Tr. at 16-17, *United States v. Gansman*, 08 Cr. 471 (MGC) (S.D.N.Y. Feb. 8, 2010), Ex. 10.

- *United States v. Gupta*, 11 Cr. 907 (JSR):  Rajat K. Gupta was sentenced to 24 months' imprisonment followed by one year of supervised release and a $5 million fine.  Sentencing Tr. at 55-56, *Gupta*, Ex. 6.  For Guidelines purposes, the gain in connection with the offense was determined to be $5,032,195.  *Id.* at 49.

Sean did not profit from the trading, nor did he engage in any trading of his own. Requiring Sean to return to prison would therefore create an unwarranted sentencing disparity under 18 U.S.C. § 3553(a)(6).

Fried, Frank, Harris, Shriver & Jacobson LLP

Hon. Jed S. Rakoff                                                                          November 26, 2019
                                                                                                       Page 18

## CONCLUSION

For all of the reasons set forth above, we respectfully request that Your Honor sentence Sean Stewart to a sentence of time served, which would be a sufficient, but not greater than necessary, sentence under the circumstances of this case.

Respectfully submitted,

Steven M. Witzel
Lawrence Gerschwer
R. David Gallo
Leigh G. Rome
One New York Plaza
New York, New York 10004-1980
(212) 859-8000

*Attorneys for Defendant Sean Stewart*

cc:     Richard Cooper, AUSA (by ECF and email)
         Samson Enzer, AUSA (by ECF email)

New York • Washington • London • Frankfurt
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership